NO. 19-1909

UNITED STATES COURT OF APPEALS

FOR THE SEVENTH CIRCUIT

United States of America,
        *Plaintiff—Appellee,*

v.

Orlando Medina,
        *Defendant—Appellant.*

Appeal from the United States District Court
For the Eastern District of Wisconsin
Case No. 15-CR-16
Hon. Pamela Pepper, District Court Judge—Trial Level

**APPELLANT'S BRIEF AND SHORT APPENDIX**

John A. Birdsall
Birdsall Law Offices S.C.
1110 N. Old World 3rd St.
Suite 218
Milwaukee, WI 53203
(414)831-5465

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 19-1909

Short Caption: US v. Medina

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    [   ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    Orlando Medina a/k/a Alejandro Pagan-Ortiz

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Birdsall Law Offices, S.C.

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

        n/a

    ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

        n/a

Attorney's Signature: s/ John A. Birdsall        Date: September 30, 2019

Attorney's Printed Name: John A. Birdsall

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes  X   No _____

Address:  1110 N. Old World Third St., Ste. 218

        Milwaukee, WI 53203

Phone Number: 414.870.5465      Fax Number: 414.831.5465

E-Mail Address: jbirdsall@birdsall-law.com

rev. 01/15 GA

# TABLE OF CONTENTS

Disclosure statement

Table of Contents..................................................................................i
Table of Authorities...........................................................................iii
Jurisdictional Statement......................................................................1
Statement of The Issues.......................................................................2
Statement of The Case.........................................................................3
Summary of The Argument................................................................17
Argument............................................................................................20

I.      This Court should reverse the judgement of conviction because it was clear error for the district court, as factfinder, to base its findings on patently false, contradictory and inherently unreliable evidence that without which there is insufficient evidence of an agreement to distribute cocaine and no rational juror could find such agreement existed beyond a reasonable doubt..............................................................................20

   A.   While an abuse of discretion standard of review is applied when determining whether a district court erred in refusing to exclude evidence, a substantial evidence standard of review must be applied when determining whether the evidence supports the finding of a district court following a bench trial.............................................21

   B.   The existence of the four postal receipts as testified to by the Puerto Rican police officers is physically impossible and incredible as a matter of law......................................................................................22

   C.   The testimony of Rodolfo Duenas, the main evidence offered of an agreement to distribute cocaine, was rejected by the district court as not credible.............................................................................28

   D.   The Arguments of counsel unlawfully relied on perjured testimony and insufficient evidence..............................................................32

   E.   The district court based its finding of guilt on perjured testimony and insufficient evidence..............................................................35

II.     This Court should reverse the district court's denial of the appellant's motion for judgement of acquittal because it was clear error for the district court to base its findings on insufficient, false and contradictory evidence, where, even in the light most favorable to the government, no

rational juror could find that a conspiratorial agreement to distribute cocaine existed...............................................................................44

    A.  A de novo standard of review is applied when determining whether a district court wrongfully denied a motion for judgement of acquittal..45

    B.  The district court denied the appellants motion based on perjured and non-credible testimony and insufficient evidence...........................45

III.    This Court should reverse the judgement of conviction because the knowing use of perjured testimony violates due process.......................47

    A.  A due-process argument that was not made in the district court is reviewed only for plain error.......................................................47

    B.  The appellant's right to due process was violated because of the use of perjured testimony that was central to both the government's arguments and the district court's findings....................................48

Conclusion.................................................................................................50
Certificate of Compliance.........................................................................52
Proof of Service.........................................................................................53
Circuit Rule 30(d) Statement...................................................................54

Short Appendix

# TABLE OF AUTHORITIES

*Cases:*

Dunn v. United States,
   284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932)............................................26
Giglio v. United States,
    405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972)...................................32
Glasser v. United States,
   315 U.S. 60, 62 S.Ct. 457 (1942)..................................................................21
Long v. Butler,
    809 F.3d 299, 311 (7th Cir. 2015).............................................................30
Long v. Pfister,
    874 F.3d 544 (7th Cir. 2017)....................................................................30
Morales v. Johnson,
   659 F.3d 588, 606 (7th Cir. 2011)..............................................................40
Napue v. Illinois,
   360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)............................20, 31, 48
Ross v. Heyne,
   638 F.2d 979 (7th Cir. 1980).................................................................20, 28
U. S. ex rel. Wilson v. Warden Cannon, Stateville Penitentiary,
   538 F.2d 1272 (7th Cir. 1976).....................................................................28
United States v. Agurs,
   427 U.S. 97, S. Ct. 2392, 49 L. Ed. 2d 342 (1976)..........................38, 40, 44
United States v. Alcantar,
   83 F.3d 185 (7th Cir. 1996)..................................................................22, 46
United States v. Allen,
   383 F.3d 644 (7th Cir. 2004)....................................................................38
United States v. Atkinson,
   990 F.2d 501 (9th Cir.1993).....................................................................44
United States v. Bagley,
   473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985)................................36
United States v. Cardena,
   842 F.3d 959 (7th Cir. 2016)....................................................21, 32, 47, 48
United States v. Carrillo,
   435 F.3d 767 (7th Cir.2006)......................................................................21
United States v. Coleman,
   914 F.3d 508 (7th Cir. 2019)....................................................................47
United States v. DiNovo,
   523 F.2d 197 (7th Cir. 1975)....................................................................38
United States v. Emerson,
   501 F.3d 804 (7th Cir. 2007)....................................................................26
United States v. Freeman,
   650 F.3d 673 (7th Cir. 2011)....................................................................48

United States v. Garcia,
   919 F.3d 489 (7th Cir. 2019)............................................36, 37, 39
United States v. Griffin,
   194 F.3d 808 (7th Cir. 1999).....................................................45
United States v. Hunter,
   145 F.3d 946 (7th Cir. 1998)........................................21, 22, 46
United States v. Jones,
   713 F.3d 336 (7th Cir. 2013).....................................................37
United States v. Koeller,
   310 F.2d 409 (7th Cir. 1962).....................................................21
United States v. Maybury,
   274 F.2d 899 (2d Cir.1960)...............................................26, 43
United States v. McClellan,
   794 F.3d 743 (7th Cir. 2015)...............................................22, 46
United States v. Miller,
   829 F.3d 519 (7th Cir. 2016).....................................................21
United States v. Mohamed,
   759 F.3d 798 (7th Cir. 2014).....................................................38
United States v. Perry,
   324 F.2d 871 (7th Cir. 1963).....................................................21
United States v. Ramirez,
   182 F.3d 544 (7th Cir. 1999).....................................................47
United States v. Reed,
   875 F.2d 107 (7th Cir. 1989).....................................................45
United States v. South,
   28 F.3d 619 (7th Cir.1994).......................................................44
United States v. Spikes,
   158 F.3d 913 (6th Cir. 1998).....................................................21
United States v. Van Wyhe,
   965 F.2d 528 (7th Cir. 1992).........................................22, 28, 47
United States v. Wallach,
   935 F.2d 445 (2d Cir.1991).......................................................48
United States v. Wasson,
   679 F.3d 938 (7th Cir. 2012).....................................................21
United States v. Young,
   20 F.3d 758 (7th Cir.1994).......................................................48
Whitlock v. Brueggemann,
   682 F.3d 567 (7th Cir. 2012).....................................................48

*Statutes*:

18 U.S.C. §1621.......................................................................33
18 U.S.C. §1503.......................................................................33

## JURISDICTIONAL STATEMENT

The United States District Court for the Eastern District of Wisconsin had jurisdiction to hear this federal criminal case under 21 U.S.C. §841. Pursuant to 28 U.S.C. §1291, this Court has jurisdiction over appeals from all final decisions of the district courts of the United States. The appeal challenges the district court's judgement and conviction, which that court imposed, entered, and docketed on April 30, 2019. After sentencing, the appellant, Orlando Medina, filed no motion for a new trial or alteration of the judgement, nor any other motion that tolled the time within which to appeal. The appellant filed a notice of appeal, pursuant to Fed. R.App. P. 4(b)(1)(A), on May 10, 2016. Thus, following 28 U.S.C. §1291, this Court has jurisdiction on appeal to hear this federal criminal case.

## STATEMENT OF THE ISSUES

**First Question Presented:**

Whether, in a bench trial, the district court committed clear error when it found beyond a reasonable doubt that sufficient credible evidence existed of a conspiratorial agreement to distribute cocaine despite the physical impossibility of key evidence and the court's own disbelief of the sole co-conspirator's testimony used as corroboration.

**Second Question Presented:**

Whether the district court committed clear error when it denied the appellant's motion for judgement of acquittal despite the physical impossibility of key evidence and the court's own disbelief of the sole co-conspirator's testimony used as corroboration.

**Third Question Presented:**

Whether the use of perjured testimony, central to the government's arguments and the district court's conviction of guilt, violated the appellants right to due process.

## STATEMENT OF THE CASE

*Statement of the Record:*

This is an appeal from a denial of a motion for judgement of acquittal and final judgement entered in the United States District Court for the Eastern District of Wisconsin. On February 3, 2015, a grand jury charged the appellant on one count of conspiracy to distribute a controlled substance involving 500 grams or more of cocaine, in violation of 21 U.S.C. §841. (R. 1). Following the indictment, the appellant entered a not guilty plea to the charge of conspiracy to distribute a controlled substance. (R. 4). On January 8, 2018, the United States District Court for the Eastern District of Wisconsin commenced a bench trial in the appellant's case. (R. 84). On January 10, 2019, during the last day of trial and after the government closed its case-in-chief, the appellant moved the court for a judgement of acquittal, claiming that no reasonable juror could find the appellant guilty beyond a reasonable doubt; the appellant, in this motion, directly questioned the sufficiency of evidence and credibility of the government's witnesses. (R. 100 at pp. 63:20-25, 28:1-25, 29:1-18). The district court denied the appellant's motion to grant a verdict of acquittal after the close of the government's case. (R. 100 at pp. 40:25, 41:1-3). On March 6, 2019, subsequent to the bench trial, the district court, the Honorable Pamela Pepper presiding, found the appellant guilty of one count of the indictment. (R.100: 487). On April 22, 2019, the district court sentenced the appellant to 138 months in prison and five years of supervised release. (R. 126). The district court subsequently entered final judgement on April 30, 2019. This Court was given timely notice of appeal on the final judgement and docketing statement on May 10, 2019. (R. 121).

*Statement of the Facts:*

The case against the appellant, Orlando Medina, a/k/a Alejandro Pagan, a/k/a Mono, a working man and father from Puerto Rico, commenced after law enforcement, guided by Detective Abner Valcarcel, executed a search warrant at the Milwaukee, Wisconsin residence of Rodolfo Duenas, a known drug dealer, (R. 99:287). Previous to executing the search, postal inspectors with the United States Postal Service alerted law enforcement of suspicious packages being sent to Mr. Duenas' residence from Puerto Rico. Following confirmation that the suspicious packages contained cocaine, (R. 98:415-434), the government commenced an investigation. This investigation included a manual comparison of prints on the suspected package sent to Mr. Duenas (R. 99:189-269), and Mr. Duenas's statements that the appellant was involved. Following the investigation, a grand jury ultimately charged the appellant on one count of conspiracy to distribute a controlled substance. In the government's indictment, it alleged that between July 1, 2014, and September 24, 2014, the appellant and Rodolfo Duenas worked together to ship, via the United States Postal Service, large quantities of cocaine between Puerto Rico and Milwaukee, Wisconsin. (R. 98-100, 127).

From the beginning, the appellant claimed that the police in Barceloneta, Puerto Rico, while colluding with Rodolfo Duenas, were framing him for someone else's crimes. (R. 41,69,76,77,81,85). Fully maintaining his innocence, the appellant pled not guilty to sole charge of conspiracy to distribute cocaine, and subsequently requested a bench trial. (R. 4,84). On January 8, 2018, the appellant was tried in the

United States District Court for the Eastern District of Wisconsin, the Honorable Pamela Pepper presiding. (R. 84). During trial, the government called a total of ten witness. The following are facts, which through the government's witnesses were adduced at trial.

Three of the government's witnesses were police officers from Barceloneta, Puerto Rico: Jesus Rivera-Uvergera, Angel Rios-Hernandez, and Luis Nunoz Rosado. Under oath, Jesus Rivera-Uvergera testified that on August 19, 2014, he received a tip from a confidential informant that the appellant was "going to be involved in the transportation of firearms." (R. 98:70-71). Coincidentally, on that same day, Officer Rivera-Uvergera saw the appellant driving a white, four-door Toyota Corolla. *Id*. Officer Rivera-Uvergera informed Officer Angel Rios-Hernandez that the appellant was approaching. *Id*.

It should be noted that Officer Rios-Hernandez and Officer Rivera-Uvergera were not the only officers present at this time; Lieutenant Oscar Cologne, Officer Rios-Hernandez's supervisor, (R. 98:115), was also present on August 19, 2014, and assisted in the investigation. (R. 98:114). During trial, Officer Rios-Hernandez testified that Lt. Cologne was arrested in a corruption scandal in which Lt. Cologne stole evidence from the Barceloneta Police Department's evidence locker. *Id*.

Officer Rios-Hernandez testified that on August 19, 2014, while driving an unmarked police vehicle and wearing plain clothes, he attempted to conduct a traffic stop of the appellant's vehicle after receiving information from Officer Rivera-Uvergera. (R. 98:114). Officer Rios Hernandez claimed that the appellant did not stop

his vehicle, but rather slowed his car and shot at him. (R. 98:109). However, no bullets or bullet casings, although searched for, were ever found. (R. 98:116-118). Officer Rios-Hernandez then testified that after he returned fire at the appellant, the appellant took a multicolored bag and ran into the woods. (R. 98:110-111). Both Officer Rivera-Uvergera and Officer Rios-Hernandez testified that when they approached the vehicle the appellant was driving, it was abandoned. (R. 98:73,111-112). Officer Rios-Hernandez then took custody of the car and stayed with it until it was towed away. (R. 98:111-112).

After the car was towed away, it was taken to the municipal police station and stored in a secured location only accessible by law enforcement. (R. 98:112, 138). Once the car arrived at the police station, Officer Rios-Hernandez while under the supervision of a corrupt lieutenant became "responsible" for the car and personally sealed the doors shut. (R. 98:137). The car sat, sealed, in the secure lot for two days before it was searched; during those two days no effort was made to review security camera footage of the area to ensure nobody tampered with the sealed car. (R. 98:141).

As testified to under oath, on August 21, 2014, Officer Luis Nunoz-Rosado completed a search of the sealed car. (R. 98:124, 132). While searching the car, Officer Nunoz-Rosado found four mail receipts. (R. 98:124). These receipts were later marked as exhibits 17-20. (App. 7-10). During trial, when the government showed Officer Nunoz-Rosado exhibits 17-20, Officer Nunoz-Rosado identified all four exhibits to be the four receipts he recovered during a search of the vehicle the appellant had been driving on August 19, 2014. (R. 98:125). Exhibit 17 was a mail receipt attached to a

6

package sent from Rodolfo Duenas in Milwaukee, Wisconsin on July 31, 2014, to Wilfredo Rosario in Barceloneta, Puerto Rico. (App. 7). Exhibit 18 was a mail receipt attached to a package sent from Rodolfo Duenas in Milwaukee, Wisconsin on August 1, 2014 to Wilfredo Rosario in Barceloneta, Puerto Rico. (App. 8). Exhibit 19 was a mail receipt attached to a package sent from Rodolfo Duenas in Milwaukee, Wisconsin on August 11, 2014 to Wilfredo Rosario in Barceloneta, Puerto Rico. (App. 9).

Exhibits 17-19 were mail receipts that predated the seizure of the vehicle on August 19, 2014. (App. 7-10). However, exhibit 20, as filled out by a postal worker in Milwaukee, Wisconsin, was a mail receipt attached to a package sent from Ramon Robles in Milwaukee, Wisconsin on August 19, 2014, to Antonia Lugosoto in Puerto Rico. (App. 10). As the postal worker noted on exhibit 20, the scheduled date of delivery to Puerto Rico for that package was August 21, 2019, *id.*; two days after the car had been taken into police custody and subsequently sealed (R.98:112,138). Due to the discrepancies raised by exhibit 20, during trial the appellant rightfully objected to the admission of all four receipts—an objection the district court overruled (R. 98:127).

On direct examination, Mr. Duenas testified that he knew the appellant as "Mono." (R. 99:270). Mr. Duenas stated that he was selling drugs for money in 2014 with the appellant, after Duenas had just been released from serving a lengthy sentence in prison. (R. 99:271-272, 279, 287). He testified that the drugs would be shipped in the mail and he would mail the money back to Puerto Rico. (R. 99:272).

Mr. Duenas was shown exhibits 17-19 and stated that those receipts were from when he sent money back to Puerto Rico from Milwaukee. (R. 99:273-275). The attorney for the government began to show Mr. Duenas Exhibit 20 but stopped short. (R. 99:275).

After law enforcement arrested Mr. Duenas on September 24, 2014, when the police executed a search warrant at his house, he was interrogated. (R. 99:278). Mr. Duenas admitted that he knew when he was arrested that he was in a lot of trouble. (R. 99:289-290). He knew that he could be revoked and serve out the remaining ten years of his state sentence on his conviction for possession with intent to distribute a controlled substance. (R. 99: 287-290). He knew that he could get ten to twenty years just for this conspiracy case. *Id.* He knew they could add five more years because of the gun found in his house after his arrest. *Id.* Due to Mr, Duenas' potential exposure, the government asked if it had given him a "deal" and he said "no," (R. 99:279), but he did indicate that he would cooperate, *id.*, because he was gravely ill and only had nineteen months to live "[s]o what [he] wanted was for them to get ahold of – get Mono before [he] died," (R. 99:325). Detective Abner Varcacel also denied that Mr. Duenas was ever signed up as a cooperator. (R. 99:371). However, Detective Valcarcel admitted that he instructed Mr. Duenas to "stay in contact with [him]." (R. 99:386). During the Fall of 2014 Detective Valcarcel refused to say or claimed that he had "no idea" about how many times he met with Mr. Duenas or talked on the phone with him, stating he did not keep record of any of the phone calls or meetings. (R. 99:386-388).

Mr. Duenas was asked about the police interviews he had on September 24, 2014, September 25, 2014, and January 28, 2015. (R. 99). He admitted under cross examination that he "sometimes lies to the police." (R. 99:30). When he was interrogated by Detective Valcarcel at his house on the date of his arrest and asked what was in the package, he lied and said it was cutting agents. (R. 99:291). Mr. Duenas claimed that he had only been doing this for twelve days because, he admitted, he was trying to minimize his involvement. (R. 99:291-292). In seeking some credit with the police for cooperating, he told them "If I give you two deaths, what happens?" (R. 99:293-294). Mr. Duenas further admitted, after being confronted with a transcript of the interrogation, that he asked, in exchange for his cooperation: (1) that he be taken out of state, (2) be given a different name and (3) have no charges brought on this arrest. (R. 99:296-300).  Law enforcement only kept Mr. Duenas in custody at District 2, not the county jail, for that evening.  (R. 99:300, 304). Mr. Duenas was then allowed to make numerous calls (using a cell provided by the police) to his son, Deante Ames; girlfriend, Gloria Martin; and his roommate, Noel.  (R. 99:301, 304). During these phone calls, Mr. Duenas continued to lie and told his son and girlfriend that he did not have anything illegal, and it was all just cutting agent. (R. 99:301). He told them as soon as it was tested, he would be out.  *Id*. Mr. Duenas said that he lied to them because he "didn't want to worry them." (R. 99:301-302).

On September 24, 2014, law enforcement showed Mr. Duenas a picture of the appellant, and Mr. Duenas only told them that the person in the photo was in

Philadelphia and then came to Milwaukee, not to deal drugs, but to visit his three daughters. (R. 99:303).

Then on September 25, 2014, law enforcement showed him another picture of the appellant, asking if Mr. Duenas knew this individual by name, and Mr. Duenas told them that it was a person named Ricky Rivera, and that Ricky was actually shipping the money and drugs with him. (R. 99:305). And that it was Ricky, not Mono, that told him how to do it. (R. 99:307). He told the detectives that "Ricky" came to him in July 2014 and gave him $3500.00 but then testified that he did not because Ricky was in jail in July 2014. (R. 99:354). When confronted about this contradiction, Mr. Duenas testified that it was a different Ricky. *Id.* Mr. Duenas said he only gave the name Ricky because the police asked him who gave him the money, but later admitted that officers never asked about the money and that he was the one that brought it up. (R. 99:357). After hearing about Ricky, law enforcement repeatedly showed Mr. Duenas pictures of Ricky Rivera, but each time Mr. Duenas said, "No, that's Poppo." (R. 99:309-317).

When asked about where the drugs came from, Mr. Duenas continuously changed his story. Mr. Duenas' drug supplier changed from the "The Columbian", to "Noel's dad", to someone named "Javie", and then someone named "Abbie". (R. 99:309-321). In one version of events, Mr. Duenas told law enforcement that Abbie was running a drug operation in prison. (R. 99:321). He then stated that he didn't talk to the "bosses" but talked to Noel who then talked to them. *Id.* But, in the same interview, Mr. Duenas said that he talked directly to the bosses. (R. 99:321-322).

Mr. Duenas' story was never straight, and he even admitted that he had a fake birth certificate and social security number so he could go by the name of Abraham Michado. (R.99:358). He also admitted using the following fake names: Andres Otek Carrosso, Jorge Moreno Ramirex, Roberto Ames, Roberto Chavez, Roberto Chavez Molinda, Rodolfo P. Duenas, Rodolpho Perez Duenas, Rodolfo Peredra Duenas and "a lot more." *Id*. Mr. Duenas never even told his parole officer about what his arrest was for nor did the police. (R. 99:337-338).  When asked if he made a "conscious decision to lie" to his probation officer, Mr. Duenas stated "that's your opinion.  It's a personal matter. My personal matter." *Id*. For the three and half years between Mr. Duenas' arrest and the appellant's trial, Mr. Duenas never told his probation officer the real story behind his arrest.    (R. 99:339-340). Regardless of Mr. Duenas' constant deception to his probation officer and law enforcement, law enforcement released Mr. Duenas from custody, his probation was never revoked and the government never charged him with this, or any, new offense, (R. 99:324), even though Detective Valcarcel agreed that the case against Mr. Duenas was a strong one. (R. 99:376). With that, when asked why Mr. Duenas was not charged, Detective Valcarcel's response was that "it's not unusual" to let a person arrested for a very serious drug offense go without any charges. (R. 99:391).

On March 6, 2019, after the evidentiary portion of the trial, the district court employed the same jury instructions regarding conspiracy in arriving at its guilty verdict,   Specifically, that the district court, as the fact finder, must conclude from the evidence received that a conspiracy existed, and that the appellant knowingly

became a member. (R. 127:510).  In its analysis, the district court summarized what it considered significant in concluding the appellant knowingly became a member of the conspiracy as charged. (R. 127:508-530).

