UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

No. 19-1909

_____

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

ORLANDO MEDINA,
Defendant-Appellant.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
Case No. 15-CR-16

THE HONORABLE PAMELA PEPPER,
CHIEF UNITED STATES DISTRICT JUDGE, PRESIDING

_____

BRIEF OF PLAINTIFF-APPELLEE

_____

MATTHEW D. KRUEGER
United States Attorney

JONATHAN H. KOENIG
Assistant United States Attorney
Attorneys for Plaintiff-Appellee

530 United States Courthouse
517 E. Wisconsin Ave
Milwaukee, WI 53202
(414) 297-1700

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.............................................................................................ii

JURISDICTIONAL STATEMENT ............................................................................ 1

STATEMENT OF THE ISSUES ................................................................................ 2

STATEMENT OF THE CASE .................................................................................... 3

SUMMARY OF THE ARGUMENT ........................................................................ 17

ARGUMENT.................................................................................................................. 20

    I.    This Court should affirm the defendant's conviction because the evidence at his bench trial, viewed in the light most favorable to the government, was sufficient to convict him of conspiring to distribute 500 grams or more of cocaine……..………   20

    II.    The defendant's unwarranted attacks on the integrity of the prosecution fail to establish a "due process violation."................................................................... 28

CONCLUSION ............................................................................................................. 33

CERTIFICATE OF COMPLIANCE AND SERVICE .......................................... 34

# TABLE OF AUTHORITIES

Page

## Cases

*Delaware v. van Arsdall*, 475 U.S. 673 (1986) .................................................. 29
*Jackson v. Virginia*, 443 U.S. 307 (1979) .......................................................... 20
*Rose v. Clark*, 478 U.S. 570 (1986) .................................................................. 29
*Smith v. United States*, 568 U.S. 106 (2013) .................................................... 21
*United States v. Alcantar*, 83 F.3d 185 (7th Cir. 1996) ..................................... 30
*United States v. Barker*, 27 F.3d 1287 (7th Cir. 1994) ..................................... 23
*United States v. Burrell*, 963 F.2d 976, 987 (7th Cir.1992) .............................. 20
*United States v. Cardena*, 842 F.3d 959 (7th Cir. 2016) ............................ 30, 32
*United States v. Coleman*, 914 F.3d 508 (7th Cir. 2019) ................................... 28
*United States v. Freeman*, 650 F.3d 673 (7th Cir. 2011) .................................. 28
*United States v. Goree*, 756 F.3d 522 (7th Cir. 2014) ....................................... 20
*United States v. Lawson*, 810 F.3d 1032 (7th Cir. 2016) .................................. 25
*United States v. Mannie*, 509 F.3d 851 (7th Cir. 2007) .................................... 29
*United States v. Neeley*, 189 F.3d 670 (7th Cir. 1999) ...................................... 29
*United States v. Rose*, 12 F.3d 1414 (7th Cir. 1994) ........................................ 29
*United States v. Rovetuso*, 768 F.2d 809 (7th Cir. 1985) .................................. 30
*United States v. South*, 28 F.3d 619 (7th Cir. 1994) ......................................... 15
*United States v. Wasson*, 679 F.3d 938 (7th Cir. 2012) ..................................... 20
*United States v. Wynn*, 845 F.2d 1439 (7th Cir. 1988) ...................................... 23
*Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012) .................................. 31

## Statutes

18 U.S.C. § 3231 ................................................................................................... 1
21 U.S.C. § 841 ......................................................................................... 1, 12, 14
21 U.S.C. § 846 ......................................................................................... 1, 12, 20
21 U.S.C. § 851 ............................................................................................ 14, 16
28 U.S.C. § 1291 .................................................................................................. 1

## Rules

Federal Rule of Criminal Procedure 12(b)(3) ...................................................... 12

## JURISDICTIONAL STATEMENT

The United States submits this jurisdictional statement because the defendant's jurisdictional statement is not complete and correct.

The district court had jurisdiction over this criminal case pursuant to 18 U.S.C. § 3231 and the underlying criminal statutes, 21 U.S.C. § 841(a)(1), 841(b)(1)(B), and 846.  Judgment was entered on the district court's docket on April 30, 2019.  The defendant filed a timely notice of appeal on May 20, 2019.

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.     Viewed in the light most favorable to the government, was the evidence
       at the defendant's bench trial sufficient to establish beyond a reasonable
       doubt that he knowingly and intentionally participated in a conspiracy
       to distribute 500 grams or more of cocaine?

II.    Did the government's case rely on "perjured" testimony?  If so, did this
       likely affect the fact-finder's verdict?

## STATEMENT OF THE CASE

I.    **Medina and others conspire to ship kilogram quantities of cocaine from Puerto Rico to Milwaukee during Summer and Fall of 2014**

 A.    *Dramatis Personae:  Medina, Duenas, et al.*

The defendant, Orlando Medina, also known as "Alejandro Pagan," or "Mono," among many other aliases, is 43 years old.  PSR, ¶¶ 13, 62.[1]  He was born and raised in Barceloneta, a small, rural town in Puerto Rico.  PSR, ¶ 70.  At age 16, the defendant came to Milwaukee, Wisconsin.  *Id.*  At age 28, he returned to Barceloneta.  *Id.*  During his time in Milwaukee, in the 1990's and early 2000's, the defendant had frequent encounters with the law and was convicted of several felony drug offenses.  PSR, ¶¶ 36-42.  It would appear that he also met Rudolfo Duenas ("Duenas") during this time frame.  Tr. 270.