The district court noted that three police witnesses from Puerto Rico testified about a shootout they claim happened on August 19, 2014, where the appellant shot at the police and escaped. (R. 127:515-517).  The district court noted that Officer Jesus Rivera-Uvergera of the Barceloneta Police Department, while sworn under oath, (R. 98:67), testified that he received a tip from an informant that the appellant was transporting guns, (R. 127:513).  The district court stated that Officer Rivera knew the appellant from the community and that he drove a four-door white Corolla. *Id.* The district court noted that he said that the guns were in a multicolored bag, but also noted that Officer Rivera was not present at the alleged shootout. (R. 127:514).

The district court then discussed Officer Rios-Hernandez also of the Barceloneta Police Department who was sworn under oath (R. 98:104, R. 127:515).  The district court noted that Rios-Hernandez saw the appellant driving on a rural highway after being alerted about the tip on the guns.  *Id.*  The district court accepted Officer Rios-Hernandez's claim that after attempting to stop the car, the appellant pulled out a gun and began to shoot at him.  (R. 127:516).  The district court accepted Officer Rios-Hernandez's claim that after a brief chase, the appellant took a multicolored bag and ran away into the "jungle."  *Id.*  As to the car, the district court accepted Officer Rios-Hernandez's testimony and stated: "[a]nd the police eventually came to tow it and

Officer Rios asked for a warrant and that was his involvement in the case."  (R. 127:516-517).

The district court then discussed Officer Luis Nunoz-Rosado of the Barceloneta Police Department who conducted a search of the car recovered by Officer Rios-Hernandez.  (R. 127:518).  Officer Nunoz-Rosado, the district court noted, recovered four U.S. mail receipts all sent from a Milwaukee zip code which were marked as Exhibits 17-20.  *Id*.  The district court noted that one of those, Exhibit 20, was sent from Milwaukee on August 19, 2014 at 3:25 pm, the same day as the alleged shootout between the appellant and the police.  *Id*.

The district court stated that it was a "mystery" how Exhibit 20, a receipt that was sent from Milwaukee on August 19, 2014 at 3:35 pm, could have been found in Mr. Pagan's car in Puerto Rico on the exact same day.  (R. 127:518-519).  Regardless, the district court concluded that this seeming impossibility, even given the sworn testimony about the receipts recovery, was not "sufficient to create reasonable doubt" because this particular receipt was an "outlier."  (R. 127:519).  The district court ruminated that the other three receipts were all addressed to the same address and the same person and were from Rodolfo Duenas. *Id*.  The district court theorizes that Exhibit 20, however, is not from Mr. Duenas and "it's addressed to a different person in Puerto Rico at a different PO box, even in a different town.  It's not even addressed to Barceloneta." *Id*.

The district court concluded: "So I'm not sure how one explains Exhibit 20.  But I don't think that Exhibit 20 creates reasonable doubt as to the discovery of Exhibits

17 through 19.  And I particularly don't think that it creates a reasonable doubt if we go to the next step in the process." *Id*. Before discussing the flow of events of law enforcement in Milwaukee, the district court commented that: "[t]he significance of [exhibits] 17 to 19 in many respects is that it - - those exhibits were the catalyst that tipped off authorities stateside that there was something going on and tipped off the postal inspectors to look for something." *Id*.

In finding the existence of a conspiratorial agreement, the district court addressed the link between the only two alleged collaborators: the appellant and Mr. Duenas. The district court conceded that its opinion of Mr. Duenas' credibility is that he has "something of a tenuous relationship with the truth."  (R. 127:525, R. 100:441).  In it's ruling denying appellant's Rule 29 motion, the district court further noted that "Mr. Duenas clearly lied or gave extremely inconsistent testimony throughout his time on the stand…" (R. 100:441). The district court explained that it agreed with the appellant that there were numerous instances in Mr. Duenas' testimony  where he accuses the appellant of being in charge of the drug operation that were "less than consistent.  *Id*.  For example, the district court notes, Mr. Duenas said that it is a bad idea to lie to the police and then admitting that he lied to the police.  *Id*. The district court emphasized that there were "several examples like that."  *Id*.  Mr. Duenas' testimony was also confusing to the district court.  *Id*.  The district court concluded: "So I don't disagree that Mr. Duenas was certainly not the most reliable witness."  *Id*.

The district court, however, asserts that "one need not rely on Mr. Duenas to make a finding in this case."  (R. 127:526).  The district court points to the fact that:

> [w]hat we already know before Mr. Duenas ever takes the stand is that *there are three mail certificates, mail receipts that were found in the car that Mr. Pagan was driving in Puerto Rico* that show packages being to Mr. Duenas from Barceloneta, or, vice versa, from Mr. Duenas to Barceloneta, and that based on that information the postal service was able to track two other packages which came and one of those packages contained drugs and Mr. Pagan's fingerprints.

*Id.* (emphasis added). The district court then ties those receipts to Mr. Duenas' testimony as confirmation that he knows the appellant and has a history of drug dealing with him by shipping drugs and money back and forth. *Id.* The district court emphasized that it did not "have to rely on Mr. Duenas' testimony in order to determine whether or not it appears whether there is evidence that [the appellant] was involved in a conspiracy to distribute drugs." *Id.* The district court dismissed the idea that Mr. Duenas' credibility should be further discounted because of the apparent lack of any cooperation deal or the fact he was released shortly after his arrest and never charged. (R. 127:526-528).

The district court further concludes, based on the receipts, Mr. Duenas' testimony, and the fingerprints found on a package, that Mr. Duenas and the appellant had a conspiratorial agreement stating:

> the circumstantial evidence includes: *the mail receipts found in his car*; the two packages that came from Puerto Rico to Mr. Duenas when the postal inspection service was surveilling; the package that was opened that had Mr. Pagan's fingerprints on the interior packaging; *and, to some extent, Mr. Duenas's testimony.* The fact that he is not believable in all respects does not mean that he is entirely incredible, and *some portions of his testimony were corroborated by other evidence* in the case.

(R. 127:528-529) (emphasis added). The district court sums up its verdict by stating:

> I believe that while there have been certainly some doubts that the defense has raised about some of these issues, none of those rise to the

level of a reasonable doubt sufficient for me to find that the government
has not proven its case beyond a reasonable doubt.  I believe that the
government has and I do find that the government has proven beyond a
reasonable doubt that Mr. Pagan conspired with people known and
unknown to the grand jury to distribute cocaine, and that the amount of
cocaine that he conspired to distribute was in excess of 500 grams and
therefore I will find him guilty on the count in the indictment.

(R. 127:530).  Following the district court's entry of the final judgement, the appellant

filed a timely notice of appeal.

## SUMMARY OF THE ARGUMENT

This Court should reverse the judgement of conviction because it was clear error for the district court, as factfinder, to base its findings on two main sources of inherently unreliable evidence that an agreement to distribute cocaine existed.

The government's case and the district court's findings that an agreement existed were based on three things: (1) four postal receipts found in the appellants car showing Rodolfo Duenas – the alleged coconspirator - sending a package to an address in Barceloneta, Puerto Rico; (2) testimony from Mr. Duenas that he was instructed by the appellant to receive shipments of cocaine from the appellant in Puerto Rico, sell it, and ship the money back to the appellant; and (3) the existence of the appellant's fingerprints on the shipment of cocaine that was intercepted by law enforcement but delivered by undercover agents to Mr. Duenas who was subsequently arrested.

The first is physically impossible and incredible as a matter of law; and the second is the subject of the district court's own finding of unreliability.    Without them, no rational juror could have found, beyond a reasonable doubt, that the appellant entered into an agreement to distribute cocaine.

The government's introduction of the postal receipts – as a package – involved two officers from the Barceloneta, Puerto Rico police department, Jesus Rivera-Uvergera ("Rivera-Uvergera") and Angel Rios-Hernandez ("Rios-Hernandez") who both claim, under oath, to have been present at an attempted traffic stop and a shootout with the appellant who escaped on August 19, 2014, in Barceloneta, Puerto Rico.

Two days later, on August 21, 2014, Officer Luis Nunoz Rosado searched the car and claims he found *four* mail receipts. At trial he testified, under oath, that *each* of the receipts, marked as exhibits 17-20, were recovered by him on August 21, 2014 from the appellant's white Toyota Corolla. That was a lie.

Exhibit 20 was *not* recovered by Nunoz-Rosado or Rios-Hernandez or anyone else in Puerto Rico on the claimed date of August 19, 2014 because it had only been *created* on August 19, 2014, at 3:25 p.m. by a postal worker in Milwaukee, Wisconsin five hours *after* the alleged chase and shoot out detailed by Rivera-Uvergera and Rios-Hernandez. Most importantly, all the exhibits were claimed to have been found *together*.

The district court brushed aside the exhibit 20 problem by saying it's a "mystery." But the district court then used the *other* three receipts, exhibits 17-19, as corroborating evidence to support the sole coconspirator's claim that he was instructed by the appellant on the shipment of drugs and money. The district court called exhibit 20 an "outlier," but did not attempt to reconcile the problem of the indisputable fact that the receipts were all found *together*.

The district court used strong language in describing Mr. Duenas' lack of credibility including that he mostly lied while testifying and had a "tenuous relationship with the truth." Despite that very firm concern, the district court reasoned that when you couple the receipts that were "found" on August 19, 2014 – the ones that didn't need teleporting – with Mr. Duenas' testimony – the part where he was not pathologically lying - then you have an agreement.

Essentially, the reasoning was that we can ignore the parts of the evidence that are patently untrue even though they are inextricably linked to parts that support a finding of guilt.  This Court should find that the district court cannot rely on obviously perjured and patently false testimony as is the case with both Mr. Duenas and the police witnesses from Barceloneta.  And that no rational jury could have found the existence of a conspiratorial agreement beyond a reasonable doubt even viewing the evidence in the light most favorable toward the government.

This Court should also reverse the denial of the appellant's Rule 29 motion because it was clear error for the district court, as factfinder, to base its findings that an agreement to distribute cocaine existed for the same reasons.  And, finally, this Court should reverse the conviction because it rests on perjured testimony.

## ARGUMENT

**I.    This Court should reverse the judgement of conviction because it was clear error for the district court, as factfinder, to base its findings on patently false, contradictory and inherently unreliable evidence that without which there is insufficient evidence of an agreement to distribute cocaine and no rational juror could find such agreement existed beyond a reasonable doubt.**

The appellant was charged with conspiracy to distribute cocaine in a one person, one count indictment. (R. 1.).  In proving this charge – and particularly the existence of an agreement – the government used perjured testimony from police witnesses about postal receipts and the district court found testimony from an alleged cooperating coconspirator incredible-on-its-face.

Despite this, the district court, in a nonjury trial, both denied the appellant's motion for judgement of acquittal and subsequently found guilt beyond a reasonable doubt. The use of perjured testimony in garnering a criminal conviction is a violation of due process, *Ross v. Heyne*, 638 F.2d 979, 985–87 (7th Cir. 1980), *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), and no rational juror could have found the existence of an agreement beyond a reasonable doubt without the postal receipts and/or the cooperator.  This is particularly true where the district court used the perjured testimony and non-credible witness to "corroborate" each other.  (R. 127:526).

Additionally, the government knew or should have known of the falsity of the receipts when introducing this evidence and arguing for conviction, and the district court did know in its ultimate ruling. In so ruling, the district court both committed plain error as the evidence of an agreement was insufficient and also violated the

20

appellant's due process right to a fair trial. *United States v. Cardena*, 842 F.3d 959, 976–77 (7th Cir. 2016) ("Undoubtedly, it violates due process for the government to obtain a conviction by the knowing use of perjured testimony."). It is also clear, as the appellant will show, that there is a likelihood that the false testimony affected the judgment of the district court *Id.*

> **A. While an abuse of discretion standard of review is applied when determining whether a district court erred in refusing to exclude evidence, a substantial evidence standard of review must be applied when determining whether the evidence supports the finding of a district court following a bench trial.**

A district court's refusal to exclude evidence is reviewed under the abuse of discretion standard. *United States v. Hunter*, 145 F.3d 946, 951 (7th Cir. 1998). A district court abuses its discretion where "it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard. *United States v. Spikes*, 158 F.3d 913, 927 (6th Cir. 1998). Furthermore, when reviewing a district court's verdict, an appellate court is concerned solely with a substantial evidence question. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457 (1942); *United States v. Koeller*, 310 F.2d 409, 410 (7th Cir. 1962); *United States v. Perry*, 324 F.2d 871, 872 (7th Cir. 1963). Therefore, this Court must overturn the district court's final decision if it is decided that, after viewing the evidence in the light most favorable to the prosecution, "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Wasson*, 679 F.3d 938, 949 (7th Cir. 2012); *United States v. Miller*, 829 F.3d 519, 524 (7th Cir. 2016); *United States v. Carrillo,* 435 F.3d 767, 775 (7th Cir.2006). In viewing the evidence in light

most favorable to the prosecution, this Court will find that no rational trier of fact could have found the appellant guilty. Accordingly, this Court should reverse the judgement of conviction entered in this matter on April 30, 2019.

### B. The existence of the four postal receipts as testified to by the Puerto Rican police officers is physically impossible and incredible as a matter of law.

A witness' testimony is incredible as a matter of law if it was "either impossible for the witness to observe that which he or she claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all." *United States v. Hunter*, 145 F.3d 946, 949–50 (7th Cir. 1998); *United States v. Alcantar*, 83 F.3d 185, 189 (7th Cir. 1996), *United States v. McClellan,* 794 F.3d 743, 753 (7th Cir. 2015*) United States v. Van Wyhe*, 965 F.2d 528, 531 (7th Cir. 1992).

It is physically impossible for exhibit 20 to have been one of the four receipts that the government "proved" were in the appellant's car in Barceloneta, Puerto Rico seized on August 19, 2014. A United States postal worker created exhibit 20 three thousand miles away from Puerto Rico on the same day officers testified they seized the appellant's car. (App.10). Given this fact it is evident that the police from Barceloneta, Puerto Rico lied about finding that receipt in the appellant's car.

On the government's part, the introduction of exhibits 17-20 was perfunctory. Officer Angel Rios-Hernandez testified that on August 19, 2014, while driving an unmarked police vehicle and wearing plain clothes, he attempted to conduct a traffic stop of the appellant's vehicle after receiving information from Officer Jesus Rivera-Uvergera. (R. 98:114). Officer Rios-Hernandez claimed that the appellant did not stop

his vehicle, but rather slowed his car and shot at him. (R. 98:109). However, no bullets or bullet casings, although searched for, were ever found. (R. 98:116-118). Officer Rios Hernandez then testified that after he returned fire at the appellant, the appellant took a multicolored bag and ran into the woods. (R. 98:110-111). Both Officer Rivera-Uvergera and Officer Rios-Hernandez testified that when they approached the vehicle the appellant was driving, it was abandoned. (R. 98:73,111-112). Officer Rios-Hernandez then took custody of the car and stayed with it until it was towed away. (R. 98:111-112).

After the car was towed away, it was taken to the municipal police station and stored in a secured location only accessible by law enforcement. (R. 98:112, 138). Once the car arrived at the police station, Officer Rios-Hernandez while under the supervision of a corrupt lieutenant (Lieutenant Oscar Cologne who was subsequently arrested for stealing from the police evidence locker (R. 98:114)) became "responsible" for the car and personally sealed the doors shut. (R. 98:137). The car sat, sealed, in the secure lot for two days before it was searched; during those two days no effort was made to review security camera footage of the area to ensure nobody tampered with the sealed car. (R. 98:141).

As testified to under oath, on August 21, 2014, Officer Luis Nunoz-Rosado completed a search of the sealed car. (R. 98:124, 132). While searching the car, Officer Nunoz-Rosado testified that he found four mail receipts. (R. 98:124). These receipts were later marked as exhibits 17-20. (App. 7-10). During trial, when the government showed Officer Nunoz-Rosado exhibits 17-20, Officer Nunoz-Rosado identified *all*

*four* exhibits as the four receipts he recovered during a search of the vehicle the appellant had been driving *on August 19, 2014*. (R. 98:125, App. 7-10).  The exhibits contained the following relevant information:

| Exhibit No. | From: | To: | "Origin:" Zip Code | "Origin:" Date | "Origin:" Time | Scheduled Delivery |
|---|---|---|---|---|---|---|
| Exhibit 17 | Rodolfo Duenas Piedras 825 N. Mitchell St., Apt. C Milwaukee, WI 53204-3532 | Wilfredo Rosario HC01 Box 5037 Barceloneta, PR 00617 | 53204 | 7/21/14 | 9:52 am | 8/2/14 |
| Exhibit 18 | Same | Same | Same | 8/1/14 | 8:13 am | 8/9/14 |
| Exhibit 19 | Same | Same | Same | 8/11/14 | 8:16 am | 8/13/14 |
| Exhibit 20 | Ramon Robles | Antonia Lugosoto | Same | 8/19/14 | 3:25 pm | 8/21/14 |

| Exhibit No. | From: | To: | "Origin:" Zip Code | "Origin:" Date | "Origin:" Time | Scheduled Delivery |
|---|---|---|---|---|---|---|
|  | 2144 S. 15th Place Milwaukee, WI 53215 414.712.9205 | HC 03 Box 30205 Morovis, PR 00687 |  |  |  |  |

Exhibits 17-19 were mail receipts that *predated* the seizure of the vehicle on August 19, 2014. (App. 7-9). However, exhibit 20, as filled out by a postal worker in Milwaukee, Wisconsin, was a mail receipt attached to a package sent from Ramon Robles in Milwaukee, Wisconsin on August 19, 2014, to Antonia Lugosoto in Puerto Rico. (App. 10).

As the postal worker noted on exhibit 20, the scheduled date of delivery to Puerto Rico for that package was August 21, 2019, two days after the car had been taken into police custody and subsequently sealed. (R.98:112,138) (App. 10). Due to the discrepancies raised by exhibit 20 during trial, the appellant rightfully objected to the admission of all four receipts—an objection the district court overruled. (R.98:127). Had this evidence been excluded, the government would not have met its burden beyond a reasonable doubt and "…the prosecution's case would have been

'significantly less persuasive'…" *United States v. Emerson*, 501 F.3d 804, 813 (7th Cir. 2007).

But instead of exclusion, the receipts became the focal point for the government's argument and the district court's ruling.  They were used to "corroborate" what Mr. Duenas testified to, and then his testimony was used to "corroborate" the receipts. The government argued, and the district court held, that the receipts were a key to finding a connection between Mr. Duenas and the appellant.  However, both ignored the fact that the receipts are a *package –* supposedly found *together*, testified under oath *together* and admitted into evidence *together*.

A similar issue is that the district court's use of this evidence to find the existence of an agreement beyond any reasonable doubt is that such a ruling is inconsistent with the trial evidence.  It's analogous to the situation where separate verdicts by the same judge are inconsistent with each other.  In *United States v. Maybury,* 274 F.2d 899, 901–904 (2d Cir.1960), the court distinguished the general rule from *Dunn v. United States*, 1932, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356, upholding jury verdicts in criminal cases despite inconsistency as between counts.

In *Maybury*, the court reversed a conviction for uttering a forged check where, the same judge in the same bench trial, acquitted the same defendant on a forgery charge. The court explained that while inconsistent *jury* verdicts are acceptable because they may be the result of leniency, or of compromises made to achieve unanimity, or, more poetically, of the unique function of the jury as "the voice of the

country," no similar rationale justifies inconsistent findings resulting from a trial before a judge. *Id.* at 902–903.

Although this case involves just one count, the principle is the same. In the court's ruling it made clear that juries can have inconsistencies because it was considered more rational than "ordeals," which it replaced. *Id.* at 902-903. The court specifically noted:

> Ignoring inconsistency in a jury's disposition of the counts of a criminal indictment may thus be deemed a price for securing the unanimous verdict that the Sixth Amendment requires [citations omitted] and for interposing 'the voice of the country' against the possibly excessive zeal of prosecutors….[and was] not too high a price for 'the most transcendent privilege which any subject can enjoy or wish for'

*Id.* at 903. But the court held:

> None of these considerations is fairly applicable to the trial of a criminal case before a judge. There is no 'arbitral' element in such a trial. While the historic position of the jury affords ample ground for tolerating the jury's assumption of the power to insure lenity, the judge is hardly the 'voice of the country,' even when he sits in the jury's place.

*Id.*

As there is no mandatory authority on this issue, the appellant requests this Court adopt the Second Circuit's rationale to inconsistencies with reasoning in bench trial findings. This Court should hold that the district court sitting as fact finder cannot, on the one hand, find that a witness is a liar and unbelievable and then, on the other hand, use that witness's testimony to find an agreement to conspire. The district court cannot essentially concede that exhibit 20 is false evidence then ignore the part of the testimony where it was supposedly found at the exact same time as the other three receipts and only use those to "corroborate" the lying witness.

27

**C. The testimony of Rodolfo Duenas, the main evidence offered of an agreement to distribute cocaine, was rejected by the district court as not credible.**

This Court should find that a district court cannot rely on perjured testimony as is the case with Mr. Duenas *and* the police witnesses from Barceloneta. "To be incredible as a matter of law, the witness's testimony must be unbelievable on its face." *United States v. Van Wyhe*, 965 F.2d 528, 531 (7th Cir. 1992). In *Ross v. Heyne*, 638 F.2d 979, 985–87 (7th Cir. 1980), this Court reversed a conviction where perjured testimony from the key witness for the prosecution was admitted when he falsely stated that he had not received any "deal" for his cooperation. This Court found this to be a due process violation and, importantly, noted that such consideration for testifying "probably affected the judgment of the jury." *Id.*

In *U. S. ex rel. Wilson v. Warden Cannon, Stateville Penitentiary*, 538 F.2d 1272, 1276 (7th Cir. 1976), this Court made clear that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice….'" and that 'reliability of a given witness may well be determinative of guilt or innocence…" *Id*.

The district court used strong language in describing Mr. Duenas' lack of credibility. In its ruling denying appellant's Rule 29 motion, the district court explained, in response to defense criticism of Mr. Duenas:

> I will probably have more comment on that in any decision that I might be asked to render in this case, but suffice to say for the moment that I don't disagree that it became clear during Mr. Duenas' testimony that he has a similar tenuous relationship with the truth on a number of issues. And so the question is taking into account the fact that *Mr. Duenas clearly either lied or gave extremely inconsistent testimony throughout his time on*

28

*the stand*, whether or not his testimony alone would support a conviction, and whether if one believes he's not a very truthful fellow, one can't return a verdict of guilty.