Duenas, a convicted felon, is in his mid-50s.  Tr. 269.  He has lived in Milwaukee for the past 20 or 25 years.  *Id.*  At the time of the defendant's trial, several years after the facts alleged in the indictment, Duenas testified that he had known Medina or "Mono" for "more than ten years."  *Id.* at 270.  As we shall see, Duenas claims that in the second half of 2014 he and the defendant went into

---

[1] In this brief, "PSR" followed by a paragraph number refers to a paragraph in Medina's pre-sentence report; "Tr." followed by a number refers to a page of the trial transcript; "R." followed by a number refers to a docket entry in the underlying criminal case; and "Def. Br." followed by a number refers to a page of the defendant's opening brief.

business selling drugs in Milwaukee.  *Id.* at 272.  Specifically, the arrangement was that the defendant would mail cocaine to Duenas from Puerto Rico, and Duenas would then return the "profits of the drugs" to the defendant in Puerto Rico.  *Id.* at 272-278.  According to Duenas, this happened at least several times, *id.* at 276, including a final shipment of 36 ounces (or one kilo) that was intercepted by law enforcement, leading to Duenas's arrest.  *Id.* at 277**.**  "Mono" paid the rent for Duenas in Milwaukee and instructed Duenas how to conceal money when sending it by mail to Puerto Rico.  *Id.* at 282.

There was at least one other player in this conspiracy: an individual named "Noel Rivera," who lived with Duenas and appears to have acted as a set of eyes and ears for the defendant in Milwaukee.  Tr. 281-282; 350.[2]

> B.     *Act One:  Barceloneta, Puerto Rico:  August 19-21, 2014: After the defendant shoots at police officers and flees on foot, they recover evidence of the conspiracy from his vehicle*

As of 2014, the defendant was living in Barceloneta, having returned to his hometown from Milwaukee during the early 2000's.  The defendant and his vehicle, a white Toyota, were well known to law enforcement officers in Barceloneta.  Tr. 70, 106, 122-123, 135.

---

[2] This person's first name is sometimes transcribed incorrectly as "Noah."

On or about August 19, 2014, Jesus Rivera Uvergara, then a sergeant in the municipal police department of Barceloneta, learned from a confidential informant that the defendant was "going to be involved in the transportation of firearms," Tr. 69-71, and that he might be transporting guns in a "multi-color bag." Tr. 73. Sergeant Rivera set out to locate the defendant and encountered him driving along a rural road in a four-door white Toyota Corolla. *Id.* at 71. Sergeant Rivera observed that the defendant was not wearing his seat-belt. *Id.* He radioed ahead to his colleague, Sergeant Angel Rios, who was also looking for the defendant, so that Rios could conduct a traffic stop. *Id.* at 72, 88. Sergeant Rivera had no further contact with the defendant that day and testified that he arrived at the scene of the attempted traffic stop after the defendant had fled. *Id.* at 72-73, 94.[3]

As for the stop of the defendant, Sergeant Rios testified that it happened this way. Rios was driving west on Highway 682 in Barceloneta, in a marked

---

[3] Although Sergeant Rivera had little to do with the traffic stop or the subsequent search of the defendant's Toyota, defense counsel suggested, on cross-examination, that the sergeant had planted firearm evidence in a vehicle belonging to someone other than the defendant. Asked if he had any evidence supporting this allegation—which Sergeant Rivera denied—defense counsel said, "I have information that I received, obviously; otherwise, I wouldn't ask it, but I can't really say where I got it from." Tr. 100. The district judge, in her findings, noted that "[t]here was no proof provided…that [Sergeant Rivera] was in any way, shape, or form corrupt or did anything corrupt or did anything illegal." *Id.* at 514.

patrol car, when he received a description of the Toyota (and its unbelted driver) from Rivera.  He saw the Toyota coming from the other direction.  Tr. 107.  He attempted to stop the vehicle by activating his patrol car's lights and siren and blocking the roadway.  *Id.* at 108.  The defendant slowed down.  Meanwhile, Sergeant Rios got out of his patrol car and gestured to the defendant that he should stop.  *Id.* at 109.  The defendant, apparently still driving at or past the sergeant, responded by taking out a "black handgun" and shooting a "burst" of gunfire at the patrol car.  *Id.*  The sergeant returned fire and the defendant "accelerated his vehicle, hit a tree, and kept on going along the road."  *Id.* at 110. He then turned into a dead-end street, stopped when he could proceed no farther, and "got out of his vehicle with a bag about three-feet long," which Sergeant Rios described as "multi-colored."  *Id.* at 110-111.  The defendant "took off running towards a mountainous area," but for safety reasons the sergeant only chased him for a "short distance."  *Id.*

Sergeant Rios then impounded the vehicle and applied for a warrant to search it; the warrant was executed several days later by Police Officer Luis Rosado.  Tr. 111.[4]

---

[4] Defense counsel inquired, on cross-examination, about Rios's partner, Lieutenant Oscar Cologne, who would later leave the force after being arrested for stealing evidence (in a different case) from the police department's evidence locker.  Tr. 114-116.