(R.100:440-441) (emphasis added). The district court reaffirmed this opinion two months later in its ultimate ruling but, with the sweep of its hand, decided that Mr. Duenas' credibility was not a big deal and was not necessary to worry about because of the receipts (exhibits 17-20):

> Mr. Duenas, as I indicated earlier -- and Mr. Birdsall is absolutely right, *I said that Mr. Duenas had something of a tenuous relationship with the truth. I still believe that.* And Mr. Birdsall accurately pointed out several places in his testimony where he was less than consistent, perhaps the most descriptive one being his testimony, number one, that he finds it a great policy not to lie to the police because if you lie to the police they always catch you anyway so he never lies to the police, followed up relatively shortly thereafter or preceded before by his statement that he lied to the police.
>
> So we had several examples like that. I also agree that Mr. Duenas's testimony was confusing. There were a number of names that Mr. Birdsall brought up that -- to Mr. Duenas and Mr. Duenas tried to explain who was who. There were no fewer I think than three Rickys whose names came up somehow or another during the testimony. I was not able to keep them all necessarily straight. So I don't disagree that Mr. Duenas was certainly not the most reliable witness.
>
> However, as Mr. Gonzales points out, <u>one need not rely on Mr. Duenas</u> to make a finding in this case. *What we <u>already know before Mr. Duenas ever takes the stand</u> is that there are three mail certificates, mail receipts* that were found in the car that Mr. Pagan was driving in Puerto Rico that show packages being sent to Mr. Duenas from Barceloneta, or, vice versa, from Mr. Duenas to Barceloneta, and that based on that information the Postal Service was able to track two other packages which came and one of those packages contained drugs and Mr. Pagan's fingerprints.

(R.127:525-526) (emphasis added).

Despite that very firm concern, the district court reasoned that when you couple the receipts that were "found" on August 19, 2014 – the ones that didn't need

29

teleporting – with  Mr. Duenas's testimony – the part where he wasn't pathologically lying - then voila, you have an agreement.  Essentially, the reasoning was that we can ignore the parts of the evidence that are patently untrue – even though they are inextricably linked to parts that support a finding of guilt.

The district court should not have used evidence that was shown to be false – the receipts – or made findings of incredibility, but rather should have "considered the trial record as a whole when evaluating the effect of the perjured testimony on [it's] verdict. *Long v. Butler*, 809 F.3d 299, 311 (7th Cir. 2015), reh'g en banc granted, judgment vacated, No. 13-3327, 2016 WL 1621711 (7th Cir. Apr. 20, 2016), and on reh'g en banc sub nom. Long v. Pfister, 874 F.3d 544 (7th Cir. 2017).

Further, the district court dismissed the idea that Mr. Duenas' credibility should be further discounted because of the apparent lack of any cooperation deal or that he was released shortly after his arrest and never charged in this case or suffered a revocation.  (R. 127:526-528).  However, cooperation deals are a critical part of a criminal trial and have a significant, often critical, effect on a fact finder.

The court commented at length on this point:

> In particular I do want to address Mr. Birdsall's argument that it is unbelievable that law enforcement had no agreement with Mr. Duenas; that he has a significant criminal history; that he had just gotten out of prison; that he admitted to receiving a number of kilos of cocaine from Puerto Rico and to selling it and to skimming some and to cutting some and various other things, and yet he was allowed to just walk out the door. And it begs belief that he didn't have an agreement.
>
> *I'm not sure why he was allowed simply to walk out the door.* Although I suspect based on the events that followed that it was because there was some hope that he would continue to cooperate in the investigation, either

with regard to Mr. Pagan or perhaps other people among the list of folks that he reeled off.

But I don't find it as shocking as Mr. Birdsall does that everyone testified that there was no agreement. *In point of fact, in my experience over the years* I've very rarely ever seen a situation where the Government, at any rate, certainly the U.S. Attorney's Office buys a pig in a poke and promises someone that they will do something for them before that person has either testified before a grand jury or testified in a court of law.

In fact, I seem to spend an inordinate amount of time rescheduling sentencings so that people can wait to see the outcome of a cooperator's testimony before deciding what particular deal to give them. If what Mr. Birdsall means is that there was kind of an implicit deal in the sense that law enforcement would just kind of look the other way and let Mr. Duenas go out into the world even knowing that he had done bad things, I don't know, maybe that did or didn't happen, but in terms of being surprised that there was no formal agreement, no formal deal, I don't in my experience find that particularly surprising. And that has been my experience of the way the Government works with cooperators generally.

(R. 127:526-528) (emphasis added).  A jury would indeed be wondering why this person, Mr. Duenas, simply walked out the door after being arrested "dead-to-rights" with one kilo of cocaine and admitting to 3-4 more while on parole after serving ten years in prison for the exact same crime.  This apparently did not bother the district court because in its "experience over the years" this was perfectly normal. (R. 127:526-528). But the cases do not support that finding.

In *Napue v. People of State of Ill.,* 360 U.S. 264, 269, 79 S. Ct. 1173, 1177, 3 L. Ed. 2d 1217 (1959), the Supreme Court held that false testimony about having a plea deal had a substantial effect on a jury and, thus, the legitimacy of a conviction.  The court stated that "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's

life or liberty may depend." *Id*. So, "'[i]t is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject…'" *Id*.

Years later, the Court reaffirmed that view in *Giglio v. United States*, 405 U.S. 150, 154–55, 92 S. Ct. 763, 766, 31 L. Ed. 2d 104 (1972) where a promise of non-prosecution was made to a key government witness and the court found that disclosure of that was necessary for due process:

> Here the Government's case depended almost entirely on Taliento's testimony; without it there could have been no indictment and no evidence to carry the case to the jury. Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it.

*Id*.

If a jury had heard this case, they would have heard about the exhibit 20 lie and discounted the entire exhibit package (exhibits 17-20); the jury would have also discounted Mr. Duenas' credibility when hearing about Mr. Duenas's sudden freedom after a serious drug arrest and countless lies. So, the district court's use of these two obviously false pieces of evidence was clear error and the admission of the receipts over objection was an abuse of discretion.

### D. The Arguments of counsel unlawfully relied on perjured testimony and insufficient evidence.

This Court should take the logical, obvious, and commonsense approach and find that when the government files a criminal charge that they are bound to only introduce evidence that is true. *United States v. Cardena*, 842 F.3d 959, 976–77 (7th Cir. 2016) ("…it violates due process for the government to obtain a conviction by the

32

knowing use of perjured testimony."). This Court should send the message, in reversing this conviction, that it will not allow the government's witnesses to commit crimes while attempting to prosecute crimes.  The officers here perjured themselves and obstructed justice on the face of the government's own evidence. See, 18 U.S.C. §1621 (Perjury), 18 U.S.C §1503 (Obstruction of Justice).

In its closing argument, the government highlighted the critical role the receipts played. (R. 127:479-480). The attorney for the government methodically went through each receipt to ensure that the district court knew of their importance in tying Mr. Duenas and the appellant together.  Counsel even mentioned exhibit 20 but then almost immediately realized the error:

> Also, _very importantly, are four receipts, Express Mail receipts that were located in the rear of the vehicle_. And these four receipts, first being Government's Exhibit No. 17, Government's Exhibit No. 17, this mail order receipt, shows that on July 31st of 2014, Rodorfo (sic) Duenas from Milwaukee sent a package of about two pounds two ounces to Barceloneta, Puerto Rico.
>
> Then it shows that -- Government's Exhibit 18 shows that on or about August 7th of 2014, Rodorfo (sic) Duenas again sends a package from Milwaukee to Barceloneta weighing approximately two pounds eight ounces. Government's Exhibit 19 shows that on or about August 11th of 2014, Rodolfo Duenas, again from Milwaukee, sends a package of about two pounds to Barceloneta to a Wilfredo Rosario, same individual who was on the three previous mail receipts.
>
> And then, finally, on _Exhibit No. 20_, it shows that on _the date of this incident_ there was a package that was – a receipt that was given showing that a package was sent _on that day_ from Milwaukee heading toward Puerto Rico. The importance of _especially government's Exhibits 17 through 19_ show that Mr. Duenas was sending packages from Milwaukee to Puerto Rico.

(R. 127:479-480) (emphasis added).

As this Court can see, even the government knew that it had a huge problem on its hands – seemingly not recognizing the teleporting problem that exhibit 20 posed until the very moment of his argument.  However, as skilled counsel does, he quickly pivoted away and emphasized exhibits 17-19 so that the district court could have an evidentiary basis to make the Duenas/appellant connection.

But first the appellant had the opportunity to inform the district court in details of the exhibit 20 problem having already established in the Rule 29 motion the incredible nature of Mr. Duenas's testimony:

> I don't know if you have these exhibits in front of you, Judge, but Mr. Gonzales walked through 17 through 20 and in doing so, he kinda tripped on 20. *And the reason he tripped on 20 is because these officers -- including Luis Nunoz Rosado who is the one who did the search -- these officers swore up and down under oath in this court that all of these were found in Mr. Medina's car, in this white Corolla.*
>
> And that was on August 19th, 2014. And if you look at each one of these receipts, 17 through 20, the upper right portion is the part that the postal employees fill out. The postal employees fill out the ZIP Code that they're using, the day of the delivery, the cost, the date that it was accepted, the time it was accepted and the estimated delivery date. So 17 through 20 all predate August 19th, 2014. *But these officers are saying that Exhibit 20 -- and I pinned them down on this specifically -- Exhibit 20 was found in his car in Puerto Rico on August 19th, 2014. <u>They said that</u>. <u>They swore that this is true</u>, except it's impossible because by Exhibit 20's own -- on its face it says it's sent from Milwaukee.*
>
> So this was filled out by a postal employee in Milwaukee on August 19th, 2014, at 3:25 p.m. *<u>So I challenge Mr. Gonzales to explain</u> in his rebuttal argument how it is that this item that his witnesses swore under oath was found in Puerto Rico after this supposed shootout, after this impounding of the car, somehow magically gets from Milwaukee, Wisconsin all the way to Puerto Rico inside his car, even though that whole chase business, that took place in the morning, if you recall, and this wasn't even  signed until the afternoon. So to say that I think that*

there's reasonable doubt here is an understatement. So these officers from Puerto Rico do all of that.

(R. 127:489-491) (emphasis added).

Counsel for the government did not accept the exhibit 20 challenge when allowed to respond. Instead, the same conspiracy argument was made except the glory of talking about exhibits 17-20 was suddenly reduced to "documentation:" "What we do have _documentation_ for is from July to September of -- _physical documentation from the Postal Service_, but we don't know how long this conspiracy is going on." (R. 127:505) (emphasis added). Clearly, at this point, counsel knew that his witnesses had lied.

Rather than address or confess the exhibit 20 issue, counsel finishes his rebuttal with "this is my story, and I'm sticking to it:"

> And if we were just relying on Mr. Duenas, you might have a little bit of pause. But what we are relying on is Mr. Medina. We're relying -- I mean, we're relying on Mr. Duenas. _And we're relying on the fact that there's postal receipts going back from Puerto Rico to Milwaukee._ There's the package that is coming in from Puerto Rico.

(R. 127:506-507) (emphasis added).

The arguments were now done and, normally a jury would have heard all this testimony and seen the exhibits and would retire to deliberate. But this was a bench trial and the district court had two months to ponder all the arguments and think about what to do with Exhibit 20.

35

### E. The district court based its finding of guilt on perjured testimony and insufficient evidence.

In *United States v. Agurs*, the primary importance of the "truth-seeking" aspect of a trial and the deleterious effect of allowing perjured testimony has on that process was emphasized by the United States Supreme Court:

> …the Court has consistently held that a conviction obtained by *the knowing use of perjured testimony is fundamentally unfair, and must be set aside* if there is <u>*any reasonable likelihood that the false testimony could have affected the judgment of the jury*</u>. It is this line of cases on which the Court of Appeals placed primary reliance in those cases the Court has applied a strict standard of materiality, not just because they involve prosecutorial misconduct, but more importantly because they involve a *corruption of the truth-seeking function of the trial process.*

427 U.S. 97, 103–04, 96 S. Ct. 2392, 2397, 49 L. Ed. 2d 342 (1976), holding modified by *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) (emphasis added).

On March 20, 2019, this Court reversed a jury verdict where a defendant was found guilty of distributing a kilogram of cocaine. *United States v. Garcia*, 919 F.3d 489 (7th Cir. 2019).  In Garcia, the court encountered a level of proof that, by all rights, should have received a judgment of acquittal, according to the Court:

> There was no admission of drug trafficking by Garcia, nor any testimony from witnesses (undercover agents, criminal confederates, innocent bystanders, or surveillance officers) that Garcia distributed cocaine. Instead, the government secured this verdict based upon a federal agent's opinion testimony purporting to interpret several cryptic intercepted phone calls between Garcia and Cisneros, a known drug dealer.

*Id.* at 491.

This Court noted that with Rule 29 motions, "[s]uccessful challenges are relatively rare, but "a properly instructed jury may occasionally convict even when it can be

said that no rational trier of fact could find guilt beyond a reasonable doubt." *Id.* at 497.

This Court ultimately held that the expert analysis provides "informed and perhaps accurate speculation about the likely meaning" of the calls but nothing more. *Id.* at 504. This Court said they were "certainly suspicious" and it's possible, even likely, that the defendant was guilty, but that "[t]he heavy standard applied in criminal cases manifests our concern that the risk of error to the individual must be minimized even at the risk that some who are guilty might go free." *Id.*

In its discussion, this Court took the opportunity to discuss the role that circumstantial evidence plays in criminal cases and the role judges must take in evaluating evidence. *Id.* In particular, the "connection" between

> requiring proof beyond a reasonable doubt, and in civil cases, where motions for summary judgment and for judgment as a matter of law require judges to evaluate the outer limits of reasonable inferences under the lower civil standard of proof by a preponderance of the evidence.

*Id.* In exploring those "outer limits" this Court examined several cases that it had reversed convictions for various offenses because the circumstantial evidence simply had gaps in the chain of facts and required speculation to get to beyond a reasonable doubt. These include:

1. *United States v. Jones*, 713 F.3d 336, 339–40 (7th Cir. 2013): The theory was that Jones helped a co-defendant to cook up some crack – all on circumstantial evidence. There were two recorded calls about drugs, buying a blender to be used for crack, and being part of police chase with the co-defendant. *Id.* at 499.

But the court held it was insufficient and "Despite the temptation to nod along with the government's evidence and think that of course the defendant was probably guilty," a district court has to look at the breaks in the "logical chain." *Id*.

2. *United States v. DiNovo*, 523 F.2d 197 (7th Cir. 1975): After a married couple let police on a chase, a search of their bedroom netted two pounds of heroin and other drug dealing accoutrements. *Id*. at 500. The court held there was enough to convict the husband but not the wife. *Id.* Nothing in the house or the dresser where the heroin was stored was anything more that suspicious circumstantial evidence. *Id.*

3. *United States v. Mohamed*, 759 F.3d 798, 800–01 (7th Cir. 2014): The defendant was pulled over with 23,000 cigarettes purchased in Kentucky, $15,000 cash and admitted he resells cigarettes for profit. *Id*. "Yet there was insufficient evidence introduced at trial that, as required for conviction, the defendant "intended to sell the cigarettes *in Indiana*." *Id*.

4. *United States v. Allen*, 383 F.3d 644 (7th Cir. 2004): Mr. Allen was convicted of being a felon in possession of a firearm. He disputed that he had a prior felony despite scant records showing some with the exact same name did. The court held that the court's inferences were reasonable because (1) they shared the same name, (2) he was arrested wrongly for the same reason years earlier and didn't object, and (3) all arrests had the same number attached. *Id*. the question, the court said, was not whether a logical set of inferences could show

38

the charge was possibly or even likely true, but whether it could be inferred *beyond a reasonable doubt*." *Id*. (emphasis in original).

*Garcia* and the cases it illustrates all point to the problem presented when district courts do not do the hard work of closely examining what the "logical chain" is in a given set of facts – even those that are "highly suspicious" and the defendant is "likely guilty." In the appellant's case, the district court glossed over glaring problems regarding the validity of the evidence.

**Verdict**

In the district court's verdict, it simply ignored exhibit 20 calling it a "mystery" (R. 127:518-519) and an "outlier." (R. 127:519). The only attempt by the district court to reconcile the inherent conflict between the obviously false testimony about exhibit 20 was to comment, almost in passing, that there was a difference in the addresses for exhibits 17-19.

Despite this "mystery," the district court repeatedly used the *other* three receipts as "corroborating" circumstantial evidence to make a finding that the appellant and Rodolfo Duenas had an "agreement" to distribute cocaine. That finding was part of the basis for denying the appellant's Rule 29 motion and later finding him guilty beyond a reasonable doubt.

The first three receipts, the district court rationalizes, were all addressed to the same address and the same person and were all from Rodolfo Duenas. *Id*. exhibit 20, the district court dramatically points out, is *not* from Mr. Duenas *and* "it's

addressed to a different person in Puerto Rico at a different PO box, even in a different town.  It's not even addressed to Barceloneta." *Id*.

The district court failed to explain, however, why the distinction as to what the addresses is significant or even relevant.  Several police officers had just finished taking a sacred oath in a United States District Court swearing to tell the truth.  They were all experienced police officers who presumably understood their jobs and the need to tell the truth when testifying in a court of law.  Yet the officers lied in the most outrageous and obvious fashion and all the district court could muster up in terms of some explanation is that the obviously false receipt – exhibit 20 - has a different address.  The district court did not address the oath these officers took or the deliberately careful fashion that each receipt was treated or that they were a package, since they were all found together.  Nor did the district court apply its opinion that Mr. Duenas cannot seem to tell the truth, even in court.

Despite the admonition in *Agurs*, the district court concluded its "analysis" of the receipts thusly: "[s]o I'm not sure how one explains exhibit 20.  But I don't think that exhibit 20 creates reasonable doubt as to the discovery of exhibits 17 through 19.  And I particularly don't think that it creates a reasonable doubt if we go to the next step in the process." *Id*.

**Duenas' credibility: intertwining receipts/Duenas**

Having now dispensed with the messiness of police officers lying in its court after swearing to tell the truth, and then fashioning a mysterious explanation to distinguish the offensive receipt admitted over objection, the district court proceeded

to use the remaining receipts with surgical precision to support the government's case: both the evolution of the case and the "corroborating" value to support Mr. Duenas's testimony.

The district court noted that: "[t]he significance of [exhibits] 17 to 19 in many respects is that it - - those exhibits were the catalyst that tipped off authorities stateside that there was something going on and tipped off the postal inspectors to look for something." (R. 127:520).

The district court links the three - now pristine - receipts to Mr. Duenas but also holds that they have independent importance after having the taint of perjury removed from them.  Accordingly, the district court asserted that "one need not rely on Mr. Duenas to make a finding in this case."  (R. 127:526).  Incredibly, the district court found them independently important:

> [w]hat we *already know* before Mr. Duenas ever takes the stand is that *there are three mail certificates, mail receipts that were found in the car that Mr. Pagan was driving in Puerto Rico* that show packages being to Mr. Duenas from Barceloneta, or, vice versa, from Mr. Duenas to Barceloneta, and that based on that information the postal service was able to track two other packages which came and one of those packages contained drugs and Mr. Pagan's fingerprints.

*Id.* (emphasis added).

In this statement, the district court's reference to "three mail certificates, mail receipts" showing shipments going *both* ways is factually wrong and demonstrates the scant attention being paid to the underlying issue of perjured testimony.  But the district court did not stop there because the real value of freeing up exhibits 17-19

41

from the radioactive death knell that is exhibit 20, is tying them to Mr. Duenas'
statements that the appellant was his boss in a drug operation.

The district court did exactly that. The district court noted that exhibits 17-19
support Mr. Duenas' testimony as *confirmation* that he knows the appellant and has
a history of drug dealing with him by shipping drugs and money back and forth:

> *Mr. Duenas confirmed <u>that</u>* by saying that, yes, he does know Mr. Pagan.
> He described the history that they have together and described drug-
> dealing activities between them where the drugs would come from Puerto
> Rican and then the money packaged a particular way would go back. But I
> don't have to rely on Mr. Duenas's testimony in order to determine whether
> or not it appears whether there is evidence that Mr. Pagan was involved in
> a conspiracy to distribute drugs.

*Id.* (emphasis added). The highlighted/underlined "that" the district court is referring
to are the three receipts just mentioned.

**Beyond a reasonable doubt**

And so, just like that, the disconnection of exhibit 20 is complete, and the
district court was then free to use exhibits 17-19 to support its notion that Mr. Duenas
knows the appellant, and that his description of "drug-dealing" with the appellant
was suddenly credible. But doing this has an enormous problem because the district
court, as discussed more fully above, already committed to *not* believing Mr. Duenas
because of *his* constant lies *under oath*.

The district court then used this receipts/Duenas-testimony connection along
with the fingerprints to find a conspiratorial agreement stating:

> the circumstantial evidence includes: *the <u>mail receipts</u> found in his car*;
> the two packages that came from Puerto Rico to Mr. Duenas when the
> postal inspection service was surveilling; the package that was opened
> that had Mr. Pagan's fingerprints on the interior packaging; *and, to*

> *some extent, Mr. Duenas's testimony.* The fact that he is not believable in all respects does not mean that he is entirely incredible, and *some portions* of his testimony were <u>corroborated</u> by <u>other evidence</u> in the case.

(R. 127:528-529) (emphasis added).   The "other evidence" that "corroborated" "portions" of Mr. Duenas's testimony the district court is referring to are the receipts, specifically exhibits 17-19.

By the district court's own words then, we see the inextricable link between two sources of false evidence. The attempted purification of exhibits 17-19 fails because, by uncontroverted testimony, they were all *together*. A *package*. We know without doubt that since exhibit 20 was not pulled from the appellant's car on August 19, 2014, that by extension exhibits 17-19 were also not.

"What's sauce for the goose…" as the old saying goes means if one accepts the impossibility of exhibit 20 – as one must – then exhibits 17-19 cannot be used because they were, according to the sworn testimony, found together.  One further cannot use those three exhibits to rehabilitate Mr. Duenas's unbelievable (by the district court's own opinion) lies.  Two lies do not make a right.

Again, the rationale of Judge Friendly's opinion in *United States v. Maybury,* 274 F.2d 899, 901–904 (2d Cir.1960) makes sense.  A judge sitting as fact finder should not be either making findings that directly conflict with previous findings nor use their professional experience as a judge as a factor in weighing credibility nor ignore patently false evidence such as the receipts.

The district court summed up its verdict by stating:

> I believe that while there have been certainly some doubts that the defense has raised about some of these issues, *none of those <u>rise to the level</u> of a reasonable doubt sufficient for me to find that the government has not proven its case beyond a reasonable doubt.* I believe that the government has and I do find that the government has proven beyond a reasonable doubt that Mr. Pagan conspired with people known and unknown to the grand jury to distribute cocaine, and that the amount of cocaine that he conspired to distribute was in excess of 500 grams and therefore *I will find him guilty on the count in the indictment.* (R. 127:526) (emphasis added).

In sum, the district court and the government agreed that it is acceptable to ignore perjured testimony and use the shattered remains to support a finding, beyond any reasonable doubt, that the appellant and Mr. Duenas had an agreement. No rational juror would so find. As such, this Court should follow the admonition in *Agurs,* reverse the appellants conviction, and remand the case to the district court for a new trial.