Officer Rosado had seen the Toyota "numerous times" prior to executing the search warrant on August 21, 2014, and knew it to be the defendant's car.  Tr. 123-124 ("He was always driving that car."); *Id.* at 129 (date of the search).  When Officer Rosado searched the Toyota, he located "a few mail receipts" and the defendant's birth certificate.  *Id.* at 124-125.  Specifically, he identified Exhibits 17 through 20 as mail receipts recovered during his search.  *Id.* at 125-127.

These mail receipts, which are reproduced in the short appendix to defendant's opening brief at pp. 7-10, are summarized as follows:

| Exhibit # | TO | FROM | ACCEPTED FOR DELIVERY |
|---|---|---|---|
| 17 | W. Rosario (Barceloneta, PR) | Rodolfo Duenas (835 W. Mitchell, Milwaukee) | 7/31/14 |
| 18 | W. Rosario (Barceloneta, PR) | Rodolfo Duenas (835 W. Mitchell, Milwaukee) | 8/7/14 |
| 19 | W. Rosario (Barceloneta, PR) | Rodolfo Duenas (835 W. Mitchell, Milwaukee) | 8/11/14 |
| 20 | Antonia Lugosto (Morovis, PR) | Ramon Robles (Milwaukee) | 8/19/14 |

---

The judge did not think that the information about Cologne suggested any impropriety or lack of credibility on the part of Sergeant Rios: "They rode together.  That does not make [Rios] guilty of anything that Cologne [] was guilty of and there's no proof that Rios has ever been alleged to have been involved in any corruption."  *Id.* at 517.

C.     *Act Two:  Milwaukee, Wisconsin: September 24, 2014:  A package of cocaine is intercepted by law enforcement on its way to Duenas; who is arrested and implicates the defendant as his source of cocaine.*

In late August of 2014, Daniel York, a Postal Inspector with the United States Postal Inspection Service ("USPIS"), received an investigative lead from Puerto Rico concerning packages that were being mailed to Milwaukee from Puerto Rico.  Tr. 143.  The information focused York's attention on addresses located on the South Side of Milwaukee, including  835 W. Mitchell and 1001 S. 24th Street.  *Id.*  Just a few days later, York learned that a package would be delivered to the latter address.  *Id.*  He conducted surveillance and observed the package as it was delivered, but did not interfere with the delivery.  *Id.* at 145.

On September 23, 2014, York learned that a second package was inbound from Puerto Rico to the same part of Milwaukee.  Tr. 146.  He contacted Milwaukee Police Detective Eugene Nagler, who often assisted the USPIS in its investigations and was then assigned to the local HIDTA task force.  *Id.* at 143.  Postal Inspector York and Detective Nagler met at the main postal facility on September 24, 2014.  Detective Nagler, a canine handler, worked with a dog that was specially-trained to detect controlled substances.  *Id.* at 164.  The officers identified a parcel addressed to Rodolfo Duenas.  This piqued their curiosity because the address was one they were looking out for and because York had

seen the name Duenas "previously … on parcels being shipped back from Milwaukee to Puerto Rico." *Id.* at 147.

The parcel was placed amongst an array of "dummy" packages, whereupon Detective Nagler's canine partner—Flora—"alerted" to the parcel. Tr. 147, 164, 169. Within a few hours, a federal magistrate judge had issued a warrant authorizing the search of the package. *Id.* at 148. Armed with this warrant, Postal Inspector York and Detective Nagler opened the package and found "coffee in there with it and numerous little baggies. … there were 40 small baggies containing white powder in total." *Id.* at 150. All of this had been wrapped in "numerous layers of Saran Wrap that [they] had to cut through." *Id.* at 151, 165; Exhs. 1a1-8. The white powder field-tested positive for cocaine. *Id.* at 152, 165; Exh. 9.

Next, the officers "repackaged" the parcel "the best [they] could" so that it could be delivered to the address on the package in a so-called "controlled delivery." Tr. 153, 157.

Detective Nagler had meanwhile obtained an "anticipatory warrant" for the address. Tr. 165. This allowed officers to search Duenas's residence if he accepted delivery of the package. When in fact he did so later on the 24th, he was placed under arrest. *Id.* at 277, 376.

9

Duenas decided to share what he knew with law enforcement, albeit not with the benefit of a formal cooperation agreement.  Tr. 368, 390.  He identified the defendant as his source of supply and told one of the officers involved in his arrest that he had accepted packages from the defendant "in various amounts, but usually a kilo or something like that three or four times before the date of his arrest."  *Id.* at 369, 380.  At trial, he would explain that he had an arrangement with the defendant whereby the defendant would send cocaine to him from Puerto Rico, by mail, and the proceeds from its sale would then be sent back to Puerto Rico, also by mail.  *Id.* at 272-274.  Specifically, Duenas looked at Exhibits 17 through 19 and confirmed that these were receipts for money shipments from Milwaukee to Barceloneta.  *Id.* at 273-275.  He also explained that these mailings were intended for the defendant, notwithstanding the recipient name on the shipping label.  *Id.* at 275.  In light of the three mail receipts for outbound cash, Duenas admitted to receipt of at least three cocaine shipments, prior to the one on the 24th, as part of his arrangement with the defendant.  *Id.* at 276 ("It could've been more, but I don't remember how many.").  Despite his significant criminal