**II. This Court should reverse the district court's denial of the appellant's motion for judgement of acquittal because it was clear error for the district court to base its findings on insufficient, false and contradictory evidence, where, even in the light most favorable to the government, no rational juror could find that a conspiratorial agreement to distribute cocaine existed.**

A motion under Federal Rule of Criminal Procedure 29 for judgment of acquittal is not necessary in a bench trial to preserve an appellate challenge to the sufficiency of the evidence. *United States v. South,* 28 F.3d 619, 627 (7th Cir.1994); *United States v. Atkinson,* 990 F.2d 501, 503 (9th Cir.1993) (en banc). In deciding a Federal Rule of Criminal Procedure 29 motion for acquittal, the district court must decide "whether, at the time of the motion, there is relevant evidence from which the jury can reasonably find the defendant guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the government and keeping in

mind that it is the exclusive function of the jury to determine credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences." *United States v. Reed*, 875 F.2d 107, 111 (7th Cir. 1989).

For the same reasons argued above regarding the judgement of conviction, this Court should reverse the district court's denial of the appellant's Rule 29 motion and enter an order for a judgement of acquittal or remand it the case to the district court with an order to grant the motion.

### A. A de novo standard of review is applied when determining whether a district court wrongfully denied a motion for judgement of acquittal.

When reviewing a district court's denial of a motion for judgement of acquittal, also known as a Rule 29 Motion, an appellate court must view the evidence in the light most favorable to the government. *United States v. Griffin*, 194 F.3d 808 (7th Cir. 1999). The question of whether a district court wrongfully denied a Rule 29 motion shall be reviewed *de novo*. *Id*. In viewing the evidence in light most favorable to the government, this Court will find that the evidence could not lead a jury to find the appellant guilty beyond a reasonable doubt, and therefore the district court wrongfully denied the appellant's motion for judgement of acquittal.

### B. The district court denied the appellants motion based on perjured and non-credible testimony and insufficient evidence.

Here, in the district court's Rule 29 decision, the court reiterated that which was without doubt – that Mr. Duenas was not credible. At all:

> Mr. Birdsall's second basis is his allegation that Mr. Duenas is the sole link -- his testimony is the sole link between Mr. Pagan and the drugs that were recovered by the Postal Inspection Service in September of 2015, and that Mr. Duenas is entirely and completely incredible and unbelievable. I

> will probably have more comment on that in any decision that I might be asked to render in this case, but suffice to say for the moment that I don't disagree that it became clear during Mr. Duenas' testimony that he has a similar tenuous relationship with the truth on a number of issues. And so the question is taking into account the fact that Mr. Duenas clearly either lied or gave extremely inconsistent testimony throughout his time on the stand, whether or not his testimony alone would support a conviction, and whether if one believes he's not a very truthful fellow, one can't return a verdict of guilty.

(R. 100:440-441) (emphasis added). But, as with the verdict findings, it's déjà vu all over again with regard to use of the receipts to "corroborate" Mr. Duenas's testimony:

> There are several independent pieces of evidence here, and Mr. Gonzales pointed to some of them which at least *corroborate some of the things that Mr. Duenas said*. Mr. Duenas testified that he got packages from Puerto Rico, and he sent money to Puerto Rico. And as Mr. Gonzales points out, <u>*the receipts that the Puerto Rican officers recovered support that argument*</u>, *that testimony as does the fact that there were two packages that the postal service actually observed and one of which they intercepted going to Mr. Duenas from Puerto Rico, not to mention, as he indicated, the fact that Mr. Pagan's fingerprints were found on the plastic packaging inside the last package that was delivered to Mr. Duenas at the house which was not his but where he was living.* So even taking into account, even viewing the evidence in the light most favorable to defendant, which is not the standard, but even if I were to do that, and even accepting that Mr. Duenas isn't very truthful, there are pieces of his testimony that are supported by completely independent evidence, and those pieces would give a reasonable finder of fact an ability to return a guilty verdict.

(R. 100:441-442) (emphasis added).

As argued above, the impossibility of the existence of exhibit 20, and thus all four postal receipts, render them incredible as a matter of law. *United States v. Hunter*, 145 F.3d 946, 949–50 (7th Cir. 1998), *United States v. Alcantar*, 83 F.3d 185, 189 (7th Cir. 1996), *United States v. McClellan,* 794 F.3d 743, 753 (7th Cir. 2015)*,*

*United States v. Van Wyhe*, 965 F.2d 528, 531 (7th Cir. 1992). When they are removed, there is no "corroboration" of anything Mr. Duenas said.

The district court's use of the receipts to corroborate the testimony of Rodolfo Duenas, which it had roundly rejected as not credible and therefore establish the existence of an agreement was clear error. Without that evidence there is insufficient evidence of a conspiratorial agreement as to the appellant and no rational juror could have found such agreement beyond a reasonable doubt.

III.   **This Court should reverse the judgement of conviction because the knowing use of perjured testimony violates due process.**

   A.   **A due-process argument that was not made in the district court is reviewed only for plain error.**

A due-process argument that was not made in the district court is reviewed only for plain error. *United States v. Coleman*, 914 F.3d 508, 511 (7th Cir. 2019). A plain error is obvious, affects substantial rights, and seriously affects the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Ramirez*, 182 F.3d 544, 547 (7th Cir. 1999). Furthermore, this Court established a three prong test to demonstrate a due process violation for a defendant convicted due to the admission of perjured testimony: "… to receive a new trial, the defendant must show "(1) that there was false testimony; (2) that the government knew or should have known it was false; and (3) that there is a likelihood that the false testimony affected the judgment of the jury." *United States v. Cardena*, 842 F.3d 959, 976–77 (7th Cir. 2016).  Here, the appellant meets each prong.

**B. The appellant's right to due process was violated because of the use of perjured testimony that was central to both the government's arguments and the district court's findings.**

This Court has held: "[u]ndoubtedly, it violates due process for the government to obtain a conviction by the knowing use of perjured testimony." *United States v. Cardena,* 842 F.3d 959, 976–77 (7th Cir. 2016) (citing *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)); See also, *Morales v. Johnson*, 659 F.3d 588, 606 (7th Cir. 2011). This Court also holds "that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way." *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012).

The government "…cannot simply ignore evidence that its witness is lying." *United States v. Freeman*, 650 F.3d 673, 680 (7th Cir. 2011) (citing *United States v. Young,* 20 F.3d 758, 764 (7th Cir.1994) (noting "a prosecutor's office cannot get around *Brady* by keeping itself in ignorance" (quotation omitted)); *United States v. Wallach,* 935 F.2d 445, 457 (2d Cir.1991) ("We fear that given the importance of [the witness's] testimony to the case, *the prosecutors may have consciously avoided recognizing the obvious*—that is, that [the witness] was not telling the truth." (emphasis added)). Further, this Court has noted that: "[w]e have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way." *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012).

48

In the factual discussion above regarding clear error, all three prongs of the due process test are met.  There was undisputable false testimony from the police officers from Puerto Rico regarding the mail receipts they claim to have found as well as extensive false testimony from the alleged coconspirator that the district court itself admitted was false.

Counsel for the government likely did not know of the falsity of the mail receipts *before* the trial but seemed to recognize the problem during questioning of Mr. Duenas and during closing arguments.  In any event, the receipts were a central theme of the government's case and counsel should have known their falsity. Finally, the false testimony by the officers regarding the receipts and by Mr. Duenas – and the intertwining of the two sources – was the centerpiece of the government's argument as well as the district court's Rule 29 ruling and ultimate verdict.

## CONCLUSION

This Court should strictly enforce the legal standard excluding as a basis for a criminal conviction perjured evidence and/or that evidence that violates the laws of physics.  The use of obviously false testimony about exhibit 20 – and thus *all* the postal receipts – to "corroborate" Mr. Duenas' allegations against the appellant - about which the district court already made a definitive finding of unreliability – should not stand.  Allowing perjured testimony to be used as the basis for a criminal conviction will erode faith in the law and court system – a result this Court should stand against.

As such, for the reasons stated, this Court should reverse the judgment of conviction and remand the case for a new trial because it was a due process violation to allow perjured testimony to support a criminal conviction and the district court committed plain error in using false testimony in its findings.  Alternatively, this Court should reverse the district court's denial of the appellant's Rule 29 motion and either enter an order granting the motion or remand the case with an order instructing the district court to grant it.

Dated at Milwaukee, Wisconsin this 30th day of September, 2019.

Respectfully Submitted,


Orlando Medina
Defendant-Appellant

*/s John A. Birdsall*
Counsel for Defendant-Appellant
Birdsall Law Offices S.C.
1110 N. Old World 3rd St.
Suite 218
Milwaukee, WI 53203
(414)831-5465
jbirdsall@birdsall-law.com

<u>Certificate of Compliance</u>

I, Attorney John A. Birdsall, certify that this brief complies with the format requirements of the Federal Rules of Appellate Procedure 32(a)(7). In particular, I certify that the brief is in 12-point Century Schoolbook font, with margins of at least one inch on all sides, and does not exceed 14,000 words excluding the cover pages, tables, and certificates.


Dated at Milwaukee, Wisconsin this 30th day of September, 2019.


*/s John A. Birdsall*

_____

Attorney John A. Birdsall

Certificate of Service

I, Attorney John A. Birdsall, certify that on September 30, 2019, a digital copy

of the Appellant's Brief and Short Appendix were filed electronically via ECF.


Dated at Milwaukee, Wisconsin this 30th day of September, 2019.


*/s John A. Birdsall*

_____

Attorney John A. Birdsall

Circuit Rule 30(d) Statement

I, Attorney John A. Birdsall, certify that pursuant to Circuit Rule 30(d), all materials required by Circuit Rule 30(a) and (b) are included in the appendix.


Dated at Milwaukee, Wisconsin this 30th day of September, 2019.


*/s John A. Birdsall*

_____

Attorney John A. Birdsall

# Appellant's Short Appendix

1. Judgement of Conviction dated April 22, 2019……………………………..…1-6

2. Trial Exhibits 17-20………………………………………………….....7-10

3. R.127:508-530 – Partial Transcript Decision and Findings………………..11-33

4. R.127:475-508 – Partial Transcript Closing Arguments…………………..33-66

5. R.100:435-449 – Partial Transcript Rule 29 Motion………………….....67-82

45AO 245B (Rev. 09/11) Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|

|  |  |
|---|---|
| v. | Case Number:  2015-cr-16-PP |
|  | USM Number:  45259-069 |
| Orlando Medina |  |

| John A. Birdsall | Mario Gonzales |
|---|---|
| Defendant's Attorney | Assistant United States Attorney |

THE court found the defendant GUILTY of  Count One of the indictment. The court adjudicates him guilty of this offense:

| Title & Section | Nature of Offense | Date Concluded | Count(s) |
|---|---|---|---|
| 21, U.S.C. §§841(a)(1), 841(b)(1)(B) and 846 | Knowingly and intentionally conspiring with others to distribute controlled substance involving 500 grams or more of a mixture and substance containing cocaine. | 9/14/2014 | 1 |
|  |  |  |  |

The court sentences the defendant as provided in this judgment. The court imposes the sentence under the Sentencing Reform Act of 1984.

The court **ORDERS** that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the Court and the United States Attorney of material changes in economic circumstances.

Date Sentence Imposed:  April 22, 2019

Hon. Pamela Pepper
Judge, United States District Court

Date Judgment Entered:  April 30, 2019

AO 245B (Rev. 09/11) Judgment in a Criminal Case

DEFENDANT:  Orlando Medina
CASE NUMBER:  2015-cr-16-PP

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of **one hundred thirty-eight (138) months.**

☒     The court makes the following recommendations to the Bureau of Prisons:

**The Bureau of Prisons place the defendant be placed in a facility that provides the Residential Drug Abuse Program.**

**The Bureau of Prisons place the defendant in a facility as close as possible to the District of Connecticut**.

☒     The defendant is remanded to the custody of the United States Marshal.

☐     The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____
with a certified copy of this judgment.

_____
United States Marshal

_____
By:  Deputy United States Marshal

AO 245B (Rev. 09/11) Judgment in a Criminal Case

DEFENDANT:  Orlando Medina
CASE NUMBER:  2015-cr-16-PP

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of **five (5) years.**

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons and shall report to the probation officer in a manner and frequency as reasonably directed by the Court or probation officer.  The defendant shall not commit another federal, state or local crime.  The defendant shall not unlawfully possess a controlled substance and shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐  The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse.
☒  The defendant shall not possess a firearm.
☐  The defendant shall cooperate in the collection of DNA as directed by the probation officer.
☐  The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense.
☐  The defendant shall participate in an approved program for domestic violence.

If this judgment imposes a fine or a restitution obligation, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## CONDITIONS OF SUPERVISION

1. the defendant must report to the probation officer in a manner and frequency directed by the court or probation officer;
2. the defendant must not knowingly leave the judicial district without permission of the court or his probation officer;
3. the defendant must follow the instructions of the probation officer designed to make sure the defendant complies with the conditions of supervision;
4. the defendant must answer truthfully all inquiries by the probation officer subject to his Fifth Amendment right against self-incrimination and follow the instructions of the probation officer;
5. the defendant must either participate in job training as directed by his supervising officer, attend school (verified by his supervising officer), or maintain a full-time job. Whether the defendant is working, training, going to school, or some combination of the three, the defendant shall participate in that activity/those activities for at least thirty (30) hours per week;
6. the defendant must notify the probation officer at least ten days prior to any change in employment (changing from one job to another, obtaining a new job, or losing a job); When such notification is not possible, the defendant shall notify the probation officer within 72 hours of the change;
7. the defendant must not reside at any address which has not been approved by the defendant's supervising officer;

8.   the defendant must notify the probation officer at least ten days prior to any change in residence (moving from one address to another); When such notification is not possible, the defendant shall notify the probation officer within 72 hours of the change;

9.   the defendant must not knowingly associate with (socialize with, travel with, reside with or communicate with) any people whom he knows to be engaged in, discussing or planning criminal activity;

10.  the defendant must permit a probation officer to visit him at reasonable times at home or elsewhere, and shall permit the probation officer to confiscate any items that violate the conditions of his supervised release that the officer observes in plain view;

11.  the defendant must notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12.  the defendant must not enter into any agreement to act as an informant or agent of a law enforcement agency without the permission of the court;

13.  the defendant must participate in a cognitive intervention program, when available and under the guidance and supervision of his supervising probation officer;

14.  the defendant must not knowingly go to places or enter buildings where controlled substances are unlawfully sold, used, distributed, or administered; and,

15.  the defendant must participate in a program of testing to include not more than six urinalysis tests per month and residential or outpatient treatment for drug and alcohol abuse, as approved by his probation officer, until such time as he is released from such program. The defendant must pay the cost of this program under the guidance and supervision of his supervising probation officer. The defendant is to refrain from the use of all alcoholic beverages throughout the supervised release term.

AO 245B (Rev. 09/11) Judgment in a Criminal Case

DEFENDANT:  Orlando Medina
CASE NUMBER:  2015-cr-16-PP

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the Schedule of Payments on the attached page.

| Total Special Assessment | Total Fine | Total Restitution |
|:---:|:---:|:---:|
| $100.00 | $Waived | $None |

The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

| PAYEE | AMOUNT |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
| TOTAL: |  |

If a defendant makes a partial payment, each payee shall receive an approximately proportioned payment.  However, pursuant to 18 U.S.C. § 3664(i), all non-federal victims must be paid before the United States is paid.

☐    The determination of restitution is deferred until _____.  An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐    Restitution amount ordered pursuant to plea agreement: $_____.

☐    The defendant must pay interest on any fine or restitution of more than $2,500.00, unless the fine or restitution is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on the Schedule of Payments may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐    The court determined that the defendant does not have the ability to pay interest, and it is ordered that the interest requirement is waived for the ☐ fine ☐ restitution.

**       Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18, United States Code, for offenses committed on or after September 13, 1994 but before April 23, 1996.

AO 245B (Rev. 09/11) Judgment in a Criminal Case

DEFENDANT:  Orlando Medina
CASE NUMBER:  2015-cr-16-PP

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

The defendant's obligation to pay the $100 special assessment balance begins immediately.

The defendant must participate in the Inmate Financial Responsibility Program.

While the defendant is in custody, he must make payments toward the special assessment and restitution obligations as required by the Inmate Financial Responsibility Program.

After his release from custody, the defendant must make payments toward the remaining balance of the special assessment and restitution obligations of no less than $25 per month, until paid in full, to start thirty days after he is released from custody.

The defendant must make all criminal monetary penalty payments, except those payments made through the Bureau of Prisons' Inmate Financial Responsibility Program, to the clerk of court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

Payments shall be applied in the following order: (1) special assessment and (2) costs (if any, including cost of prosecution and court costs).


Case: 18-1909    Document: 12    Filed: 01/30/2019    Pages: 143

**EXPRESS**

**Finance Copy**

Label 11-B, March 2004

UNITED STATES POSTAL SERVICE®

**Post Office To Addressee**

EI 408644002 US

**ORIGIN (POSTAL SERVICE USE ONLY)**

PO-ZIP Code: 53204

Postage: $ 46.00

Date Accepted: 7 31 14

952

Flat Rate or Weight: 2 2.70

Total Postage & Fees: $ 46.00

**DELIVERY (POSTAL USE ONLY)**

**CUSTOMER USE ONLY**

**FROM:** (PLEASE PRINT)

Rodolfo Duenas Piedras
835 W. Mitchell St Apt C
Milwaukee WD

53204-3532

**TO:** (PLEASE PRINT)

Wilfredo Rosario A
HC.01 Box .5037
Barceloneta P.R.
00617

**FOR PICKUP OR TRACKING**

Visit: www.usps.com

Call 1-800-222-1811

EMS

EXHIBIT
17

US v. Medina Appendix: page 7 of 82



**EXPRESS MAIL**

UNITED STATES POSTAL SERVICE ®

**Finance Copy**
Label 11-B, March 2004

**Post Office To Addressee**

### DELIVERY (POSTAL USE ONLY)

| Delivery Attempt | Time | ☐ AM | Employee Signature |
|---|---|---|---|
| Mo. Day | | ☐ PM | |
| Delivery Attempt | Time | ☐ AM | Employee Signature |
| Mo. Day | | ☐ PM | |
| Delivery Date | Time | ☐ AM | Employee Signature |
| Mo. Day | | ☐ PM | |

### CUSTOMER USE ONLY

**PAYMENT BY ACCOUNT**
Express Mail Corporate Acct. No.

Federal Agency Acct. No. or
Postal Service Acct. No.

☑ WAIVER OF SIGNATURE (Domestic Mail Only) Additional merchandise insurance is void if customer requests waiver of signature. I wish delivery to be made without obtaining signature of addressee or addressee's agent (if delivery employee judges that article can be left in secure location) and I authorize that delivery employee's signature constitutes valid proof of delivery.

☐ NO DELIVERY  Weekend ☐  Holiday ☐

Waiver Signature

### ORIGIN (POSTAL SERVICE USE ONLY)

PO ZIP Code: **33204**

Day of Delivery: Next / 2nd / 2nd Del Day

Postage: **$ 46.00**

Date Accepted: **8-7-14**

Scheduled Date of Delivery: Month / Day

Return Receipt Fee: **$**

Time Accepted: **8:13** ☐ AM ☑ PM

Scheduled Time of Delivery: ☐ Noon ☑ 3 PM

COD Fee: **$**    Insurance Fee: **$**

Flat Rate ☐ or Weight: **2.9** lbs oz

Military: ☐ 2nd Day ☐ 3rd Day

Total Postage & Fees: **$ 46.00**

Int'l Alpha Country Code:

Acceptance Emp. Initials:

**EI 406638231 US**

**FROM:** (PLEASE PRINT)  PHONE ( )
Rodolfo _____
835 ___ ___
APT-C
Milwaukee, WI 53204

**FOR PICKUP OR TRACKING**
Visit **www.usps.com**
Call 1-800-222-1811

**EMS**

**TO:** (PLEASE PRINT)  PHONE ( )
Wilfredo Rosario Hedz
HC 01 Box 5C34
Barceloneta P.R.
00617

ZIP + 4 IN 5 ADDRESSES ONLY. DO NOT USE FOR FOREIGN POSTAL CODES.

FOR INTERNATIONAL DESTINATIONS, WRITE COUNTRY NAME BELOW.

EXHIBIT 68

PENGAD-Bayonne, N.J.

US v. Medina Appendix: page 8 of 82




EI 408643205 US

**EXPRESS MAIL**
Label 11-B, March 2004
**Finance Copy**

UNITED STATES POSTAL SERVICE®

**Post Office To Addressee**

**DELIVERY (POSTAL USE ONLY)**

| Delivery Attempt | Time | ☐ AM ☐ PM | Employee Signature |
|---|---|---|---|
| Mo. Day | | | |
| Delivery Attempt | Time | ☐ AM ☐ PM | Employee Signature |
| Mo. Day | | | |
| Delivery Date | Time | ☐ AM ☐ PM | Employee Signature |
| Mo. Day | | | |

**CUSTOMER USE ONLY**

PAYMENT BY ACCOUNT
Express Mail Corporate Acct. No

Federal Agency Acct. No. or
Postal Service Acct. No.

☐ WAIVER OF SIGNATURE (Domestic Mail Only)

NO DELIVERY  ☐ Weekend  ☐ Holiday

Mailer Signature

**ORIGIN (POSTAL SERVICE USE ONLY)**

PO ZIP Code: 53204

Date Accepted: 8 11 14

Time Accepted: ☐ AM ☐ PM

Flat Rate ☐ or Weight: 2 lbs. 12 ozs.

Day of Delivery: ☐ Next ☐ 2nd Del. Day

Scheduled Date of Delivery

Scheduled Time of Delivery

Military: ☐ 2nd Day ☐ 3rd Day

Postage: $

Return Receipt Fee: $

COD Fee: $

Total Postage & Fees: $

Int'l Alpha Country Code

Acceptance Emp. Initials

**FROM:** (PLEASE PRINT)   PHONE (   )

Rodolf  Duenas  Pedro
836 w. Mitchell  Apt c
Milwaukee  WIS

**TO:** (PLEASE PRINT)   PHONE (   )

Wilfredo  Rosario
Metz  Hc. 01 Box. 5031
Barceloneta  PR 00617

ZIP + 4 (U.S. ADDRESSES ONLY. DO NOT USE FOR FOREIGN POSTAL CODES.)

FOR INTERNATIONAL DESTINATIONS, WRITE COUNTRY NAME BELOW.

FOR PICKUP OR TRACKING

Visit www.usps.com

Call 1-800-222-1811

EMS

EXHIBIT
19



**EXPRESS MAIL**
UNITED STATES POSTAL SERVICE®

**Finance Copy**
Label 11-B, March 2004
**Post Office To Addressee**

EI 408644387 US

**ORIGIN (POSTAL SERVICE USE ONLY)**

PO ZIP Code: 53204
Day of Delivery
Postage $5175

Date Accepted: 8-19-14
Scheduled Time of Delivery
Return Receipt Fee

Time Accepted: 3:28 AM/PM
COD Fee | Insurance Fee

Flat Rate or Weight: 374

**DELIVERY (POSTAL USE ONLY)**

**CUSTOMER USE ONLY**

PAYMENT BY ACCOUNT
Express Mail Corporate Acct. No.