10

history and exposure, Duenas testified against the defendant without the benefit

of any "deal as to whether [he was] going to be charged." *Id.* at 279.[5]

> D.    *Epilogue: Forensic testing of the intercepted package shows that the white powder is slightly more than one kilo of cocaine and that the defendant's fingerprints are on the packaging material*

The contents of the intercepted package were sent to the United States

Postal Inspection Service, where they were analyzed by Michael Hitchcock, a

senior forensic chemist.  Hitchcock testified—without any meaningful challenge

to his expertise or his findings—that the results of gas chromatography and mass

spectrometry testing, along with visual inspection, allowed him to identify the

substance in the package as cocaine.  Tr. 423.  It appears that Hitchcock tested a

sampling of the contents of the package, which were broken down into

approximately forty smaller packages or "baggies."  *Id.*  The total weight of the

exhibits was a little more than 1,000 grams.  *Id.*

Meanwhile, the packaging for the cocaine was analyzed by Valerie Betty,

an experienced forensic latent print analyst with the USPIS; formerly employed

by the FBI.  More accurately, Betty compared three of the seven latent

fingerprints found on the plastic wrap with prints on file for Medina and found

---

[5] Although defense counsel repeatedly expressed skepticism about this, the district judge found Duenas's testimony that he did not have a cooperation agreement with the government plausible, based on her experience.  Tr. 527.

that they matched.  Tr. 194, 199-200, 202-203.  Betty was able to make her

identification based on fourteen "common markers," *i.e.*, points or characteristics

that were present in both the latent prints and the comparison prints.  *Id.* at 198,

200.

## II.  Procedural History of *United States v. Medina*, No. 15-CR-16 (E.D. Wis.).

### A.    *Indictment*

On February 3, 2015, a grand jury in the Eastern District of Wisconsin

returned a one-count indictment against the defendant, which alleged that

between approximately July 1, 2014 and September 24, 2014, he had knowingly

and intentionally conspired with others to distribute "500 grams or more of a

mixture and substance containing cocaine, a Schedule II controlled substance," in

violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846.

### B.    *Pre-Trial Proceedings*

Although there were extended pre-trial proceedings concerning the

defendant's custodial status, scheduling, the defendant's request for new

counsel, and various requests for adjournments, there were no timely pre-trial

motions within the meaning of Federal Rule of Criminal Procedure 12(b)(3).

At a status conference on August 15, 2017, the district judge set the case for

a final pretrial conference on December 19, 2017, and for a jury trial commencing

January 8, 2018.  R. 67.  The defendant then filed a *pro se* "motion to dismiss charges" and a *pro se* request for an "evidentiary hearing," both of which the district judge denied as untimely and because the defendant was represented by counsel.  R. 68-77.

In their joint final pretrial report, the parties informed the district judge that the defendant would waive his right to trial by jury and proceed with a bench trial.  R. 79.  The defendant later confirmed, in open court, his desire for a bench trial.  Tr.  14-16.

C.     *Motion in Limine: Fingerprints*

A few days before trial, on January 4, 2018, defense counsel filed a motion *in limine* to exclude the government's fingerprint evidence and testimony by the government's fingerprint expert, Valerie Betty.  R. 82.  The Court would ultimately qualify Ms. Betty as an expert under Rule 702.  Tr. 262.  However, the judge also adjourned the trial after the close of the government's evidence so that the defense could obtain its own fingerprint expert.  *Id.* at 462-463.  The defense did not call its own expert at the continued trial proceedings in early March.  *Id.* at 474-475.

D.    *The 851 Information*

On January 5, 2018, the government filed an information alleging, for purposes of the enhanced penalties in 21 U.S.C. § 841(b)(1)(B) and 851(a),  that the defendant had previously been convicted of a felony drug offense.  The defendant thus became subject to a mandatory minimum sentence of ten years' imprisonment.

E.    *Bench Trial*

The defendant's bench trial commenced January 8, 2018, lasted several days, and was then adjourned until a final day of proceedings held March 6, 2018.  R. 84.  The government's witnesses included three law enforcement officers from Puerto Rico, who testified concerning their encounter with Medina in August 2014 and the subsequent search of his vehicle (which uncovered the mail receipts), several Milwaukee-based law enforcement officers who participated in the interception of the package from Puerto Rico and the arrest of Duenas in Milwaukee on September 24, 2014, a fingerprint expert who confirmed that the plastic wrap in the intercepted package bore the defendant's fingerprints, and a DEA drug analyst who testified that the controlled substance in the package was cocaine, and Rodolfo Duenas.