Federal Agency Acct. No. or
Postal Service Acct. No.

WAIVER OF SIGNATURE

NO DELIVERY
Weekend ☐ Holiday ☐

Mailer Signature: *Ramon Robles*

**FROM:** (PLEASE PRINT)   PHONE 414 712 9205
Ramon Robles
2144 S. 15th Place
Milwaukee WIS 53215

**TO:** (PLEASE PRINT)   PHONE 787 362 1030
Antonia Lugo Soto
HC. 03 Box 30205
Morovis PR. 00687

**FOR PICKUP OR TRACKING**
Visit www.usps.com
Call 1-800-222-1811

EMS

EXHIBIT 2D

US v. Medina Appendix: page 10 of 82

1    check a couple things, and then I'll be back and I'll deliver

2    the verdict and findings at that point in time.

3              MR. GONZALES:  Okay.

4              THE COURT:  Come back in five minutes.

5              THE BAILIFF:  All rise.

6              (Recess taken at 9:59 a.m., until 10:08 a.m.)

7                     **DECISION AND FINDINGS**

8              THE COURT:  Have a seat everyone, please.

9              As you all may remember, at the beginning of the case

10   when Mr. Pagan indicated that he wanted a bench trial in front

11   of a judge rather than a jury trial, I asked Mr. Birdsall

12   whether at the end of the bench trial he wanted me to make

13   findings and he indicated that he did.

14             Under normal circumstances I wouldn't be in a position

15   to make findings right after closing statements because I

16   wouldn't have had time to go through my notes and the materials

17   and consider the elements of the offense and so forth.  But in

18   this circumstance we took a significant break between the body

19   of the trial and today's closing statements -- for legitimate

20   reasons, to allow Mr. Birdsall to follow up on a private

21   fingerprint examination -- and, as a consequence, I had more

22   time than I normally would to be able to go over the evidence

23   that's been presented and the facts.  And so that puts me in

24   something of a unique position to be able to make a

25   determination today and to give you findings that support that

508

1    determination.

2         I want to start out by noting that the indictment in

3    the case charges that sometime between July 1st of 2014 and

4    September 24th of 2014, both in Wisconsin and elsewhere,

5    Mr. Pagan knowingly and intentionally conspired with people

6    known and unknown to the grand jury to distribute controlled

7    substances.  The indictment specifically indicates that that

8    offense involved 500 grams or more of a mixture and substance

9    containing cocaine.  Those are in violation -- that offense is

10   in violation of 21 U.S.C. 841(a)(1), 841(b)(1)(B), as in boy,

11   and 846.

12        The way that we assist a jury in deciding whether or

13   not a defendant is guilty of an offense that's charged is we

14   give the jury instructions on what the law is that governs that

15   crime or those crimes.  And in this case I looked at that same

16   law, those same instructions to help me process the information

17   and the facts that have been provided.

18        The first thing I noted is that Mr. Pagan has been

19   charged with a conspiracy, and the law tells us that a

20   conspiracy is an express or an implied agreement between two or

21   more people to commit a crime.  It's pretty straightforward.  A

22   conspiracy can be proven even if its goals weren't accomplished.

23   And a jury can consider all the circumstances, including the

24   words and the acts of each participant, in deciding whether the

25   conspiracy existed.

US v. Medina Appendix: page 12 of 82

1    In order for me to find that Mr. Pagan was guilty of a

2  conspiracy, I have to prove that the Government proved the

3  following elements beyond a reasonable doubt:

4    First, that a conspiracy or an agreement to commit a

5  crime existed.

6    And second, that Mr. Pagan knowingly became a member

7  of that conspiracy with the intent to make the conspiracy

8  succeed.

9    If I find that the Government proved both of those

10  facts beyond a reasonable doubt, then I must find Mr. Pagan

11  guilty of the offense.  If the Government didn't prove both of

12  those things beyond a reasonable doubt, then I cannot find him

13  guilty of that offense.

14    Now, the conspiracy as charged in the indictment is a

15  conspiracy to distribute controlled substances.  So the next

16  thing that I look at is the definition of "distribution of a

17  controlled substance."

18    The law tells us that someone distributes a controlled

19  substance if he delivers or transfers possession of that

20  controlled substance to somebody else; or, if he causes another

21  person to deliver or transfer possession of that controlled

22  substance to another person.

23    In order to prove whether or not someone did that,

24  distributed controlled substance, then the jury, or the judge in

25  this case, must look at whether the defendant knowingly

510

1  distributed, in this case cocaine; whether the defendant knew

2  the substance was or contained cocaine.  Doesn't necessarily

3  even have to know that it was cocaine, but he has to know that

4  it was a controlled substance or an illegal substance.  And if

5  the Government has proved both of those things beyond a

6  reasonable doubt, then that is proof of distribution.

7          So those are the laws that govern the facts that I

8  have to look at in the case.  Before going to the specific facts

9  in relation to those elements, I wants to point out a couple of

10  things.

11          The first thing I want to point out is that unlike a

12  jury, I have a rather longstanding relationship with and

13  knowledge of Mr. Pagan, because pretty much since the early days

14  of Mr. Pagan having gone into custody he has been writing

15  letters to me.  I made mention of those letters at a couple of

16  hearings in the past.  A couple times actually I asked

17  Mr. Birdsall to let Mr. Pagan know that he should communicate

18  with me through Mr. Birdsall and not directly.  And even after

19  we finished the last trial, the first part of the trial,

20  Mr. Pagan wrote me another letter, apparently concerned that I

21  had given some indication that I had become frustrated with him

22  and he wanted to apologize and he wanted me not to be frustrated

23  with him.  He wanted to tell me that he was sorry, and also to

24  tell me how difficult it is to be in custody and have people

25  make allegations against you that aren't true.

511

1       I'm raising this issue because I want to make it clear

2   right here and right now, nothing in my verdict is based in any

3   way, shape or form on the fact that Mr. Pagan has written

4   letters to me.  My frustration with Mr. Pagan writing letters to

5   me over the last couple years has not been so much with the fact

6   that he doesn't have a right to say whatever he wants to, my

7   frustration has been that in our legal system it is -- the whole

8   reason that somebody has a lawyer sitting next to them is to

9   make sure that they don't say things that might come back to

10  bite them later or hurt them.  And it is customary for

11  defendants to communicate with the court through their lawyers.

12  There are legal procedures that govern communicating with the

13  court.  The lawyers know that, defendants often don't.

14      And so I've never been angry at Mr. Pagan.  I've never

15  held it against Mr. Pagan that he's writing letters to me.  And

16  I still don't, even as we sit here.  My concern was a procedural

17  concern.

18      The second point I need to make about that, however,

19  is that I cannot take anything that was in those letters as

20  evidence in this case.  As I explained at the beginning of the

21  trial, the evidence in this case is the testimony and the

22  exhibits that were presented here in the courtroom, the

23  testimony under oath, and the exhibits that were admitted

24  through the trial process.

25      Mr. Pagan has told me more times than I can count, in

512

1    the letters that he's written to me, that he doesn't believe

2    he's guilty of this crime and that he believes that he's being

3    unfairly prosecuted.  I understand that he believes that.  I

4    don't disagree that he believes that.  But that is not evidence

5    in front of me, and I cannot take it into account in making a

6    determination about whether the Government has proven its case

7    beyond a reasonable doubt.

8              With that, turning to the evidence and looking at the

9    evidence that has been presented in connection with those

10   elements, first with regard to what happened in Puerto Rico.

11             We had three witnesses come in and testify with regard

12   to the events of August of 2014.  First of all, we had Jesus

13   Rivera-Vergara.  He was a sergeant with the Barceloneta Police

14   Department.  And his testimony was very limited, quite frankly.

15   He didn't provide a lot of information.

16             He testified that he was aware of Mr. Pagan from the

17   community.  I think he also knew that he went by a nickname

18   "Mono."  And he had some law enforcement contacts with him.  And

19   that on this particular date, August 19th of 2014, he got a tip

20   from an informant that Mr. Pagan was involved in transportation

21   of some guns, so he went out and he tried to find Mr. Pagan.

22   And he was looking for a four-door white Corolla.  By the time

23   he had contact with -- actual direct contact with anything to do

24   with what happened on August 19th, the white Toyota Corolla has

25   been abandoned and it was just out there with nobody in it.

513

1        The one detail that he did provide is that the

2   informant indicated that Mr. Pagan had the guns in a

3   multicolored bag.  So that was pretty much all of the

4   information that Mr. Rivera-Vergara provided.

5        On cross-examination he told Mr. Birdsall that the

6   informant didn't have any active charges against him or her, but

7   otherwise that's about it.

8        The one thing that was of note to me was that

9   Mr. Birdsall, on cross-examination, asked this officer whether

10  or not this officer framed someone named Wilfredo Rosario.  This

11  question I believe was related to some efforts that Mr. Birdsall

12  has made throughout the case to pursue the question in his mind

13  and in Mr. Pagan's mind of whether or not any of these officers

14  who testified here in Milwaukee were corrupt or were involved in

15  corruption.

16       Mr. Birdsall asked that question.  Officer

17  Rivera-Vergara responded by saying as far as he knew, this

18  Rosario person was not framed; that he was found not guilty

19  because there was some forensics analysis done but the analysis

20  came back too late to be able to be of any use at trial.

21       There was no proof provided while this gentleman was

22  on the stand, or anywhere else that I have seen, that Jesus

23  Rivera-Vergara was in any way, shape, or form corrupt or did

24  anything corrupt or did anything illegal.  And what I'm about to

25  say applies to pretty much all three of the Puerto Rican

US v. Medina Appendix: page 17 of 82

1    officers who testified.  If this officer had wanted to make up a

2    story, he probably could have done a better job than *I got a tip*

3    *that he was transporting guns and by the time I got there the*

4    *car was abandoned.*  He could have made up some better facts than

5    that if he wanted to frame Mr. Pagan.

6        The second officer who testified was Angel

7    Rios-Hernandez.  Same thing, an officer on the Barceloneta

8    Police Department.  And he is the person who I think for the

9    most part was most involved in the August 19 incident because

10   he's the person who actually saw past Mr. Pagan, Mr. Pagan going

11   one way and the officer going on an other, on the road or

12   highway.

13       I should note that as I recall, Detective Rios's -- or

14   Officer Rios's testimony, this incident that happened on the

15   19th did not happen in the middle of crowded city streets in

16   San Juan or something along those lines.  This was kind of out

17   in a more rural area on a narrow -- somewhat narrow road that

18   Rios called a highway, but he also said that it was pretty --

19   pretty narrow and pretty constricted.

20       He sees the white car.  He sees Mr. Pagan who he

21   refers to as "Alejandro."  He slows the car down to, I think

22   Mr. Gonzales said five miles an hour.  I had a couple miles an

23   hour in my notes.  Either way, slows down and has its lights and

24   sirens on.  Even starts to get out of the car, but Mr. Pagan

25   does not stop.  Officers signaling him to stop, still doesn't

515

1   stop.

2        According to Officer Rios, this is when Mr. Pagan then

3   pulls a gun out, points it out the window, and begins to shoot.

4   At this point Officer Rios took cover and returned fire from his

5   car.

6        And he was fairly specific about the way this exchange

7   went down.  He testified that Mr. Pagan had a pistol that seemed

8   to have been sort of a modified automatic because with one burst

9   he could fire multiple shots.

10        Mr. Pagan kept driving.  Eventually sped up and

11   clipped a tree but kept going.  Eventually hit another car.  At

12   this time he was behind Officer Rios.  As Mr. Gonzales said, he

13   had to find a driveway to turn around in because it was too

14   narrow to turn around on the road.  And pulled into kind of a

15   neighborhood area.

16        It's at this point that he testified that Mr. Pagan

17   got out with a bag approximately three feet long, multicolored.

18   Mr. Pagan was wearing blue shorts and a plaid shirt, and took

19   off running toward -- Mr. Gonzales called it a "jungle" several

20   times, I think Officer Rios said a "mountainous area."  He did

21   give chase for a little ways.  But Officer Rios testified that

22   he stopped because frankly he had been shot at already once

23   before, and the area where he pulled into the driveway was a

24   more populated area so he stayed back with the car.  And the

25   police eventually came to tow it and Officer Rios asked for a

US v. Medina Appendix: page 19 of 82

1    warrant and that was his involvement in the case.

2          Again, Mr. Birdsall brought this up and hammered on it

3    fairly hard in his closing statement.  Officer Rios was partners

4    with an officer named Oscar Cologne Quevas.  And during the

5    discovery phase of this case, Mr. Birdsall was able to find a

6    newspaper article that indicated that Officer Cologne Quevas had

7    been investigated and I think prosecuted for stealing things

8    from police inventory.

9          The fact that Officer Rios was partners with this

10   person in no way, shape or form proves that he was doing what

11   this partner was doing.  In point of fact, it looks like IAD or

12   whatever version of the Puerto Rican Police Department, the

13   Barceloneta Police Department has caught Mr. Cologne Quevas,

14   they were able to prove that Mr. Cologne Quevas was doing

15   something wrong, and I don't have any evidence in front of me

16   that anybody proved that Officer Rios was doing something wrong

17   or even accused him of doing something wrong.  They rode

18   together.  That does not make him guilty of anything that

19   Cologne Quevas was guilty of and there's no proof that Rios has

20   ever been alleged to have been involved in any corruption.

21          With regard to Mr. Birdsall's point about the fact

22   that no bullets or no casings were recovered, it is true that

23   there were no casings recovered.  However, Rios testified that

24   they did look for them.  They weren't able to find them.  And

25   there were no -- the police car itself wasn't hit with any

517

1  bullets.

2  The reason, as Mr. Gonzales pointed out, the officers

3  did not recover any firearms or anything else from Mr. Pagan

4  that day was because Mr. Pagan fled and the officers did not

5  continue to chase him on foot because Officer Rios testified he

6  had been fired at before.

7  Finally, the last witness from Puerto Rico was Luis

8  Nunoz Rosado.  He's the one that actually conducted the search

9  of the vehicle after the vehicle -- after this incident was over

10  with and the car had been taken back to the police department.

11  And he was really with the car and with Mr. Pagan.  And he's the

12  one who recovered Exhibits 17 through 20 and the other items

13  that were in the car

14  With regard to Exhibits 17 through 20 -- and I do have

15  all the exhibits with me and I've looked at them, both back

16  during the trial and again in preparation for today.  And they

17  are four U.S. Mail receipts that list the sending address as

18  53204, which, of course, is a Milwaukee ZIP Code, and then the

19  address to which they are being sent in Puerto Rico.

20  Mr. Birdsall argued fairly vehemently that

21  Exhibit No. 20 had a problem with it and couldn't possibly have

22  been recovered by Officer Rosado on August 19th in Barceloneta.

23  The reason he argues that is because the send date on that

24  package is August 19th of 2014, at 3:25 in the afternoon.  And

25  so he questions how that receipt could have ended up in

518

1    Mr. Pagan's car earlier that day in Puerto Rico.  And it's a

2    valid question and certainly it raises a mystery.

3            However, I don't find that it is sufficient to create

4    reasonable doubt, because there's another interesting fact about

5    these Exhibits 17 through 19.  Exhibit 17 through 19, all of

6    which were sent before August 19th, well before August 19th, all

7    of those exhibits are addressed to a Wilfredo Rosario in

8    Barceloneta, Puerto Rico at a particular post office box.  All

9    three of them addressed to the same address and to the same

10   person.  All of them are from, I believe, if I'm stating this

11   correctly, Rodolfo Duenas.

12           20 appears to be an outlier of some sort.  It is not

13   from Rodolfo Duenas.  It's from someone named Ramon Robles at a

14   totally different address.  It's addressed to a different person

15   in Puerto Rico at a different PO box, even in a different town.

16   It's not even addressed to Barceloneta.

17           So I'm not sure how one explains Exhibit 20.  But I

18   don't think that Exhibit 20 creates reasonable doubt as to the

19   discovery of Exhibits 17 through 19.  And I particularly don't

20   think that it creates a reasonable doubt if we go to the next

21   step in the process.

22           Puerto Rican authorities then contacted Homeland

23   Security because they were concerned about drugs moving back and

24   forth.  And that's how Inspector York from the Postal Inspection

25   Service became involved.  Inspector York testified that he got

519

1    word from the Puerto Rican authorities --

2         Let me back up.  The significance of 17 through 19 in

3    many respects is that it -- those exhibits were the catalyst

4    that tipped off authorities stateside that there was something

5    going on and tipped off the postal inspectors to look for

6    something.

7         And that's where Inspector York came in.  He got a

8    lead on August 29th that there was another package that was

9    coming toward the Milwaukee area.  And so September 3rd was when

10   that package arrived.  And that testimony was pretty

11   straightforward from Inspector York.

12        Mr. Birdsall argues again that this testimony was

13   convoluted and was vague.  I think I heard different testimony

14   than Mr. Birdsall heard.  Inspector York I think clearly

15   explained exactly what happened.  They decided they were going

16   to let this package go through.  They were not going to

17   interfere with it and simply see where it went.  It was about a

18   three- to four-pound package, so maybe something just less than

19   two kilos and whatever it contained.  And they let it go through

20   and it went to 100 South 24th Street.  And it got delivered.

21        So at this point now they know who is on the other

22   end, as Mr. Gonzales said, and that's Mr. Duenas.  And so when

23   the next package comes on September 23rd, after they get

24   notice -- Inspector York gets notice that there's -- there are

25   more packages coming, they decide this one they are going to

1    intercept.  This one was addressed to Mr. Duenas.

2          As Mr. Gonzales has gone through, they brought in the

3    drug-sniffing dog.  That's Nagler.  Nagler brings in his canine

4    partner.  And they run through the drill where they put the

5    boxes on the floor, several empty decoy boxes and then the box

6    that contained the drugs, and the dog hit on the box that

7    contained the drugs, alerted on that package.

8          Nothing in my experience about that description of

9    what happened was unusual or suspect or questionable.  Very

10    similar to dog canine sniffs that I have heard about in the

11    past.  And I didn't find it to be in any way vague or confusing.

12          At that point they open up the package.  Him,

13    Inspector York, his supervisor and Nagler all were there.  And

14    that's when they found 40 small bags of white powder total,

15    which had been wrapped in Saran Wrap and coffee.  And then they

16    repackaged it to be able to conduct a controlled delivery.

17          So I don't see -- and Nagler's testimony was

18    relatively short, just about how he works with the dog and how

19    the dog works and how the dog alerts.

20          It is somewhat mystifying to me the argument that

21    somehow the three officers in Puerto Rico were conspiring with

22    the two postal employees here in Milwaukee to somehow set up

23    Mr. Pagan.  I've yet to hear an explanation of why any of these

24    individuals were going to set up Mr. Pagan.

25          Mr. Birdsall intimated that perhaps these officers had

521

1    bad feelings toward Mr. Pagan because they dealt with him on

2    several occasions before in Puerto Rico.  I don't know whether

3    they did or didn't.  They didn't express that when they were

4    here in court and I didn't see any evidence of it.  But even if

5    that were true, there is no explanation for why York or Nagler,

6    who did nothing more than investigate a suspicious package

7    without even having a specific defendant whom they were

8    investigating, would be untruthful or would lie in any way.  I

9    found their testimony quite credible.

10           We know that the package got delivered to Mr. Duenas.

11    And then we also know that the packaging was submitted to the

12    Postal Inspection Service for testing for fingerprints.

13           There has been a tremendous amount of discussion about

14    the fingerprints and about Ms. Betty's testimony.  And it is

15    difficult for me to imagine anyone more thorough or more

16    specific or more dispassionately precise about her job than

17    Ms. Betty was.  She was clear, she was straightforward.  She has

18    a tremendous amount of experience in her field.  She explained

19    exactly what the process was and what she did in probably one of

20    the most clear fashions that I've ever heard anyone explain it.

21           Mr. Birdsall raised questions with regard to the fact

22    that originally the person who had done the fingerprint exam was

23    Craig Helman, and that Helman left the employ of the Postal

24    Service.  There's been speculation about why he left the employ

25    of the Postal Service.  I don't have any idea and no one else in

US v. Medina Appendix: page 25 of 82

1    this room as far as I know has any idea or has presented

2    anything other than speculation about why he left the Postal

3    Service.  But Ms. Betty took over the case from him and even

4    though she had been the verifier for the work that he did

5    originally, she then conducted her own examination.

6         Mr. Birdsall made a number of points about the fact

7    that she didn't take any notes, that Helman didn't take any

8    notes.  Ms. Betty testified as to why that was.  It was because

9    every single inspection -- fingerprint comparison has to be

10    verified by a supervisor or by a verifier, and the Postal

11    Inspection Service lab does not want the verifier to read the

12    notes of the person who conducted the exam and then go, *oh,*

13    *okay, well, I'll just rubberstamp that.*  They want the verifier

14    to conduct the verifier's own examination.

15         That perhaps we could argue that -- that perhaps a

16    better practice would be after the verifier does verify the

17    fingerprints to then put notes in the file.  That may or may not

18    be a better process.  But the bottom line is that she testified

19    that to avoid, in using Mr. Birdsall's own terms, confirmation

20    bias, they don't put notes in the file.

21         She also testified about the fact that the reason that

22    she first looked at Mr. Pagan was because of AFIS.  Mr. Birdsall

23    said in his closing statement that she looked at Mr. Pagan

24    because that's who she was told to look at.

25         That's not entirely accurate.  What Ms. Betty

523

1    testified to was that she ran the prints through AFIS.  AFIS

2    spit out 27, 30, I can't remember how many different names.  But

3    AFIS ranked Mr. Pagan highest on the list because of the number

4    of points of comparison.  That is why she selected Mr. Pagan to

5    compare first.

6         Finally, Mr. Pagan -- Mr. Medina has expressed --

7    excuse me, Mr. Birdsall has expressed concern about the fact

8    that the actual demonstrative exhibit pointing out point of

9    comparison wasn't turned over to him until just shortly before

10    Ms. Betty testified and he believes that it was created for

11    trial.

12         It may very well have been created for trial.

13    Demonstrative exhibits often are created for trial to help the

14    trier of fact visualize what it is that they're processing or

15    that they're trying to figure out.  That doesn't mean that it's

16    made up.  It doesn't mean that it's wrong or that it's invalid.

17    It simply means that it's created for a purpose, and that

18    purpose is to assist the trier of fact in figuring out the

19    information.

20         Finally I'll note that aside from the fact that I

21    found Ms. Betty credible, that I did not find anything

22    questionable in her testimony, I'll also note that in response

23    to Mr. Birdsall's request I did something I probably would not

24    have done had we had a jury here, and that is I gave Mr. Pagan

25    an opportunity to submit those prints to a private fingerprint

1    examiner in the event that there was some issue.  Even after

2    having done that, I still have nothing in front of me except

3    Ms. Betty's testimony, which I do, as I indicate, find to be

4    credible, and she found that the prints on the packaging matched

5    Mr. Pagan's prints both through AFIS and from the latent print

6    card that was recovered from him while he was in custody.