At the close of the government's evidence, on January 10, 2018, the defendant made an oral motion for a judgment of acquittal under Rule 29, Tr. 435, even though such motions are not necessary in a bench trial to preserve a sufficiency-of-the-evidence challenge. *United States v. South*, 28 F.3d 619, 627 (7th Cir. 1994). Defense counsel argued that Duenas's testimony was "not believable at all" and—even though the court had already qualified the government's fingerprint expert under Rule 702—asserted that the court should disregard the expert's testimony because it was "kind of questionable and vague" and "simply not acceptable under the *Daubert* standard or otherwise." Tr. 436. The district judge reviewed the government's evidence and denied the motion. *Id.* at 448-449. After extended discussion of the fingerprint evidence, the court decided that it would adjourn the proceedings to allow the defense to obtain its own fingerprint expert. *Id.* at 462-463.

On March 6, 2019, the trial resumed. R. 88. The defense did not call any witnesses. The parties gave their closing arguments, whereupon the court made detailed findings, and found the defendant guilty as to the single count in the indictment. Tr. 508-530; R. 88.

F.     *Sentencing, Entry of Judgment, & Appeal*

At sentencing, the defendant objected to the application of the 10-year mandatory minimum under Section 851, the calculation of drug quantity attributable to him, and his designation as a career offender.  The district judge applied the mandatory minimum under Section 851, but declined to consider the defendant a career offender and, for purposes of the guidelines, trimmed the government's estimate of cocaine attributable to the defendant.  R. 114.

The district court sentenced the defendant, on April 22, 2019, to a 138-month term of imprisonment, to be followed by five years of supervised release.  R. 118.  The court also ordered payment of a special assessment in the amount of $100.  *Id.*  The court entered  judgment on April 30, 2019, *id.*, and the defendant filed his notice of appeal on May 10, 2019.  R. 121.  On appeal, the defendant does not challenge any of the district judge's sentencing rulings.  Instead, he asks this Court to reverse his conviction and remand the case for a new trial.  Def. Br. 50.

## SUMMARY OF THE ARGUMENT

This challenge to the sufficiency of the evidence arises from a one-count drug conspiracy case with relatively straightforward facts. In a nutshell, the evidence at the defendant's bench trial showed that the defendant—working in tandem with other individuals, including Rodolfo Duenas—knowingly conspired to ship kilogram quantities of powder cocaine from Puerto Rico for distribution in Milwaukee. The short-lived conspiracy was broken-up when law enforcement intercepted a one-kilogram package of cocaine *en route* from the defendant in Puerto Rico to Duenas in Milwaukee. The packaging within, as it turned out, bore the defendant's fingerprints.

The defendant attacks the credibility of Duenas, who testified against him at trial. He also challenges key evidence connecting himself to Duenas; namely, postal receipts recovered from his car in Puerto Rico after he shot at police and then fled on foot. On appeal, however, the defendant has apparently abandoned his efforts to discredit the crucial findings of the government's fingerprint expert.

The district judge's findings are an excellent starting point for an analysis of the sufficiency of the evidence, precisely because they took into account the defendant's main arguments. The district judge acknowledged that the presence of one of the four receipts in Medina's car was "a mystery," Tr. 519, given the

17

date on the receipt, but the judge aptly characterized that exhibit as an "outlier" and relied on the remaining three postal receipts as evidence corroborating Duenas's testimony.  *Id.*  The judge found that Duenas "had something of a tenuous relationship with the truth" and that his testimony at times was "confusing."  *Id.* at 525.  Nevertheless, his testimony about the drug-distribution conspiracy was corroborated by other evidence, including, notably, the three postal receipts and Medina's fingerprints on the packaged cocaine that was successfully delivered to Duenas in Milwaukee on September 24, 2014.  *Id.* at 526. "The fact that he is not believable in all respects does not mean that he is entirely incredible," the judge found, because "some portions of his testimony were corroborated by other evidence in the case."  *Id.* at 529.

As even these brief quotations demonstrate, the district judge weighed the evidence carefully and assessed Duenas's credibility in light of the specific concerns raised by defense counsel.  On appeal, this Court may not reweigh the evidence or substitute its own assessment of witness credibility for that of the factfinder.  It may only reverse the guilty verdict if – after viewing the evidence in the light most favorable to the government—it concludes that no rational fact-finder could agree with the district court's finding of guilt.

In addition to challenging the sufficiency of the evidence, the defendant claims that the government knowingly relied on "perjured" testimony as part of its case, in violation of due process.  Even if this were true, the factfinder was well aware of the infirmities of the government's case (Duenas's credibility problems and the inexplicable date on one of the four mail receipts) and addressed them head-on.  Thus, the defendant cannot satisfy the prejudice component of the applicable plain error standard of review, which requires him to show that any "false" testimony knowingly presented by the government likely affected the trier of fact's verdict.

## ARGUMENT

**I.**     **This Court should affirm the defendant's conviction because the evidence at his bench trial, viewed in the light most favorable to the government, was sufficient to convict him of conspiring to distribute 500 grams or more of cocaine.**

      **A.**     Medina "faces a formidable burden" in challenging the sufficiency of the evidence.

This Court "review[s] challenges to the sufficiency of the evidence at a bench trial under the same demanding standard applied to a jury trial." *United States v. Wasson*, 679 F.3d 938, 949 (7th Cir. 2012). The standard, derived from the Supreme Court's decision in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), is consistently articulated this way:

> [W]e will overturn the verdict only if we conclude, after viewing the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. We neither reweigh the evidence nor assess witness credibility, and may uphold even a verdict based entirely on circumstantial evidence.