7            Mr. Duenas, as I indicated earlier -- and Mr. Birdsall

8    is absolutely right, I said that Mr. Duenas had something of a

9    tenuous relationship with the truth.  I still believe that.  And

10   Mr. Birdsall accurately pointed out several places in his

11   testimony where he was less than consistent, perhaps the most

12   descriptive one being his testimony, number one, that he finds

13   it a great policy not to lie to the police because if you lie to

14   the police they always catch you anyway so he never lies to the

15   police, followed up relatively shortly thereafter or preceded

16   before by his statement that he lied to the police.

17           So we had several examples like that.  I also agree

18   that Mr. Duenas's testimony was confusing.  There were a number

19   of names that Mr. Birdsall brought up that -- to Mr. Duenas and

20   Mr. Duenas tried to explain who was who.  There were no fewer I

21   think than three Rickys whose names came up somehow or another

22   during the testimony.  I was not able to keep them all

23   necessarily straight.

24           So I don't disagree that Mr. Duenas was certainly not

25   the most reliable witness.  However, as Mr. Gonzales points out,

525

1   one need not rely on Mr. Duenas to make a finding in this case.

2   What we already know before Mr. Duenas ever takes the stand is

3   that there are three mail certificates, mail receipts that were

4   found in the car that Mr. Pagan was driving in Puerto Rico that

5   show packages being sent to Mr. Duenas from Barceloneta, or,

6   vice versa, from Mr. Duenas to Barceloneta, and that based on

7   that information the Postal Service was able to track two other

8   packages which came and one of those packages contained drugs

9   and Mr. Pagan's fingerprints.

10       Mr. Duenas confirmed that by saying that, yes, he does

11   know Mr. Pagan.  He described the history that they have

12   together and described drug-dealing activities between them

13   where the drugs would come from Puerto Rican and then the money

14   packaged a particular way would go back.

15       But I don't have to rely on Mr. Duenas's testimony in

16   order to determine whether or not it appears whether there is

17   evidence that Mr. Pagan was involved in a conspiracy to

18   distribute drugs.  In particular I do want to address

19   Mr. Birdsall's argument that it is unbelievable that law

20   enforcement had no agreement with Mr. Duenas; that he has a

21   significant criminal history; that he had just gotten out of

22   prison; that he admitted to receiving a number of kilos of

23   cocaine from Puerto Rico and to selling it and to skimming some

24   and to cutting some and various other things, and yet he was

25   allowed to just walk out the door.  And it begs belief that he

526

1    didn't have an agreement.

2         I'm not sure why he was allowed simply to walk out the

3    door.  Although I suspect based on the events that followed that

4    it was because there was some hope that he would continue to

5    cooperate in the investigation, either with regard to Mr. Pagan

6    or perhaps other people among the list of folks that he reeled

7    off.

8         But I don't find it as shocking as Mr. Birdsall does

9    that everyone testified that there was no agreement.  In point

10   of fact, in my experience over the years I've very rarely ever

11   seen a situation where the Government, at any rate, certainly

12   the U.S. Attorney's Office buys a pig in a poke and promises

13   someone that they will do something for them before that person

14   has either testified before a grand jury or testified in a court

15   of law.

16        In fact, I seem to spend an inordinate amount of time

17   rescheduling sentencings so that people can wait to see the

18   outcome of a cooperator's testimony before deciding what

19   particular deal to give them.  If what Mr. Birdsall means is

20   that there was kind of an implicit deal in the sense that law

21   enforcement would just kind of look the other way and let

22   Mr. Duenas go out into the world even knowing that he had done

23   bad things, I don't know, maybe that did or didn't happen, but

24   in terms of being surprised that there was no formal agreement,

25   no formal deal, I don't in my experience find that particularly

527

1  surprising.  And that has been my experience of the way the

2  Government works with cooperators generally.

3        Finally, there is one other witness who wasn't

4  mentioned but I think is important because one of the elements

5  that I have to look at under the indictment is the amount of

6  drugs involved in the case.

7        Michael Hitchcock from the Postal Inspection Lab was

8  in Dulles in Virginia, was the forensic chemist who tested the

9  packages, the material that was in these 40 little packages that

10  have Mr. Pagan's fingerprints on them.  And he testified that

11  there was a total of 1,031.12 grams in the larger package and

12  then there was a smaller bag, the one that he pulled out

13  separately with 53.71 grams.  So something over a kilo of

14  cocaine.

15        And that is an important finding that I have to make

16  because the indictment says that Mr. Pagan has been charged with

17  conspiring to distribute over 500 grams of cocaine.  That

18  amount, and that is uncontroverted testimony, certainly is in

19  excess of 500 grams of cocaine.

20        So is there evidence that Mr. Pagan had an agreement

21  with Mr. Duenas to distribute drugs?  Yes, there is.  It is

22  circumstantial evidence, to be sure.  But in federal court, of

23  course, the federal government -- the federal law does not make

24  any distinction between circumstantial evidence and direct

25  evidence.  So the circumstantial evidence includes:  The mail

528

1    receipts found in his car; the two packages that came from

2    Puerto Rico to Mr. Duenas when the Postal Inspection Service was

3    surveilling; the package that was opened that had Mr. Pagan's

4    fingerprints on the interior packaging; and, to some extent,

5    Mr. Duenas's testimony.  The fact that he is not believable in

6    all respects does not mean that he is entirely incredible, and

7    some portions of his testimony were corroborated by other

8    evidence in the case.

9            That agreement was to distribute drugs.  And that,

10   again, you don't necessarily need Mr. Duenas's testimony to

11   show.  The amount involved here, the thousand -- the kilogram,

12   is certainly not a user amount.  It is a distribution amount.

13   In fact, it was packaged -- the way it was packaged in the Saran

14   Wrap and the coffee, obviously to avoid detection by a sniffing

15   dog, the purpose of the coffee being to mask the scent.  The way

16   that it was packaged shows that it was packaged to be

17   distributed so that nobody would intercept it on its way to

18   wherever it was going.

19           And I also have to find whether or not the

20   Government's proven beyond a reasonable doubt that Mr. Pagan

21   intentionally participated in the conspiracy.  And again, it is

22   very telling the way that package was wrapped.  And the fact

23   that it was wrapped in cellophane or -- or Saran Wrap and then

24   it was wrapped in coffee, shows that this wasn't somebody who

25   sent something by accident.  I'm not sure how you could send

529

US v. Medina Appendix: page 32 of 82

1    something by accident.  But clearly this was someone who knew

2    that they needed to mask and protect what they were sending and

3    didn't want to get caught.

4         And so there is circumstantial evidence that Mr. Pagan

5    knew, knowingly that he was participating in the conspiracy.

6    And that is verified or corroborated by portions of Mr. Duenas's

7    testimony.

8         I believe that while there have been certainly some

9    doubts that the defense has raised about some of these issues,

10   none of those rise to the level of a reasonable doubt sufficient

11   for me to find that the Government has not proven its case

12   beyond a reasonable doubt.  I believe that the Government has

13   and I do find that the Government has proven beyond a reasonable

14   doubt that Mr. Pagan conspired with people known and unknown to

15   the grand jury to distribute cocaine, and that the amount of

16   cocaine that he conspired to distribute was in excess of 500

17   grams and therefore I will find him guilty on the count in the

18   indictment.

19        And with that having been said, the next issue that we

20   have to turn to is scheduling a sentencing date.  And I note

21   that Ms. Mallet joined us from the Probation Department during

22   the closing statements.

23        Ms. Mallet, I don't know if you have a sense of how

24   much time you would need to put together a presentence report.

25        PROBATION OFFICER:  Your Honor, we could have it

530

1  rest.

2  **DEFENSE RESTS**

3       THE COURT:  All right.  So the defense now has rested.

4       Mr. Gonzales, does the government have any rebuttal

5  evidence that it wishes to present?

6       MR. GONZALES:  No, Your Honor.

7       THE COURT:  All right.  Given that, then, it appears

8  that the parties have put in all of the evidence that they

9  planned to put in.

10       I have a copy of the exhibit list that Ms. Wrobel

11  prepared.  Ms. Wrobel, did we get copies to everybody?

12  Terrific.

13       I would ask everyone, if you haven't already done so,

14  to just take a minute, double-check the list, make sure that the

15  documents that are on it are the documents that you all had as

16  having been admitted.  And I'll give you just a second to check

17  it and then inquire whether or not it's accurate.

18       MR. GONZALES:  The government believes it is accurate,

19  Your Honor.

20       THE COURT:  Thank you.

21       MR. BIRDSALL:  I think this is accurate, Judge.

22       THE COURT:  Okay.  According to my notes that I was

23  keeping it is, so ....

24       All right.  So the evidence now having closed, does

25  either party have any motions before we proceed to closing

475

1    statements?  Mr. Gonzales?

2           MR. GONZALES:  I have no motions, Your Honor, but I

3    believe the Court addressed the Rule 29 motion at the end of the

4    Government's case.

5           THE COURT:  I did address it at the close of the

6    Government's case and there hasn't been any additional evidence.

7           MR. GONZALES:  No additional evidence.

8           THE COURT:  All right.  Thank you.

9           Any disagreement with that, Mr. Birdsall?

10          MR. BIRDSALL:  No, that's true.  It's accurate.

11          THE COURT:  Thank you.  All right.

12          Mr. Gonzales, does the Government wish to give a

13   closing statement?

14          MR. GONZALES:  I do, Your Honor.

15          THE COURT:  You may.

16                    GOVERNMENT CLOSING ARGUMENT

17          MR. GONZALES:  Counsel.  Good morning, Your Honor.

18          The facts of this case are simple and direct.  The

19   facts point to the simple fact that Orlando Medina or Alejandro

20   Pagan is a drug trafficker and a very dangerous individual.  And

21   this is based upon the evidence that was presented in this

22   courtroom.

23          This case begins in Puerto Rico on August 19th of

24   2014.  On that day, Sergeant Jesus Rivera-Vergara receives a tip

25   from one of his confidential informants that the defendant,

476

1  Mr. Orlando Medina, somebody who he was familiar with, was going

2  to be transporting guns, money, and drugs, and he believed those

3  items were going to be transported in a multicolored backpack or

4  case.  To verify this information, Sergeant Rivera-Vergara

5  travels to the defendant's residence or the general area where

6  he knows the defendant to live.  He is going to set up

7  surveillance at that location.

8      While en route to that location, he observes the

9  defendant driving a white Toyota Corolla in the opposite

10  direction.  They pass each other as they're traveling down the

11  highway.  He recognizes the defendant, he recognizes the

12  vehicle.  He also observes that the defendant's not wearing a

13  seatbelt.  The portion of the road where they pass each other,

14  he's unable to do a U-turn at that location.  He calls for

15  backup.  He calls for assistance.

16      What he does is, he contacts several officers,

17  including Sergeant Angel Rios-Hernandez.  And Sergeant Angel

18  Rios-Hernandez, he testified in this courtroom that he was also

19  familiar with the defendant, Mr. Medina, and he attempted to,

20  along with another officer, to block the road to prevent

21  Mr. Medina from driving by with his white Toyota Corolla.  And

22  they attempted to block the path of Mr. Medina.  And Mr. Medina

23  slowed down his vehicle.  He didn't stop his vehicle, he didn't

24  submit to the officer's commands.

25      What Mr. Medina did is he slowed his vehicle down to

US v. Medina Appendix: page 36 of 82

1    about five miles an hour.  I think that was close to the

2    testimony.  At a very low rate of speed.  And then proceeded to

3    remove a handgun out the window and discharge rounds toward the

4    officers.

5            Officer Rios was able to avoid being shot by the

6    defendant and was able to return fire and struck the rear

7    quarter panel of the Toyota Corolla.

8            At that point, the Toyota Corolla went through the

9    blockade and continued away from that location.  Officer Rios

10   and other officers turned around their vehicles and began

11   pursuit.  They chased the defendant probably about a half mile,

12   according to their testimony, down the road until he turned into

13   what appeared to be a cul-de-sac area.

14           He pulled his vehicle in there.  They observed him get

15   out of the white Toyota Corolla carrying a multicolored large

16   bag, the kind of a bag that one would use for baseball I think

17   was the description that they used.  So big enough to carry

18   firearms and money and drugs.

19           So they see him, he begins to flee into the jungle

20   area.  After having been shot at previously by Mr. Medina,

21   officers do not begin pursuit.  What they do do is, they secure

22   the white Toyota Corolla, which the defendant was seen

23   driving -- which they were familiar with as being his vehicle --

24   they secure this vehicle, they transport it, have it towed back

25   to the police department in Barceloneta.

478

1         They put it in a secure location.  Officer Rios tapes

2    up the vehicle so that no one else could open it except him, or

3    at least have an indicator that the vehicle wasn't tampered

4    with.

5         They wait till they get a search warrant to search

6    that vehicle.  And once a search warrant -- Sergeant

7    Rios-Hernandez obtains a search warrant from a local magistrate

8    and then contacts one of his colleagues, Luis Nunoz Rosado.

9         And Mr. Rosado, when he pulls into the station that

10   day, recognizes -- or when he pulls in and sees the white Toyota

11   Corolla in the impound lot, he recognizes it as a vehicle that

12   he had seen Mr. Medina drive previously.

13        So he gets there, he gets his assignment.  His

14   assignment is to inventory the items in that vehicle.  So

15   Mr. Rosado, Officer Rosado, he inventories the items in the

16   vehicle.  And he testified that amongst the items that he found

17   in the vehicle were the defendant's birth certificate and the

18   birth certificate of the defendant's wife.

19        Also, very importantly, are four receipts, Express

20   Mail receipts that were located in the rear of the vehicle.  And

21   these four receipts, first being Government's Exhibit No. 17,

22   Government's Exhibit No. 17, this mail order receipt, shows that

23   on July 31st of 2014, Rodorfo Duenas from Milwaukee sent a

24   package of about two pounds two ounces to Barceloneta, Puerto

25   Rico.

479

1        Then it shows that -- Government's Exhibit 18 shows

2    that on or about August 7th of 2014, Rodorfo Duenas again sends

3    a package from Milwaukee to Barceloneta weighing approximately

4    two pounds eight ounces.

5        Government's Exhibit 19 shows that on or about August

6    11th of 2014, Rodolfo Duenas, again from Milwaukee, sends a

7    package of about two pounds to Barceloneta to a Wilfredo

8    Rosario, same individual who was on the three previous mail

9    receipts.

10        And then, finally, on Exhibit No. 20, it shows that on

11    the date of this incident there was a package that was -- a

12    receipt that was given showing that a package was sent on that

13    day from Milwaukee heading toward Puerto Rico.

14        The importance of especially Government's Exhibits 17

15    through 19 show that Mr. Duenas was sending packages from

16    Milwaukee to Puerto Rico.  At this point we don't know what

17    those packages are containing or the importance of those

18    packages.  But the Puerto Rican authorities analyzed this.  They

19    know that they were investigating Mr. Medina for various things.

20    They passed this information on to Homeland Security who in turn

21    passes that information on to the United States Postal

22    Inspection Service because these packages are being sent in the

23    mail.

24        They contact United States Postal Inspector Daniel

25    York and let him know that there's this individual, Mr. Duenas,

480

1    here in Milwaukee who is sending packages to Puerto Rico, and

2    that it's somebody that they should watch out for.

3             So what happens is, on September 3rd, about two weeks

4    after this incident occurs in Puerto Rico, following up on the

5    information provided by Puerto Rico, Postal Inspector York

6    begins to conduct surveillance and monitor packages that are

7    coming in from Puerto Rico to Milwaukee to the general location

8    of where those earlier packages were sent.

9             And during the course of that investigation, on or

10   about September 3rd, Daniel York observes a five-pound package

11   addressed to Rodolfo Duenas in Milwaukee, coming again from

12   Barceloneta, Puerto Rico, scheduled to be delivered to

13   Mr. Duenas.

14            So what Mr. York or Inspector York does is he allows

15   that package to go through the system.  And it goes through the

16   system, it gets assigned to a mail carrier, and it gets sent out

17   onto the street for delivery.  He doesn't stop the package, he

18   doesn't try to interdict the package, what he does is he follows

19   that package to see where that package is going and he sets up

20   surveillance at the location where the package is to be

21   delivered.

22            He observes, during the course of that investigation,

23   an individual later identified in photographs during the course

24   of surveillance as Rodolfo Duenas.  He identifies Mr. Duenas.

25   He puts the two together.  Now he has a face, somebody on the

481

1    other end who is receiving these packages, and then he begins a

2    more thorough investigation, planning on stopping the next

3    package.

4            So on or about September 23rd of 2014, about one month

5    after the incident in which Puerto Rican authorities try to stop

6    the defendant, another package is scheduled to arrive in

7    Milwaukee from Puerto Rico.  On that day Inspector York is

8    notified that a package is en route from Puerto Rico to be

9    delivered on the 24th.  So what Inspector York does is he

10   contacts Gene Nagler of the Milwaukee Police Department and his

11   narcotics dog.  They wait for the morning of the 24th, they go

12   there early in the morning, and the packages are coming in.

13   They start looking for packages that might match the

14   description, looking for packages with the name of Rodolfo

15   Duenas.  And during the course of that early-morning

16   investigation, they find a package that matches what they're

17   looking for.  It's scheduled to be delivered to Rodolfo Duenas.

18           They take that package and then they submit it to the

19   standard protocol to determine whether it might contain the

20   narcotics.  They set up dummy packages.  They line up the

21   packages on the floor, they bring in the narcotics dog.  The

22   narcotics dog goes through the packages, indicates a positive

23   result on the package that's going to be delivered to

24   Mr. Duenas.  And then Inspector York obtains a federal search

25   warrant, he obtains a federal search warrant for that package to

482

1   determine the contents.

2       Once he obtains that federal search warrant, he and

3   Eugene Nagler take that package to the Postal Inspection Service

4   office and they open it up and they go through the contents.

5   When they do that, they find a package, a large package that is

6   wrapped in coffee grounds, as the Government's Exhibits I

7   believe 1 through or 2 through 10 document, wrapped in coffee

8   grounds inside individual packets of cocaine, a little bit over

9   a kilogram of cocaine.  They test it to determine whether it's

10  presumptive positive, it tested presumptive positive for

11  cocaine.  They've identified that it's approximately a kilogram.

12      They take it, they secure it, they send it off to the

13  crime lab to be analyzed both for fingerprints and to ensure

14  that the contents are, in fact, cocaine.  That gets done.

15      But in the interim they take and conduct a controlled

16  delivery, what they believe to be the controlled delivery of a

17  package to Rodolfo Duenas at the residence listed on the

18  original packing receipt.

19      So they take that package -- it's a controlled

20  delivery.  Shortly after the package is delivered to Mr. Duenas,

21  law enforcement agents conduct a raid.  They've obtained a state

22  search warrant to search that residence.  They conduct the raid,

23  out the back door goes Mr. Duenas.  Mr. Duenas is taken into

24  custody.  Mr. Duenas is then transported to the local police

25  department and at HIDTA, and there he is interviewed by Abner

483

1    Valcarcel of the Milwaukee Police Department and Evelyn Lazo.

2           And Mr. Duenas, as most drug defendants would, doesn't

3    want to cooperate, keeps telling them that he's -- he can't

4    cooperate, he would be killed, things of that sort, and refuses

5    to cooperate.  But after some discussion with the officers, he

6    begins to tell the story and he tells what he knows and who he

7    was involved with.

8           They don't tell him anything about the ongoing

9    investigation because quite frankly at that point they don't

10   have a knowledge of what's going on at that -- with the Puerto

11   Rican investigation, other than that packages were coming in.

12   Mr. Duenas begins to tell the story that he was dealing with

13   somebody who he knew as Mono, or Orlando Medina Alejandro Pagan.

14          He identifies the defendant as the source of the

15   drugs.  He explains that Mr. Pagan or Medina had arranged for

16   another individual from Puerto Rico to come and live with

17   Mr. Duenas at his residence in Milwaukee.

18          And the arrangement was that kilograms of narcotics

19   would be sent from Puerto Rico.  Those drugs were to be sold,

20   the return -- in return envelopes packed between carbon paper

21   and other items to mask the scent.  The money was to be

22   repackaged and sent back to Puerto Rico for payment of the

23   drugs.

24          And this was the standard practice.  So the packages

25   would come.  He would take the drugs, they would be sold, and

484

1    the money would go back to Puerto Rico to the defendant.  He

2    indicated that he was in communication on multiple occasions

3    with Orlando Medina and that they had had discussions about

4    this, Mr. Medina had made these arrangements with Mr. Duenas,

5    and this had been going on for several months prior to the

6    interception of these packages.

7            We know this is true.  We know there's a contact

8    because, again, going back to the earlier seized mail receipts

9    in the defendant's vehicle.  The defendant, when law enforcement

10   stops him in Puerto Rico, after discharging his weapon and

11   shooting at the officers and fleeing, he leaves his vehicle.

12   And when they go through that vehicle, they find at least three

13   of the four mailing receipts show that the sender of those

14   mailing receipts were Rodolfo Duenas, to Barceloneta, Puerto

15   Rico.  Consistent with what Mr. Duenas was telling us, that his

16   arrangement was he was to receive the package and then he was to

17   sell the contents and return the money to the defendant,

18   Mr. Medina.  So they interview him, he gives the statement.

19           He also tells law enforcement, interestingly enough,

20   that during the course of the -- his time dealing with

21   Mr. Medina, Mr. Medina tells him of an incident that he was

22   involved with with local law enforcement where he shot at the

23   police officers.  There was a chase and that he fled from the

24   scene and got away.

25           Mr. Duenas tells us that -- he tells that to the

485

1    officers when they interview him.  That was back on the day

2    shortly after his arrest.  So there is further corroboration of

3    the communication between these two.

4         We also -- based on those statements he's indicated

5    that there's this pattern.  He's familiar with the controlled

6    substances of cocaine.  He has sold it, he has used it in the

7    past, and that he was involved in this distribution network

8    paying/returning the money to Mr. Medina.

9         Meanwhile the package that was intercepted by Postal

10   Inspector York was submitted off, sent off to the postal

11   inspection crime lab.  And we know that was done, the

12   examination was conducted, and the examination revealed:  One,

13   what we knew already based on the presumptive positive, that the

14   contents, a little bit over a kilogram of white powder, was, in

15   fact, cocaine hydrochloride examined by the postal inspection

16   laboratory.

17        We also know that during the course of the

18   investigation that they examined the packaging material, the

19   material, the cellophane wrap around the kilogram of cocaine

20   that was shipped for latent fingerprints.  And during the course

21   of that investigation they first get a computer identification

22   listing the fingerprint as most likely the defendant

23   Mr. Medina's.  And then at that point, a 29-year veteran of

24   fingerprint analysis, Ms. Valerie Betty, submits the

25   fingerprints to a closer examination.  She examines all the

486

1  fingers versus known fingerprints of the defendant that were

2  given to her and she makes a positive confirmation that, in

3  fact, the fingerprints located on the cocaine that was shipped

4  to Mr. Duenas contained the defendant's fingerprints.