*Wasson*, 679 F.3d at 949 (citations omitted). As this well-known formulation makes clear, "[a] defendant challenging the sufficiency of the evidence against him 'faces a formidable burden.'" *United States v. Goree*, 756 F.3d 522, 525 (7th Cir. 2014) (quoting *United States v. Burrell,* 963 F.2d 976, 987 (7th Cir.1992)).

To convict a person of a drug distribution conspiracy under 21 U.S.C. § 846, the government must prove that (1) two or more people agreed to commit a

crime; and (2) the defendant knowingly and willfully participated in the agreement. *Id.* (citing *Smith v. United States*, 568 U.S. 106, 110 (2013)). Circumstantial evidence, standing alone, can form the basis for a conspiracy conviction, as long as the evidence supports an inference that the conspirators agreed amongst themselves to distribute drugs. *Id.*

    B.    The evidence against the defendant was sufficient to find him guilty of each of the elements of conspiracy beyond a reasonable doubt, despite questions concerning *one* of the four mail-receipt exhibits introduced by the government and despite problems with the credibility and coherence of a key government witness.

At trial, the government presented evidence showing that the defendant conspired with Duenas and others to ship kilogram quantities of powder cocaine to Milwaukee for distribution. Much of the evidence came from Duenas, who was busted when law enforcement officers intercepted a package from Puerto Rico, *en route* to Duenas in Milwaukee, which contained a kilo of powder cocaine. The package had something even better than a return address: it had the defendant's fingerprint on the plastic wrap used for packaging the cocaine. The government also presented evidence of mail receipts that had been recovered earlier from the defendant's car in Puerto Rico. These linked the defendant and Duenas and showed, even more specifically, that Duenas had been mailing packages to Barceloneta during the time period covered by the conspiracy, as he

claimed. All of this, but especially the fingerprints, corroborated Duenas's

account that the defendant had been shipping cocaine to Milwaukee for the past

couple of months, with the "profits" from its sale being returned to him in Puerto

Rico.

On appeal, the defendant challenges the testimony concerning the mail

receipts, and claims that Duenas's testimony was so lacking in credibility that a

reasonable factfinder could not rely upon any of it. Indeed, in the final section of

his brief, the defendant describes Duenas's testimony as perjurious.

The defendant's argument concerning the mail receipts stems from the fact

that Exhibit 20 is dated August 19, 2014, the day of his arrest in Puerto Rico.

How, he asks, could he have had a mail receipt in his car on August 19, 2014, for

a package that was accepted for delivery in Milwaukee on the afternoon of the

same day? The defendant goes on to argue that the Barceloneta officers (here he

presumably means Officer Rosado, who searched the car) "lied in the most

outrageous and obvious fashion" as to the entire "package" of receipts. Def. Br.

40. In other words, because the date on Exhibit 20 cannot be explained, it is not

believable that *any* of the receipts were recovered from the defendant's vehicle as

Officer Rosado described. It sounds like the defendant has "buyer's remorse"

concerning his choice of a bench trial because he speculates—without any basis

22

for doing so—that "[i]f a jury had heard this case, they would have heard about the exhibit 20 lie and discounted the entire exhibit *package* (exhibits 17-20)." *Id*. (emphasis added).

In any event, it is unfair of the defendant to fault the district judge for failing to address his "all or nothing" argument, since he did not present that argument during cross-examination of Rosado or during closing argument.[6] Defense counsel did not argue that Exhibits 17-19 were problematic or that all four exhibits should be disregarded. Instead, he took aim at Exhibit 20. Tr. 490.

The district judge, presented with an argument focused on Exhibit 20, differentiated that exhibit from the others and chose to rely on Exhibits 17-19 as evidence corroborating Duenas. She noted, for example, that Exhibit 20, unlike the others, was not a receipt for a package sent by Duenas nor was it even sent to Barceloneta. Tr. 519.[7] She therefore described it as an "outlier," which could not be explained, but which did not cast doubt on the significance of the other three

---

[6] The defense did not even object properly to the admission of Exhibits 17-20. A party must make a proper objection at trial that alerts the court and opposing counsel to the specific grounds for the objection. *United States v. Barker*, 27 F.3d 1287, 1292 (7th Cir. 1994) (citing *United States v. Wynn*, 845 F.2d 1439, 1442 (7th Cir. 1988)). At trial, in response to the government's motion to admit these exhibits, defense counsel stated, "I'll object for purposes of form." Tr. 127. When asked what this meant, counsel said, "I'm entering an objection, and I don't have an argument about it." *Id*.

[7] This package was sent to Morovis, PR, roughly fifteen or twenty miles southeast of Barceloneta.

receipts. These, the judge concluded, were obviously the impetus for the postal service to "look for something" in Milwaukee. *Id.* at 520. This was a reasonable approach to the evidence, in light of the record and considering the argument that was actually presented to the court. Indeed, even if none of the receipts were found in the defendant's car, they would still at least partially corroborate Duenas, who said that he was sending drug proceeds back to Barceloneta.