5          As I said when I started, the facts of this case are

6  not complicated; in fact, they're quite simple.  They clearly

7  point to the fact that the defendant was involved in an ongoing

8  conspiracy at least for several months.  Based on the fact that

9  there are these mail receipts from July, August and September of

10  2014 between Puerto Rico, with Mr. Duenas sending money back and

11  packages coming in from Puerto Rico for Mr. Duenas, the fact

12  that we recovered these, the one package which did contain

13  1 kilogram of cocaine and the defendant's fingerprints, I think

14  that based upon the totality of this evidence the defendant is

15  guilty of the offense of conspiracy to possess with the intent

16  to distribute cocaine greater than 500 grams.

17          Thank you, Your Honor.

18          THE COURT:  Thank you, Mr. Gonzales.

19          Mr. Birdsall.

20                  DEFENSE CLOSING ARGUMENT

21          MR. BIRDSALL:  Thank you, Judge.  Mr. Gonzales,

22  Ms. Lazo.

23          I don't think the Court's going to be surprised that I

24  have a very different take on the evidence than Mr. Gonzales

25  does.  And, where to start.

US v. Medina Appendix: page 46 of 82

1        I think that Mr. Duenas's credibility speaks for

2   itself.  In our Rule 29 motion the Court said -- commented that,

3   yes, you didn't want to accept that I was calling him a liar,

4   but you did say that he had a tenuous relationship with the

5   truth I believe was your comment.  And that's an absolute truth.

6        So my theme is really twofold.  One is that the

7   witnesses who testified by and large were either outright lying

8   or being purposely deceptive, or they have a history of doing

9   that and they're not to be believed.

10       Number two is that the fingerprint evidence is not to

11  be believed beyond a reasonable doubt because of the way that

12  the examination was done and the way that it was brought to this

13  court.  And I'll walk through what I'm talking about with both

14  of those.

15       So why do we have a reason to doubt the Government's

16  witnesses?  Well, let's take the Puerto Rican officers to start

17  with.  Jesus Rivera-Vergara I believe it's pronounced.  He says

18  that he has a witness, a confidential informant who we don't

19  know anything about.  We don't know what history they have, we

20  don't know what -- you know, who this person is or why they

21  should be believed, but they say, supposedly, that Mr. Medina

22  has two rifles, five pistols and some drugs.  None recovered.

23       They say that they get into a shootout with him down

24  some winding road.  And it's like -- I mean, it sounded like a

25  movie.  Shooting out while they're driving and then they get him

488

1    in a cul-de-sac and he runs into the woods.  And suddenly,

2    they're the only ones that see this, but they see the very bag

3    that they claim that the CI told them about.  Okay.  But

4    nothing's recovered.  So we have only their words to take for

5    that.  But they have a shootout on the street.

6         But you remember the cross-examinations about, well,

7    what did you do?  What, did you collect some of the casings?

8    You know, maybe some future ballistic review of that.  Nope.

9    Nothing.  Nothing recovered.  Zip.

10        Not only that, but the first thing the officer that

11   was called to the scene, Angel Rios-Hernandez, what did he do?

12   Well, first of all, he worked with Lieutenant Oscar Cologne.

13   You remember that testimony?  Cologne the thief.  Cologne the

14   cop who was stealing evidence.  Worked with him quite often but,

15   you know, I don't know nothing about this whole stealing

16   business.

17        So does that mean that he's guilty of that?  No, it

18   just means it smells.  It just means that it's not passing the

19   sniff test.  But he's the one that impounds the car.  So he's

20   the one we need to trust to impound the car to recover these

21   receipts that Mr. Gonzales makes a great deal about.  And he

22   does that.  And that's very significant.

23        I don't know if you have these exhibits in front of

24   you, Judge, but Mr. Gonzales walked through 17 through 20 and in

25   doing so, he kinda tripped on 20.  And the reason he tripped on

489

US v. Medina Appendix: page 48 of 82

1   20 is because these officers -- including Luis Nunoz Rosado who

2   is the one who did the search -- these officers swore up and

3   down under oath in this court that all of these were found in

4   Mr. Medina's car, in this white Corolla.  And that was on August

5   19th, 2014.

6        And if you look at each one of these receipts, 17

7   through 20, the upper right portion is the part that the postal

8   employees fill out.  The postal employees fill out the ZIP Code

9   that they're using, the day of the delivery, the cost, the date

10  that it was accepted, the time it was accepted and the estimated

11  delivery date.

12       So 17 through 20 all predate August 19th, 2014.  But

13  these officers are saying that Exhibit 20 -- and I pinned them

14  down on this specifically -- Exhibit 20 was found in his car in

15  Puerto Rico on August 19th, 2014.  They said that.  They swore

16  that this is true, except it's impossible because by Exhibit

17  20's own -- on its face it says it's sent from Milwaukee.  So

18  this was filled out by a postal employee in Milwaukee on August

19  19th, 2014, at 3:25 p.m.

20       So I challenge Mr. Gonzales to explain in his rebuttal

21  argument how it is that this item that his witnesses swore under

22  oath was found in Puerto Rico after this supposed shootout,

23  after this impounding of the car, somehow magically gets from

24  Milwaukee, Wisconsin all the way to Puerto Rico inside his car,

25  even though that whole chase business, that took place in the

490

1    morning, if you recall, and this wasn't even signed until the

2    afternoon.

3         So to say that I think that there's reasonable doubt

4    here is an understatement.  So these officers from Puerto Rico

5    do all of that.

6         Then we have Agent York come in, and Nagler.  They

7    give a bunch of testimony that was kind of like -- how shall I

8    describe this?  I think it was Nagler that was talking about

9    how -- he never said what they did.  He said, "this is what we

10    normally do."  He never actually said this is specifically what

11    happened.

12         And if you remember, both of them were telling a

13    different story about whose idea it was to do this particular

14    stiff.  And they didn't really remember, they couldn't really

15    recall, *I don't know if we took other packages, if we just let*

16    *them roam around.*  They don't recall how it all went down.

17         This is a court of law.  These are people that are

18    supposed to be trained to do all this and to make records.  Did

19    they make any records of any of that?  Zero.  They made zero

20    records of all of that.

21         So, you know, there's no records about the dog.

22    There's no details on the sniff.  All we know is that they say

23    that it happened.  Okay.

24         Well, they do open the package and eventually it works

25    its way over to Valerie Betty.  But on the way there, it goes

491

1    through the hands of Mr. Helman.  I'm trying to remember his

2    first name.  Craig Helman.

3         Mr. Helman, for reasons we don't know, is dismissed

4    from his employ with the Postal Inspection Service.  He does a

5    report.  We're told that his initial report wasn't a comparison,

6    it was just running them through AFIS.

7         Okay.  Ms. Betty gets on the case, and in the course

8    of her hundred-comparisons-a-day workload, she says that she

9    made a comparison.  All right.  So when we have experts come

10   into a courtroom, at least in the United States, they need to

11   speak from some well of knowledge.  They need to be able to say

12   this is what I found and this is how I got there.

13        Well, she came in and she started to say that.  But

14   was there a single record of that?  She came in here, Judge, and

15   she testified that years ago she did this analysis and she

16   didn't make one single note about the points of comparison.  Not

17   one.

18        And, but she shows up with this Exhibit 14.  She shows

19   up in court with Exhibit 14, which she tells us is from

20   Mr. Medina's file, and yet this was never produced ever in the

21   history of this case.  Three years it's been hanging around.

22   And it's got a bunch of points of comparison which she

23   apparently just -- I don't know when she created this, but

24   probably shortly before she flew into Milwaukee.

25        And to say that's a little trial by ambush is an

492

1  understatement also, but to say it strains credibility is

2  absolutely true.  She seemed like a perfectly nice person when I

3  was talking to her both in and out of court.  But that doesn't

4  mean that there's not reason to doubt what she is saying.

5  There's no reason to say that we can't be skeptical about

6  evidence that turns up at the last minute, that's never turned

7  over, and that's based on supposedly her own memory.  That's all

8  we can conclude.

9          Not only that, she says we're told not to keep any

10  records.  We're told not to keep any records of the prints and

11  she -- there's zero standards to rely on then, because most

12  states and most countries and most labs are going to have some

13  sort of standards, you have to have 10 points of comparison or

14  whatever it is.  Other countries do it differently.  But we

15  don't apparently do that.

16          She never tested the actual wrap.  We don't know

17  really what happened to that because that was in the custody of

18  Mr. Helman, now dismissed.

19          There's no reports about the photos taken by

20  Mr. Helman.  There's no reports about any contamination that

21  might have taken place there.  There's no explanation about why

22  she runs these cases -- she runs these -- the prints through the

23  AFIS system.  And then she comes up with 20 different names but

24  she only tests one because that's the one she was instructed to

25  test.

493

1          So, in my thinking, Ms. Betty is really the lynchpin

2     of this case.  But in order to get even to there, we have to go

3     through Mr. Duenas.  Mr. Duenas.  Mr. Duenas, the explanation

4     from the Government about his interviews was a summary at best.

5     Mr. Duenas has --

6          Here we go.  You'll recall from my cross-examination

7     that Mr. Duenas's deeply shifting stories about a variety of

8     items really exposed all he's trying to do is squirm his way out

9     of trouble.

10          Let's start with who owns the drugs.  He says

11     variously, "The Colombian."  He says, "The Colombian," somebody

12     named "Javie" or "Javie," and "Noel's dad."

13          He sat here and testified about how he never lies to

14     the police, and yet then he turns around and he admits lying to

15     the police.  Not only does he do that, he lies to everybody he

16     deals with including the people that he's dealing drugs for.

17          "You're not supposed to open the package, you're just

18     supposed to deliver it."  But he opens it anyways, takes a

19     little drugs out, puts a little filler in, and then he delivers

20     it and then he lies about it to them.  At least he admitted

21     that.

22          He told you that this guy named Rickey is the one that

23     supposedly Mr. Medina sends to train him how to do this.  So

24     really what he's talking about here is he's talking about July

25     of 2014.

494

1    So just like a month -- I guess two months before the

2  actual arrest.  And yet, if you look at Exhibit 53, that's just

3  a flat-out lie because Ricky was in the Milwaukee County Jail.

4  So what he's doing is, he's -- because he's here for

5  Mr. Medina's trial, he's conflating all of the stuff he did with

6  either this guy named Piku, or Ricky, or whoever else, he's

7  conflating that with him, with Mr. Medina.

8    So he can't tell the same story about who is actually

9  taking -- who owns the drugs.  He tells you that these two

10  individuals, Noel lived with them you may recall, Noel and Piku.

11  He introduced them.  That's what he said.  He introduced those.

12  And then I confronted him about it and it turns out that Piku

13  and Noel are cousins and they've known each other since they

14  were kids.  So he's just trying to play fast and loose with the

15  truth.

16    Valcarcel, the detective who interviewed him on the

17  day of the arrest, and the following day for that matter, he,

18  when he's showing him pictures of various people including

19  Mr. Medina, he shows him a picture and he says, "This is Orlando

20  Medina's photo."  And then he wants him to ID him.

21    He does the exact same thing with Ricky.  You may

22  recall that -- looking for it here -- Ricky.  Ricky, the guy

23  that's in jail that supposedly somehow magically I guess he got

24  a weekend pass to come over and train him how to deal drugs in

25  July of 2014.

495

1          You may recall I questioned both of them about this

2    back and forth, back and forth.  He's like -- and I was reading

3    directly from the transcript, from his interview.

4          And he says:  "Ah, this is --"

5          You know, can you identify?

6          "This is Ricky."

7          He's like, "That's not Ricky, that's Pappo."

8          "No, that's Ricky."

9          "That's Pappo.  I'm telling you, that's Pappo."

10          Over and over and over.  And so, you know, I mean

11    his -- his -- you know, then he finally says, "Oh, yeah, that's

12    Ricky."  When the detective kind of basically demands it,

13    demands him to give that answer.

14          And most suspicious, and most not at all believable

15    even a little bit, is to say that Mr. Duenas didn't have a deal

16    with the Government.  Mr. Duenas -- let's just look at this

17    logically.  We're all criminal justice professionals here.

18    Mr. Duenas is caught in a controlled delivery with over a kilo

19    of cocaine.

20          He eventually tells them, "Yeah, I did this like four

21    other times."  So now we have four kilos.  We're just shy of the

22    10-year mandatory minimum, we definitely have the five, plus if

23    the Government wanted to throw in an 851 we'd have a mandatory

24    minimum of 10.

25          This guy just got out of prison.  So Valcarcel and

1    Duenas both say, after I just put it right at them and I finally

2    just gave up because both their testimonies were so incredible

3    and so ridiculous to say, "No, there's no deal."

4         This guy just got popped for four kilos really,

5    essentially.  They have him in custody and they let him go.  And

6    there's no explanation.  Not a single attempt to explain this.

7    And all Valcarcel would say was, "Well, no, this is an ongoing

8    investigation."  Doesn't say what.

9         And do you know what else?  "Ah, yeah, I don't have

10   nothing to do with this.  I don't have anything to do with this.

11   This is those guys down in Puerto Rico, this is their case."

12   Even though he's the one that did all the questioning.  And if

13   you remember, I questioned Duenas about his comments to

14   Valcarcel about, "Hey, if I give you two deaths, what does that

15   give me?"  And then Valcarcel says, "That'll get you a lot.

16   That'll get you a lot."

17        So this is in September of 2014 this is going on, this

18   questioning.  Inexplicably, this guy that they have dead to

19   rights, walks out the door and they say we -- "yeah, we really

20   don't know where he went."  You know.  "He promised he wasn't

21   going to deal drugs anymore so that's good enough for us."

22        So he does.  And, in fact, he picks up Noel at the

23   airport a few days later.  But he's not working for him.  That's

24   what they said.  He's not working with him.  There's no deal.

25   Okay.  So he's picking up Noel, this guy who's his roommate, the

497

1  guy that supposedly Medina introduces him to, and yet he refers

2  to Noel as his friend.

3       All right.  So time passes, months, we have no idea.

4  Valcarcel says he had some contact with him.  But if you

5  remember his testimony, he was unbelievably resistant and

6  deceptive in trying to describe what it was.  And he just kept,

7  "oh, it's an ongoing investigation."  Okay.

8       So, January, I think it was the 20th, of the following

9  year, Duenas comes into -- I don't know if it was District 2 or

10  over at HIDTA, but he comes in for a videotaped interview where

11  he just continues to expand on his story about Mr. Medina, the

12  great drug dealer.  Still, there's no -- there's no deal.

13  There's no decades in prison, there's no nothing.  And the

14  explanation is, that you're expected to buy and not have any

15  doubt about, the explanation is is that that's those guys's case

16  down in Puerto Rico, guys we've never heard from.

17       Mr. Gonzales didn't have anything as far as a deal

18  with him.  I think he asked him about that specifically.  That's

19  just -- that's just not believable.  And he's not believable.

20       The officers that testified from Puerto Rico, also not

21  believable.  The officers, Detective Valcarcel, it just -- it

22  just smacks of sort of like a quiet little conspiracy of their

23  own.

24       Now, and as far as Ms. Betty's testimony goes, as I

25  said, we expect more and we deserve more before we convict

498

1    somebody of a serious felony in terms of her -- just disclosure

2    and her actual testing.  It's gotta be based on actual standards

3    and it's gotta be something where she can explain specifically.

4         If you remember when I cross-examined her, I asked her

5    specifically like which point went to which point.  Cause I had

6    no idea.  And she couldn't even explain that.

7         So, Your Honor, respectfully, I know you've done this

8    work and you've been in the system.  I'm asking you to not

9    accept this level of proof.  This is not beyond a reasonable

10   doubt.  I'm asking you to return a verdict of not guilty.

11        Thank you.

12        THE COURT:  Thank you, Mr. Birdsall.

13        Mr. Gonzales, rebuttal?

14        MR. GONZALES:  Sure.

15        (Counsel confer inaudibly.)

16        MR. GONZALES:  I took them off of there.  Unless I put

17   them all back.

18        MR. BIRDSALL:  Yeah, I think you did.

19        (Brief pause.)

20             REBUTTAL CLOSING ARGUMENT

21        MR. GONZALES:  Listening to the defense argument in

22   this case boils down to everybody is lying about Mr. Medina.

23   The cops in Puerto Rico are lying, the Postal Inspection Service

24   people are lying, the -- Mr. Duenas is lying, Ms. Betty is

25   lying.  Everyone is lying about Mr. Medina to frame him.  That

499

1    version of events does not make sense.

2            When we look at the evidence as presented, and

3    Mr. Birdsall attacked some of that.  He talked about

4    Rivera-Vergara receiving this tip about the guns and the drugs

5    and possibly money and a large multicolored bag.

6            He's following up on that investigation.  He's in the

7    course of trying to conduct surveillance.  Mr. Medina gets

8    involved in the shootout with the law enforcement officers.

9            They trail him to the point where he dumps his

10   vehicle, parks it and runs into the woods.  The cops are right

11   on his tail.

12           One, he's a very dangerous guy.  He just got done

13   shooting at them.  But they see him get a bag out of the truck

14   or out of the vehicle matching the description of what was given

15   by the informant.

16           The fact that they didn't recover anything is obvious

17   because they visually saw him take the items that would have

18   been recovered and run off into the woods.  And they don't chase

19   him again because he shot at them on at least two -- two rounds

20   at them in the street, so they're not going to follow him into

21   the jungle.  So there wasn't any follow-up, but they did see him

22   take the package.

23           When one looks at the -- and it's funny that

24   Mr. Birdsall says, well, we can't believe Sergeant Angel

25   Rios-Hernandez because he was in the company of Lieutenant

500

1   Cologne who has this -- who was arrested for stealing items or

2   dismissed for stealing items because he's a bad guy and these

3   two guys hang out together so that doesn't smell good, it

4   doesn't look good.  Yet Mr. Duenas and Mr. Medina hang out with

5   each other and we're not supposed to make any connection there.

6          But the fact of the matter is, the evidence in this

7   case clearly points to Mr. Medina's involvement.  We have the

8   cops in Puerto Rico who identify him, who try to take him into

9   custody and are shot at.

10         We know that packages are coming in.  And this is from

11  Puerto Rico, there's no Milwaukee investigation going on here.

12  The names of Rodolfo Duenas is coming from Puerto Rico,

13  receiving packages involving with Mr. Medina.

14         Postal Inspection looks for those packages and they

15  find a package -- they find two packages, one on September 3rd,

16  but the September 23rd package is the one that they're going to

17  intercept.  And they intercept that package.

18         Inspector Daniel York, there has been no indication

19  that he had any involvement with Mr. Medina, or Nagler had any

20  involvement with Mr. Medina.  They're just doing their job.

21  They intercept the package, they take this package, they open it

22  up after getting the federal search warrant.  They find cocaine

23  in it and they send that package off to the crime laboratory.

24  It gets sent off to Postal Inspection Service for analysis.

25         And we hear -- Mr. Birdsall likes to talk about how

1    Mr. Helman was dismissed.  We didn't hear any testimony of

2    Mr. Helman dismissed.

3         We heard Mr. Birdsall ask Ms. Betty, "Well, wasn't he

4    fired for misconduct?"

5         And I can still see the shock on her face when he was

6    asking her those questions.  And she was like, "No, my

7    understanding is he left for a better job."

8         So we have an individual who -- Mr. Helman, who

9    receives the first package, and at that point we're in the

10   initial stages of this investigation.  That package gets sent

11   off to Mr. Helman.  We don't have a known suspect or someone to

12   look for.  And what typically happens, as I'm sure you're aware,

13   packages get sent off for them to tell us who did you find on

14   this package.  What information did you find from that package.

15        They analyzed the package.  Mr. Helman runs the

16   fingerprints that he identifies into the AFIS system and the

17   AFIS system spits out, as we learned during the course of this

18   trial, a number of names.  But the top name -- the name at the

19   top of the list is Orlando Medina.

20        He compares that to the AFIS file to the fingerprints

21   and makes a positive match.  That's where it sits.  It sits

22   there, case moves along, then Valerie Betty becomes involved in

23   this case.

24        The Government is going, now we've identified

25   Mr. Medina, Mr. Medina's been charged, we're preparing for

502

1    trial, there has to be an active comparison.  We find out that

2    Mr. Helman has now moved on to another job, so there has to be

3    an active comparison.

4        So Postal Inspector York goes down to the jail where

5    Mr. Medina is located, takes fingerprints.  Sends latent cards.

6    We're not going to rely on the AFIS system, those are the

7    computers -- the computer system has for his original

8    fingerprints.

9        Just to make sure that that wasn't somebody else using

10   his name or doing anything else, they go and they get another

11   copy of his original fingerprints and they take those original

12   fingerprints from the jail and they send it off to Ms. Betty.

13       Ms. Betty, who has -- we've heard no indication that

14   she has any animosity or any problems with Mr. Medina, any

15   connection to him whatsoever, she conducts her analysis.  She

16   conducts her analysis based on the photographic evidence taken

17   from the packaging material and the known latent prints and she

18   compares those two items.

19       She also tells us that the AFIS system spits out 25

20   names and his was at the top of the list.  So that was the first

21   one that they would naturally go to.  But she takes the

22   fingerprints that Postal Inspector York sends her, compares it

23   to the known fingerprints that were taken from the packaging

24   material and makes a positive match.

25       Granted the system that Postal Inspection and FBI not

503

US v. Medina Appendix: page 62 of 82

1    documenting the number or points of contact, that's up to the

2    agencies to make that determination.  But she makes a positive

3    identification based on her comparison of the defendant's known

4    fingerprints to the sample taken -- of the fingerprints taken

5    off the packaging material.

6            She also -- Mr. Birdsall talks about, ah, she had

7    hundreds of analyses of fingerprints a day.  She explained what

8    that analysis meant.  When she does a comparison, when she does

9    the comparison of the defendant's fingerprints to the known

10   prints, she compares each finger to each fingerprint on file.

11   So there's multiple multiples of comparisons.

12           So she goes through each finger, compares it to each.

13   One fingerprint we got analysis, then I compare that to all 10

14   fingers of the defendant to make sure to see if that's his

15   finger.  Then I take -- there were two fingerprints, then I

16   would turn that whole process over and I compare that to known

17   fingerprints of the defendant.

18           So it seems like a lot of analysis, but it's really a

19   lot of analysis on one person at a time.  So one person could

20   have multiples.  And I think she did the math and it ended up

21   being quite a lot, but just for a few defendants during the day,

22   of analysis.  So she's not rushing through anything, she's

23   taking her time.  She's doing a complete analysis.

24           Then we talk -- Mr. Birdsall talks about how

25   Mr. Duenas can't be believed.  Mr. Duenas gets arrested and he

504

1   gives a statement and he talks about everyone that he was

2   familiar with in this organization.