That brings us to Duenas's testimony, which the defendant describes as not just incredible, but perjurious. Def. Br. 45. The judge found that Duenas "had something of a tenuous relationship with the truth" and that his testimony at times was "confusing." Tr. 525. But, she also found that his testimony about the drug-distribution conspiracy was corroborated by other evidence, including the three postal receipts, the packages monitored or intercepted in Milwaukee, and of course Medina's fingerprints on the packaged cocaine that was successfully delivered to Duenas in Milwaukee on September 24, 2014. *Id.* at 526.[8] The district judge addressed the crux of the matter when she said this

---

[8] Another point of corroboration, not specifically mentioned by the district judge, is evident from Milwaukee Police Department Detective Abner Valcarcel's testimony concerning his interview of Duenas on the day of Duenas's arrest. At the time of this interview, Valcarcel knew "just a little bit" about the investigation in Puerto Rico but was *not* aware of the shootout between the defendant and Barceloneta officers. Tr. 368-369. Duenas, however, consistent with someone who said that he knew the defendant and had had recent dealings with him, accurately related that there had been such an

about Duenas's testimony: "The fact that he is not believable in all respects does not mean that he is entirely incredible, and some portions of his testimony were corroborated by other evidence in the case." *Id.* at 529.

On appeal, in contrast with the district judge's nuanced approach to the evidence, the defendant again takes an "all or nothing" position. If any aspect of Duenas's testimony is questionable, so the argument goes, his testimony must be rejected in its entirety. Despite the well-known maxim *falsus in uno, falsus in omnibus*,[9] the law does not require wholesale rejection of testimony by a witness who is shown to be partially lacking in credibility. To the contrary, this circuit's pattern criminal jury instructions state that the finder of fact "may accept all of what a witness says, or part of it, or none of it." PATTERN CRIMINAL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT, Instruction 3.01 (2012 ed.); *see also United States v. Lawson*, 810 F.3d 1032, 1039 (7th Cir. 2016) ("Generally, juries may reject parts of a witness's testimony while accepting other parts.") (quotation omitted).

Here, the part of Duenas's testimony that mattered to the judge was his identification of the defendant as his source of supply. The judge found this

---

altercation between the defendant and police in Puerto Rico. *Id.* The government called attention to this aspect of Detective Valcarcel's testimony during its closing argument. *Id.* at 485–486.

[9] False in one thing, false in all. BLACK'S LAW DICTIONARY 679 (9th ed. 2009).

testimony believable in light of the packages that went to Milwaukee, the corroborating fingerprint evidence, and the three postal receipts found in the defendant's car.

The defendant describes Duenas's testimony and the postal receipts as "intertwining" pieces of evidence that were critical to the "ultimate verdict." Def. Br. 49. Indeed they were, but the defendant conveniently ignores a third and very important strand in this evidentiary braid: his fingerprints on the cocaine packaging material. This evidence merits some discussion, even though the defendant does not directly challenge it on appeal.

At trial, the government's fingerprint expert—Valerie Betty—testified at length about her background and experience, her methodology, and the specific comparisons she performed in this case. She identified three of the seven latent prints on the packaging material as the defendant's. The defense cross-examination of Betty focused on a perceived weakness of her methodology, *i.e.,* that when performing  the "ACE-V" method of comparison, she does not record so-called "points of comparison" in her reports. Tr. 224-227; 257-258. But Betty testified that her agency prefers this approach because it allows a subsequent

peer reviewer or "verifier" to render an opinion based on an "independent analysis." *Id.* at 253.[10]

Defense counsel also attempted to discredit the findings of the government's fingerprint expert by suggesting—without *any* evidence—that the first analyst who looked at the prints had been fired by the government for some form of misconduct. Tr. 215-218. At the end of the day, however, these efforts were unsuccessful. The district judge not only accepted Betty's findings but described the government's expert as "clear," "credible," "thorough," and "dispassionately precise," with a "tremendous amount of experience in her field." *Id.* at 268, 522-525.

In assessing the sufficiency of the evidence, it is difficult to overstate the importance of the credible—and uncontroverted—expert testimony identifying the defendant's fingerprints on the inbound package of cocaine. In effect, by leaving his fingerprints on the packaging material, the defendant provided a bodily return address—and a unique one. Tr. 192. The core of Duenas's testimony was thus corroborated in a most convincing way by physical evidence that came directly from the defendant.

---

[10] This practice may minimize the phenomenon of "confirmation bias." Tr. 523.

In sum, the trial evidence was certainly sufficient, when viewed in the light most favorable to the government, to establish that the defendant conspired to distribute cocaine.  This Court should therefore affirm the defendant's conviction.

## II.     The defendant's unwarranted attacks on the integrity of the prosecution fail to establish a "due process" violation.

In the final section of his brief, the defendant argues that his conviction should be overturned on "due process" grounds because the government knowingly relied on "perjured" testimony to convict him.  Def. Br., Section III. Here, as the defendant concedes, the Court's review is for plain error because he did not make a due process argument below.  Def. Br. 47 (citing *United States v. Coleman*, 914 F.3d 508, 511 (7th Cir. 2019)).  This means that the defendant must establish both demonstrably false testimony (that the government knew about) *and* a likelihood that the false testimony made a difference to the outcome. *United States v. Freeman*, 650 F.3d 673, 677–79 (7th Cir. 2011).