3          As the Court is aware, as everyone -- Mr. Birdsall

4   said, we're all criminal justice professionals, we all

5   understand.  But there's never just -- a conspiracy is never

6   just between two people, especially a drug conspiracy.  There's

7   multiple people in that process.

8          We have the person that got sent in to supervise

9   Mr. Duenas while he was in Milwaukee.  He's part of that

10  conspiracy.

11         We have Mr. Medina who is sending the cocaine from

12  Puerto Rico to Mr. Duenas for distribution.  He's part of that

13  conspiracy.

14         And before him, there was this -- this gentleman

15  "Ricky" who was a brother-in-law of the defendant's sister who

16  may have been running the drug operation before Mr. Duenas.

17         And Mr. Birdsall talks about how this guy was in jail.

18  Well, this guy was in jail.  He wasn't in jail forever.  And we

19  also know that Mr. Duenas is saying, well, it was a couple

20  months, I don't know exactly how many months.  We don't know how

21  long this conspiracy is going on.

22         What we do have documentation for is from July to

23  September of -- physical documentation from the Postal Service,

24  but we don't know how long this conspiracy is going on.  But he

25  tells the story and he identifies all the players.

505

1          And Mr. Medina, he's not manufacturing that cocaine in

2     Puerto Rico, it's not grown and distributed there.  It's coming

3     from other sources.  So he's got a boss above him who is

4     supplying him and somebody else is supplying those drugs.

5          So there's a whole chain of distribution here.  So

6     Mr. Duenas tells us about all those people that are involved.

7     But the important thing is, when he gets arrested he names a lot

8     of names, but ultimately he identifies the defendant Mr. Medina

9     as the individual who he was directly dealing with, person who

10    he had experience with, and a person who he was able to

11    identify.

12         And I know that Mr. Birdsall likes to tell us about

13    what Mr. Valcarcel and other people did as far as their

14    testimony.  I don't think, and the Court will remember the

15    testimony of the agents, but it would be very poor law

16    enforcement to show photographs of people and say, *this is so*

17    *and so, can you identify so and so?*  No, they show photographs

18    of people and they want to see if the witness knows who this

19    individual is.

20         So based on those facts, the investigation was done,

21    Mr. Duenas identified Mr. Medina as the individual who was

22    responsible for sending the drugs.

23         And if we were just relying on Mr. Duenas, you might

24    have a little bit of pause.  But what we are relying on is

25    Mr. Medina.  We're relying -- I mean, we're relying on

506

1    Mr. Duenas.  And we're relying on the fact that there's postal

2    receipts going back from Puerto Rico to Milwaukee.  There's the

3    package that is coming in from Puerto Rico.  And the package

4    that's coming in from Puerto Rico has one person's fingerprints

5    on it when they open up that package.  It hadn't been opened up

6    and examined by anyone before the Postal Inspection Service

7    intercepts it and goes through the packaging material and takes

8    it all out.

9         And the one fingerprint that they find -- the two

10    fingerprints that they find are the defendant's fingerprints.

11    His fingers were on that cocaine when it was shipped from Puerto

12    Rico to Milwaukee because the Postal Inspector seized that

13    package, that he had it examined, and it showed the defendant's

14    fingerprints.  We have that information and it's bolstered by

15    the testimony of Mr. Duenas indicating that the defendant was

16    involved in this.

17         So when one looks at the case, all the evidence that's

18    presented, I think the Court will find that the defendant is

19    guilty of conspiracy to possess with the intent to distribute

20    cocaine as charged in the indictment.

21         Thank you, Your Honor.

22         THE COURT:  Thank you, Mr. Gonzales.

23         Well, I'm going to ask -- were you retrieving

24    something, Mr. Birdsall, or your phone?  Okay.

25         I'm gonna ask you all to give me five minutes just to

507

1   check a couple things, and then I'll be back and I'll deliver

2   the verdict and findings at that point in time.

3            MR. GONZALES:  Okay.

4            THE COURT:  Come back in five minutes.

5            THE BAILIFF:  All rise.

6            (Recess taken at 9:59 a.m., until 10:08 a.m.)

7                    **DECISION AND FINDINGS**

8            THE COURT:  Have a seat everyone, please.

9            As you all may remember, at the beginning of the case

10   when Mr. Pagan indicated that he wanted a bench trial in front

11   of a judge rather than a jury trial, I asked Mr. Birdsall

12   whether at the end of the bench trial he wanted me to make

13   findings and he indicated that he did.

14            Under normal circumstances I wouldn't be in a position

15   to make findings right after closing statements because I

16   wouldn't have had time to go through my notes and the materials

17   and consider the elements of the offense and so forth.  But in

18   this circumstance we took a significant break between the body

19   of the trial and today's closing statements -- for legitimate

20   reasons, to allow Mr. Birdsall to follow up on a private

21   fingerprint examination -- and, as a consequence, I had more

22   time than I normally would to be able to go over the evidence

23   that's been presented and the facts.  And so that puts me in

24   something of a unique position to be able to make a

25   determination today and to give you findings that support that

508

1    Exhibits 16 through 20 into evidence.  Those are the items

2    that the Government moved into evidence.

3             THE COURT:  And that's what I have from the

4    Government.

5             Any disagreement with that, Mr. Birdsall?

6             MR. BIRDSALL:  No.

7             THE COURT:  And then from the Defense, I have

8    Defense Exhibit 55 and 51, 52, and then 53 is the

9    stipulation between the parties.

10            MR. GONZALES:  Yes, as to the jail records.

11            THE COURT:  Right, as to the jail record.

12            Anything different from your perspective,

13   Mr. Birdsall?

14            MR. BIRDSALL:  No.

15            THE COURT:  All right.  So we're on the same page

16   with the exhibits that have come in.  Thank you for that.

17            Mr. Birdsall, then, let me ask whether or not,

18   before I inquire about your case in chief, whether you have

19   any motions?

20            MR. BIRDSALL:  I do.  I would like to make a

21   motion for a judgment of acquittal on a number of grounds,

22   which I'll try and make short since it's sort of a summary

23   of my closing anyways, and that is that I think that the

24   evidence has shown that there is -- that no reasonable juror

25   would find this to be a credible case based on what we've

1    heard, and specifically what I'm talking about is the whole

2    way that this came up from Puerto Rico in the first place

3    and, frankly, the incredible testimony from Mr. Duenas, who

4    is, as I discussed in my opening, the linchpin.  Even though

5    he was only on direct examination for 20 minutes, he's the

6    one that we have to believe in order to determine that

7    Mr. Pagan conspired to deliver cocaine as charged in the

8    indictment.  And, frankly, he is not believable at all for

9    any slew of reasons, including his inability to tell a

10   straight story about who the drugs belong to, including his

11   history, admitted history, conceded history of lying not

12   only to other drug dealers but to the police, to his PO and

13   I would argue to this Court on a number of different points.

14          So, you know, I realize this motion isn't the

15   reasonable doubt standard, it's what would a reasonable

16   juror do.  But, in essence, even if we look at this in the

17   light most favorable to the Government, he's still not

18   believable, that on top of what I think was a compelling

19   case that Ms. Betty's testimony regarding the fingerprinting

20   was simply not acceptable under the Daubert standard or

21   otherwise in that her testimony should be disregarded by

22   this Court in the analysis of this motion.  And I realize

23   you've already made a finding that she's qualified, but

24   there hasn't been a finding that fingerprinting analysis

25   itself is sufficient.  And there hasn't been a finding that

 1    a reasonable juror would find her testimony to be

 2    trustworthy beyond a reasonable doubt, or believable beyond

 3    a reasonable doubt, and part of the reason is that we

 4    literally have no record of what she did other than what she

 5    came in here to say.  It's literally almost trial by ambush.

 6              So I would submit that when a person purports to

 7    be a scientist, or to present scientific evidence in the

 8    form of expert testimony under Rule 702, at a minimum

 9    they're going to have, as Mr. Hitchcock did, a rather

10    extensive detailing of exactly how they arrived at their

11    conclusion.  We didn't have that with Ms. Betty at all.  We

12    didn't have that certainly not in advance.  We had that when

13    she walked up and took the stand, and even then her

14    explanation was, frankly, kind of questionable and vague, if

15    I can say that.

16              So for all those reasons, Judge, I would ask the

17    Court to direct a judgment of acquittal pursuant to Rule 29.

18              THE COURT:  Thank you, Mr. Birdsall.

19              Mr. Gonzales, would you like to make a response?

20              MR. GONZALES:  Yes, Your Honor.

21              Viewed in the light most favorable to the

22    Government, I believe the Government has presented

23    sufficient evidence to indicate the defendant's involvement.

24              Regarding the testimony of Mr. Duenas.  Mr. Duenas

25    clearly indicated who he was receiving the packages from.

1   We have confirmation of that in that when the Puerto Rican

2   authorities attempted to arrest the defendant, he had postal

3   receipts from Mr. Duenas in his vehicle, and the Postal

4   Inspection Service was able to identify packages that were

5   being shipped from Puerto Rico to Milwaukee, the first

6   occurring on or about September 3rd where Postal Inspector

7   York indicated that they found a package of three to five

8   pounds, roughly, that was delivered to Mr. Duenas here in

9   Milwaukee.  They let that first package go through; waited

10  for the second package to come through before they completed

11  their investigation and seized that packaging.  When they

12  did seize that package and the packaging plastic wrap

13  material, the Postal Inspection Service located a

14  fingerprint of the defendant.

15          So based upon that evidence, the fact that

16  Mr. Duenas provided significant information regarding the

17  ongoing relationship, the receiving of cocaine, the sending

18  of money back, I think the Government has met its burden.

19          THE COURT:  You're finished, Mr. Gonzales, or are

20  you just --

21          MR. GONZALES:  I am, Judge.

22          THE COURT:  Okay.

23          MR. GONZALES:  I apologize.

24          THE COURT:  That's okay.  Mr. Birdsall is making

25  his motion under Rule 29 of the Federal Rules of Criminal

1  Procedure, and Rule 29(a) says that before submission of the

2  case to the finder of fact for a final determination, the

3  defendant may move for a judgment of acquittal if the

4  evidence was insufficient to sustain a conviction.

5       And as Mr. Birdsall noted, that standard is

6  different from the beyond a reasonable doubt standard the

7  trier of fact has to use in determining guilt or innocence.

8  That standard basically asks whether a reasonable juror, or

9  in this case a reasonable finder of fact would be able, on

10  the evidence submitted, to be able to return a verdict, or

11  if there's just simply no way that a reasonable finder of

12  fact could return a verdict of guilt.  So it is a lower

13  standard than the standard for proving a criminal case.

14       Mr. Birdsall, as I understand it, rests his motion

15  broadly, in broad strokes on three grounds.  First of all,

16  he made reference to, quote, "The way this whole thing came

17  up in Puerto Rico to begin with," unquote.

18       I assume that Mr. Birdsall is referring to the

19  fact that it was an anonymous tip, or a tip from an

20  informant that we don't know who it was that caused the

21  police in Puerto Rico to begin surveilling or trying to find

22  Mr. Pagan, and then the attempted stop that was described by

23  the first three witnesses in the case.  I'm not sure what it

24  is about that particular issue that would cause a reasonable

25  juror or a reasonable finder of fact not to be able to find

1    in the Government's favor.  It's not at all unusual that

2    cases begin with anonymous tips or tips from people who are

3    unidentified, and we don't accept anonymous tips as evidence

4    because they're not evidence.  The issue is whether or not

5    legitimate law enforcement efforts following anonymous tips

6    yield any evidence that is admissible.  And, in this case,

7    we have information from three different witnesses, the

8    first three witnesses who testified at trial about the

9    circumstances surrounding the attempted stop and the fact

10   that it was Mr. Pagan who they saw in a white Toyota

11   Corolla, and the fact that they saw him run away from the

12   Corolla with sort of a sports-sized bag, carrying a

13   multicolored bag, and that inside the car were recovered

14   these receipts.  So there's nothing in that evidence

15   standing alone that I can see that would cause a reasonable

16   juror to question whether or not he or she could return a

17   verdict, or me as well.

18          Mr. Birdsall's second basis is his allegation that

19   Mr. Duenas is the sole link -- his testimony is the sole

20   link between Mr. Pagan and the drugs that were recovered by

21   the Postal Inspection Service in September of 2015, and that

22   Mr. Duenas is entirely and completely incredible and

23   unbelievable.

24          I will probably have more comment on that in any

25   decision that I might be asked to render in this case, but

1    suffice to say for the moment that I don't disagree that it

2    became clear during Mr. Duenas' testimony that he has a

3    similar tenuous relationship with the truth on a number of

4    issues.  And so the question is taking into account the fact

5    that Mr. Duenas clearly either lied or gave extremely

6    inconsistent testimony throughout his time on the stand,

7    whether or not his testimony alone would support a

8    conviction, and whether if one believes he's not a very

9    truthful fellow, one can't return a verdict of guilty.

10           There are several independent pieces of evidence

11   here, and Mr. Gonzales pointed to some of them which at

12   least corroborate some of the things that Mr. Duenas said.

13           Mr. Duenas testified that he got packages from

14   Puerto Rico, and he sent money to Puerto Rico.  And as

15   Mr. Gonzales points out, the receipts that the Puerto Rican

16   officers recovered support that argument, that testimony as

17   does the fact that there were two packages that the

18   postal service actually observed and one of which they

19   intercepted going to Mr. Duenas from Puerto Rico, not to

20   mention, as he indicated, the fact that Mr. Pagan's

21   fingerprints were found on the plastic packaging inside the

22   last package that was delivered to Mr. Duenas at the house

23   which was not his but where he was living.

24           So even taking into account, even viewing the

25   evidence in the light most favorable to defendant, which is

1    not the standard, but even if I were to do that, and even

2    accepting that Mr. Duenas isn't very truthful, there are

3    pieces of his testimony that are supported by completely

4    independent evidence, and those pieces would give a

5    reasonable finder of fact an ability to return a guilty

6    verdict.

7            Finally, Mr. Birdsall argues that Ms. Betty's

8    testimony should be -- that I should disregard Ms. Betty's

9    testimony.  I've already found that Ms. Betty was qualified

10   as an expert in the field of fingerprint examination, and I

11   think that that was certainly, at least for me, a very clear

12   decision.

13           Mr. Birdsall indicated that I had made no finding

14   that fingerprint analysis was sufficient to support -- well,

15   you said "sufficient."  I'm not sure, Mr. Birdsall,

16   sufficient for what?  To support a verdict?  But whatever.

17           I actually thought I had rather resolved the

18   question of whether or not fingerprint analysis was an

19   accepted and verified science.

20           When I cited to the two Seventh Circuit cases, one

21   a more recent one and the one from Judge Hamilton back

22   several years ago discussing the fact that the ACE-V -- or

23   the ACE-V, however you pronounce it -- methodology was

24   appropriate and accepted, and, in fact, the standard for

25   determining whether or not a fingerprint belonged to a

1   particular person.  So I thought I had made a finding on

2   that.  If I was not clear, I'll make that finding now, that

3   I do believe scientifically that the ACE-V standard is a

4   sufficient scientific methodology to support a district

5   court using its gatekeeping function and allowing testimony

6   based on that methodology to be used as evidence.

7           Finally, with regard to Mr. Birdsall's argument

8   that Ms. Betty's testimony was vague.  I'm not sure that

9   Ms. Betty's testimony was vague.  I think her testimony was

10  pretty clear.  What is in question, and it seems to be a

11  policy question from the postal service, is why it is that

12  the postal service lab, apparently most federal law

13  enforcement labs in the United States who do fingerprint

14  analysis, don't include the actual point comparison in their

15  case files.  I can speak more to that perhaps at a later

16  date as well, or later time.  But Ms. Betty did explain that

17  one of the reasons for not doing that, at least while the

18  case is still in progress, is to avoid the very thing that

19  Mr. Birdsall argued could be concerning, and that's the

20  phenomenon of confirmation bias, a situation in which if

21  somebody tells me that something is true and then asks me to

22  verify it, I'm a lot more likely to say, "Yeah, it's true,

23  because I've already got somebody who has given me the

24  answer to the question."

25          Ms. Betty indicated that one of the concerns that

1    the service has about putting the points of comparison into

2    the file is that the person who is supposed to verify the

3    fingerprint examiner's conclusions shouldn't be any more

4    biased by having that information; in other words, if

5    Ms. Betty had put her eight points of comparison into her

6    file, then Ms. McGillivray, who was her verifier, would've

7    been tempted perhaps to take a look at those and go, "Oh,

8    she found those eight points.  Those eight points look good

9    to me, so okay," and sign off on it rather than doing her

10   own independent look to see whether or not there were enough

11   points of comparison to match.

12          So whether or not as a policy point the postal

13   service should at some point after the conclusion of its

14   investigation put the points of comparison in the file,

15   certainly I suppose it's something that reasonable people

16   might debate.  But the fact that it was not in the file up

17   until Ms. Betty provided it is not sufficient for me to be

18   able to indicate that a finder of fact could not reach a

19   verdict.

20          I should also comment just briefly on

21   Mr. Birdsall's argument that Ms. Betty's testimony amounted

22   to trial by ambush.

23          As the attorneys will recall, the fingerprint

24   evidence issue has been pervasive in this case for the last

25   year.

1          On January 5th of 2017, Mr. Birdsall told me at

2    a status hearing -- Mr. Pagan actually was present at that

3    status hearing -- Mr. Birdsall told me that he had asked for

4    information on the fingerprint analysis conducted on a print

5    lifted from a piece of evidence.  He didn't identify it.

6    And at that time, Mr. Birdsall said, as far as he understood

7    it, the only thing that had happened was the print had been

8    run through AFIS.  So there was nothing really even in the

9    file other than notes.

10          Mr. Gonzales responded that that was right, that

11    there was nothing really in the file except notes, and that

12    the postal service didn't turn over notes absent a court

13    order.  But if I were to issue a court order, that the

14    postal service would provide those notes.

15          And so I did issue that order at that point in

16    time and at the end of that hearing noted that Mr. Gonzales

17    was going to obtain the analyst file content, including

18    notes, and provide them to Mr. Birdsall.

19          We had another hearing on February 16th.  At

20    that point in time, Mr. Gonzales said that the postal

21    inspector was going to, as in future tense, give him the

22    fingerprint analysis file, including the notes, and said he

23    would turn it over to Mr. Birdsall as soon as possible.

24          At the March 15th, 2017 hearing -- at this point

25    we're having hearings once a month -- at this point,

1    Mr. Gonzales reported that he had turned over to

2    Mr. Birdsall the file from the fingerprint lab, but then

3    Mr. Gonzales said that the agents probably would need to

4    take another set of Mr. Pagan's fingerprints in preparation

5    for trial because they hadn't had a 10-print card, I don't

6    think, at that point in time.  They had latent prints and

7    they had whatever AFIS had worked up, but they didn't have a

8    10-print card.

9            At that point, he had turned over -- Mr. Gonzales

10   had turned over the file.

11           Mr. Birdsall expressed surprise at how little

12   information was in the file, and then that's kind of where

13   we left it at that point in time.

14           In July we had another hearing, July 11th of

15   2017.  And, again, the fingerprint issue came up, and I said

16   at that hearing, "Mr. Birdsall, you've got all you need now

17   to file a motion, if you want to file a motion.  If you

18   believe there's stuff out there that you should have that

19   you don't have, you should file that motion."

20           The minutes state, "If you want to argue that the

21   fingerprint analysis was flawed because it hadn't been

22   conducted by a human analyst," which apparently at that time

23   was still what Mr. Birdsall was concluding, he had the

24   ability to do that based on the information that was already

25   provided.  But Mr. Gonzales was still talking to the postal

1    inspectors about this second analysis that was getting done

2    by Ms. Betty at that point in time as it turns out, and he

3    was going to provide those results by July 21st of 2017.

4          So I issued an order saying that Mr. Birdsall

5    needed to give me some sort of notice by the end of the day

6    on July 21st about whether he had gotten the fingerprint

7    analysis.

8          July 21st came and went.  I didn't get any

9    notice from Mr. Birdsall.  So I issued an order to show

10   cause saying, "What happened here?  Did you get what it was

11   that you were asking for?"

12         And Mr. Birdsall responded, although most of his

13   response related to some other issues regarding, I think,

14   transcripts and translation that we were dealing with at

15   that point in time.

16         At our August 15th monthly hearing, Mr. Gonzales

17   reported that he ought to have Ms. Betty's fingerprint

18   analysis -- although he wasn't referring to her as

19   "Ms. Betty" at that point in time -- within 24 hours.  And

20   he explained at that point that the reason that this was

21   taking longer than everybody expected, because he had

22   learned that the original fingerprint analyst was no longer

23   with the Postal Inspection Service, and that a new analyst

24   was conducting the test, and that was why it hadn't sort of

25   gone as quickly as he had hoped that it would.

1          Finally, at our final pretrial conference,

2    Mr. Birdsall, who by that point had not filed any motions,

3    said that he had been asking for the lab results from the

4    drugs and, quote, "Data from two fingerprint examinations,"

5    and that he renewed that request but that he didn't have the

6    information, and he wanted to have an opportunity to get it

7    and then determine whether or not he would want to call

8    experts and said that he had set aside time for the trial,

9    and he would be ready for trial but that he might decide

10   that he needed to call experts.

11          So this issue has been bubbling and percolating

12   and talked about and gone back and forth for a year.  And it

13   is certainly concerning that the diagram that drew the lines

14   to the particular eight points of comparison that Ms. Betty

15   had used didn't show up until the day before trial, but by

16   the same token, at several junctures I've given the

17   opportunity for the Defense to file motions, and we walked

18   through this and walked through this.

19          So as things proceed, depending on where we get

20   to, if we need to consider whether or not the Defense wants

21   to take any further action, we can do that.  But in terms of

22   using, quote, "trial by ambush" as a way to succeed on a

23   Rule 29 motion, it is insufficient based on the history of

24   the case.

25          So for all of those reasons, I will deny the

1    Defense motion to grant a verdict of acquittal after the

2    close of the Government's case, and we'll proceed, then, to

3    the Defense case.

4          So with that being said, perhaps more

5    long-windedly than it should've been, let me turn to you,

6    Mr. Birdsall, and ask, number one, whether or not you have

7    any witnesses to present, or, number two, whether you need

8    any time to talk with Mr. Pagan?

9          MR. BIRDSALL:  I do not have any witnesses, and I

10   will take a moment to talk to Mr. Pagan, although we've

11   already talked about that.

12         But before I do that, I'm not sure procedurally if

13   we want to address, probably not, but address the request

14   that I made in terms of an independent fingerprint analysis

15   that I had made in my motion in limine.  So I don't know if

16   that's procedurally something that would have to wait until

17   an actual judgment was entered by the other.

18         THE COURT:  Given that this is a bench trial, I

19   would say the answer to that is "no."  If we had a jury, and

20   we had the logistics around the jury, that might be a

21   different ballgame.  But I think in this instance, it is

22   better to address it before we have a judgment because I

23   have the flexibility in a bench trial, if I determine that

24   your request should be granted, to be able to give you a

25   specific amount of time to be able to do that, and then we