To the extent that the defendant's due process claim alleges prosecutorial misconduct, it lacks both specificity and merit.  It also fails under the applicable standard of review in light of the judge's detailed findings, which show that she

was well aware of —and not dissuaded by—the problems with Duenas's testimony and the "mysterious" nature of Exhibit 20.

Duenas's testimony was hardly unassailable. He is a thrice-convicted felon who has difficulty remembering things, and who admitted on the stand that he "sometimes lie[s] to the police." Tr. 308. But, as the district judge explained, there are sound reasons to believe Duenas about the defendant being his source of supply, including the presence of the defendant's fingerprints on the packaging material he used to send cocaine to Milwaukee. Similarly, while the dating of the "fourth receipt"—Exhibit 20—may be inexplicable based on the trial record, that does not mean that Officer Rosado *must* have been lying when he testified that he recovered the other three mail receipts from the defendant's car. Indeed, as discussed, the district judge gave several reasons for treating the first three exhibits differently from the "outlier" receipt.

"It is axiomatic in our system of justice that an individual is entitled to a fair trial—not a perfect one." *United States v. Mannie*, 509 F.3d 851, 857 (7th Cir. 2007); *see also United States v. Neeley*, 189 F.3d 670, 679 (7th Cir. 1999) (*citing Rose v. Clark*, 478 U.S. 570, 579 (1986), and *Delaware v. van Arsdall,* 475 U.S. 673, 681 (1986)). Furthermore, witnesses in criminal cases are not always "pillars of their communities." *United States v. Rose*, 12 F.3d 1414, 1425 (7th Cir. 1994); *see also*

29

*United States v. Rovetuso*, 768 F.2d 809, 818 (7th Cir. 1985) ("In this imperfect world, a litigant must often take the witness as he or she is, imperfections and all."). In drug-trafficking prosecutions, government witnesses are often—as in this case—criminals. Duenas may not be anyone's idea of the ideal witness, but he happened to be the person the defendant chose to do business with in Milwaukee. And, crucially, his testimony about the conspiracy was corroborated by the three mail receipts and the presence of the defendant's fingerprints on the inbound package of cocaine from Puerto Rico.

The defendant had a conspicuously fair trial, during which he could both cross-examine Duenas and focus the trier of fact on the problems with Exhibit 20. As this Court observed in *Cardena*, one of the cases cited by the defendant, "'[w]hen a [fact-finder] has chosen to credit crucial testimony *with full knowledge of the many faults of the witness providing it*, we have no basis to interfere.'" *United States v. Cardena*, 842 F.3d 959, 977 (7th Cir. 2016) (quoting *United States v. Alcantar*, 83 F.3d 185, 189 (7th Cir. 1996) (emphasis added)). This is another way of saying that the plain error standard is very demanding; in this context as in others. Here we know that Duenas's (partial) lack of credibility and the issue of the date on the fourth receipt did not affect the finding of guilt, because the district judge explained on the record why they did not. Tr. 519, 525-526. Thus,

30

the defendant cannot show that Duenas's supposed falsehoods (or those of Officer Rosado) likely affected the outcome.

The government, for its part, did not knowingly present "perjured" testimony, or anything close to it. This case involved the relatively common phenomenon of a drug-dealer witness with "baggage" — it is in no way comparable to *Whitlock v. Brueggemann*, cited by the defendant, in which the police and a prosecutor allegedly "conspir[ed]…to fabricate false evidence against innocent suspects." 682 F.3d 567, 576 (7th Cir. 2012). Nor did this case involve alleged *Brady* violations—the withholding of exculpatory evidence. To the contrary, the government met all of its discovery obligations (with the possible exception of some delay in providing expert disclosures) and elicited Duenas's criminal history from him on direct examination. To the extent the government's case had warts, nothing prevented the defense from shining a light on them during trial.

In assessing the defendant's due process claim, the Court should reject the defendant's unfounded accusations of prosecutorial misconduct. And it should hold, in any event, that the defendant cannot satisfy the prejudice component of the plain error test because the factfinder so obviously "chose[] to credit crucial

testimony with full knowledge of the many faults of the witness providing it."

*Cardena*, 842 F.3d at 977.

## CONCLUSION

For the reasons stated above, this Court should affirm the defendant's conviction for conspiracy to distribute cocaine.

Dated at Milwaukee, Wisconsin, this 12th day of December, 2019.

Respectfully submitted,

MATTHEW D. KRUEGER
United States Attorney

By:　s/Jonathan H. Koenig

JONATHAN H. KOENIG
Assistant United States Attorney

530 United States Courthouse
517 E. Wisconsin Ave
Milwaukee, WI 53202
(414) 297-1700

CERTIFICATE OF COMPLIANCE AND SERVICE

I hereby certify that this brief complies with the type volume limitations in Circuit Rule 32(a)(7)(B)(i) because it contains 6,649 words according to the word-processing system used to prepare the brief.

I hereby certify that on December 12, 2019, I electronically filed the foregoing with the Clerk for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF System. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

s/Jonathan H. Koenig
JONATHAN H. KOENIG
Assistant United States Attorney

530 United States Courthouse
517 E. Wisconsin Ave, Room 530
Milwaukee, WI 53202
(414) 297-1700